**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| DENNIS BALL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 4:18-cv-01364 |
| | ) | |
| CITY OF ST. LOUIS ET AL, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

NOW COMES, Plaintiff DENNIS BALL-BEY, by and through his attorneys, the

LEGAL SOLUTION GROUP, L.L.C. complaining of the Defendants, the **KYLE CHANDLER,**

**RONALD VAUGHN, CHIEF SAM DOTSON, CITY St. LOUIS (collectively**

**"Defendants")** and each of them in the alternative, Plaintiff states as follows:

**INTRODUCTION**

1.    This is an action for money damages brought pursuant to 42 U.S.C. §§ 1983 and

1988, and the Fourth Amendment to the United States Constitution, as made applicable to the

States through the Fourteenth Amendment, and the Eighth Amendment, against Officers Kyle

Chandler and Ronald Vaughn, police officers of the City of St. Louis, in their individual and

official capacities, against the City of St. Louis, Missouri, and against Former Police Chief Sam

Dotson, in his official capacity.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.

1

2.     This action also asserts state law wrongful death claim against Kyle Chandler, Ronald Vaughn and the City of St. Louis, Missouri. The Court can and should exercise supplemental jurisdiction over these claims, pursuant to 28 U.S.C. § 1367, as they are so related to the other claims in the action already under the Court's original jurisdiction and form part of the same case or controversy under Article 3 of the United States Constitution.

3.     It is alleged that the individual police officers, Kyle Chandler, and Ronald Vaughn, engaged in an action which resulted in the unreasonable seizure of Plaintiff's Decedent, Mansur Ball-Bey, thereby violating his rights under the Fourth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, which grants Plaintiff's Decedent freedom from unreasonable seizure.

4.     It is further alleged that this violation was committed as a result of the policies and customs, including the Rec & Normal policies and practices of the St. Louis Police Department, under the supervision of Police Chief Sam Dotson and Julian Bush, City Counselor.

5.     Regarding the remaining claims, it is alleged that Kyle Chandler and Ronald Vaughn intentionally caused the wrongful death of Plaintiff's son, Mansur Ball-Bey, by responding with inappropriate force.  Plaintiff maintains this action for wrongful death pursuant to R.S.Mo. §537.080(1).

6. The City of St. Louis is a municipal corporation charged with and responsible for

appointing and promoting the members of the Police Department and for the supervision, training, instruction, discipline, control and conduct of the Police Department and its personnel. At all times relevant, Defendant City of St. Louis had the power, right and duty to control the way individual police officers carried out the objectives of their employment and to see that all orders, rules, instructions, and regulations promulgated for the Police Department were consistent with applicable laws.

7. Defendant Sam Dotson was at all times relevant to the incidents which are the subject of this lawsuit, the Chief of Police of the City of St. Louis.  As such, he is the responsible party for supervising the training, instruction, discipline, control and conduct of all police officers.  He is also charged with promulgating all orders, rules, instructions and regulations of the police Department including but not limited to those orders, rules, instructions and regulations concerning the use of force and of deadly weapons.  He also has the authority to approve all weapons to be used by members of the Police Department.  He is sued in his official capacity.

8. Defendant Police Officer Kyle Chandler (hereinafter "Defendant Chandler") was at all times relevant to this Petition a male police officer employed by the St. Louis Metropolitan Police Department.  He is being sued in both his individual capacity and his official capacity as a law enforcement officer.

9. Defendant Police Officer Ronald Vaughn (hereinafter "Defendant Vaughn")

was at all times relevant to this Petition a male police officer employed by the St. Louis Metropolitan Police Department.  He is being sued in both his individual capacity and his official capacity as a law enforcement officer.

## PARTIES

10.    That at all times pertinent to this lawsuit, Plaintiff Dennis Ball-Bey was the father of decedent, Mansur Ball-Bey.

11.    Defendant City of St. Louis, Missouri (hereinafter "City of St. Louis") is a first class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

12.    Defendant Chandler was at all times relevant to this complaint duly appointed and acting as an officer of the St. Louis Police Department, State of Missouri, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the City of St. Louis, State of Missouri.

13.    Defendant Vaughn was at all times relevant to this complaint duly appointed and acting as an officer of the St. Louis Police Department, State of Missouri, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the City of St. Louis, State of Missouri.

14.    Defendants Chandler and Vaughn are residents of the City of St. Louis, State of Missouri, in the United States District Court for the Eastern District of Missouri.

15.    Defendant Sam Dotson was at all times relevant to this complaint duly

appointed and acting as an officer of the St. Louis Police Department, State of Missouri, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the City of St. Louis, State of Missouri.

16.    Defendant Sam Dotson is a resident of the City of St. Louis, State of Missouri, in the United States District Court for the Eastern District of Missouri.

**Waiver of Sovereign of Immunity**

17.    At all relevant times, Defendant City of St. Louis had purchased and had in effect a policy of insurance to insure itself against claims or causes of action for damages caused by city employees engaged in government functions, including those as described herein. The purchase of that insurance constitutes a waiver of sovereign immunity by the Defendant City of St. Louis.

**FACTS**

18.    On or about August 19, 2015, Defendants Chandler and Vaughn and other police officers went to a residence located at 1241 Walton Avenue, St. Louis, MO 63108 to execute a search warrant.  Defendants Chandler, Vaughn, and an ATF Agent were assigned to cover the backyard of 1241 Walton Avenue.

19.    While there, Plaintiff's decedent, Mansur Ball-Bey, and a 14-year-old were walking in alley way behind 1241 Walton when they first made visual contact with Defendant's Vaughn and Chandler.  The Defendants, with their guns drawn, chased them.  The 14-year-old juvenile stopped running and hid behind an abandoned car parked in an empty lot next to 1241 Walton.  While Mansur continued to run southbound in the alley way.

20.    Mansur, who was unarmed, turned into the backyard of 1233 Walton Avenue, and began to run eastbound toward the front of the property.

21.    The Defendants continued to chase Mansur through the back yard of 1233 Walton, and fired multiple shots striking him once in the back.

22.    The gunshot wound severed Mansur's spinal cord which caused him to fall face first in the front yard at 1233 Walton Avenue and died.  Mansur was employed with UPS and was a youth leader at his church.  He did not have a criminal record.

23.    That at all times mentioned, Defendants Chandler and Vaughn were acting under the color of the statutes, ordinances, regulations, customs, and usages of Defendant City of St. Louis and the State of Missouri and under the authority of their respective office as police officers.

24.    Specifically, Defendants Chandler and Vaughn were driven, motivated, and protected as a direct result of Defendant Dotson's 'Rec & Normal' policies and practices.

   a.   "THE RELEASE or "REC"

25.    The Defendant City of St. Louis incorporated, and enforced a blanket release practice and policy (referred to as the "The Release, or "'Rec policy" "the Rec"), spanning over two decades under the direction, supervision and authority of City of St. Louis Counselor's office.

26.    The City Counselor's policy states:

> **3. "Resisting arrest & Interfering with a Police Officer charges <u>cannot</u> be amended without first obtaining a signed release from defendant (See Sample)."** (no emphasis added)

27.    The policy provides a sample of "The Release" which Plaintiffs by reference incorporate as Exhibit A.

6

28.    The Rec Policy requires the releasor to enter into a contract between, the City

of

St. Louis, the Mayor's office (whose name appear), Bush and Garvin the Police department, and

any employee of SLMPD, under the threat of criminal prosecution.

29.    "The Release" was written to censor, restrain, and deter civil rights'

lawsuits against the Defendant City of St. Louis. The Release further acted as a method to

conceal and obscure civil rights violations by the Defendant City of St. Louis Metropolitan

Police Department.

30.    Plaintiff has not found a single case that Defendants "legally enforced" a

Release agreement against a plaintiff in federal court because The Release was not created for its

legal effect. Instead, the Release was created for its psychological effects that resulted, and

continue to result, in censorship and prior restraints on accused victims to petition the courts for

redress of civil rights violations.

31.    Defendant City consulted experienced attorneys with strong marketing and

constitutional law backgrounds. Consultant-1, was an experienced civil defense attorney who

was also a constitutional law professor.  Consultant-1, had a strong background in marketing,

advertising and mass communication holding advanced degrees in both. Consultant-1 ultimately

became the top enforcer for the Rec practice and policy, and regularly consulted Defendant

Dotson and the St. Louis Metropolitan Police Department on planning and policy.

32.    Since 1987, prosecutors and legal practitioners have been aware of the

psychological effects of release agreements. Defendants knew and should have known of these widely known effects. In an interview with John Palermo, Former Assistant City Attorney, Personnel Litigation; Former Acting Supervisor, City Court Division, of Denver City Attorney's Office, he said the, *"effect of releases was largely psychological, although releases were probably unenforceable."*

33.   That same year, James Fais, Former Chief Prosecutor, City Attorney's Office in Columbus, Ohio, explained, *"the release convinces defendants that there is no legal redress, and they do not go to lawyers."*

34.   Renowned Constitutional Law professor from Suffolk University School of
       Law

Michael Avery explained, *"if the person believes in it [The Release], they don't sue; it's like Santa Claus."*

35.   The Defendants' blanket Release policy acts as an end around, for municipal immunity against §1983 claims. Defendants have relied on Release agreements to act as legal immunity from civil rights claim *without* judicial oversight. As, one prosecutor of Defendant City of St. Louis explained, *"…my whole point, why would I plead down a charge, and potentially be looking at civil liability, I'm not doing myself any favors by doing that."*

36.   The City prosecutors were trained under this blanket Release policy, which

inherently conflicts with the prosecutor's ethical duty. The prosecutor in a criminal case shall: (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause. Missouri Special Responsibilities for Prosecutors, Rule 4-3.8. To force prosecutors to obtain Release agreements by presenting the appearance they have probable cause, thus forcing cases to trial, is an ethical and legal dilemma, requiring obvious training for prosecutors themselves.

37.    Instead, The City prosecutors are motivated and base decisions to amend or dismiss solely on a blanket Release policy. Even a current prosecutor in Defendants' municipal division stated, "*if its a clear cut "bogus" arrest, then the defendant shouldn't be asking for a plea, tell em' put it on the docket set it for trial.*"

38.    Defendants' prosecutors believe, an arrest that is clearly improper and violative of an accused victims' civil rights will not be dismissed or amended, instead, the accused victim's only relief is to take the matter to trial.

39.    When asked was there any way around "a clear-cut bogus arrest," a chief prosecutor with the Defendants' municipal division replied, "*no, my whole point, why would I plead down a charge, and potentially be looking at civil liability, I'm not doing myself any favors by doing that.*" The Release's purpose has nothing to do with reducing the burden on the judicial, instead the blanket release policy is enforced to protect the City of St. Louis from paying accused victims' compensation for police misconduct.

40.    The Rec Policy does not distinguish between frivolous and meritorious claims,

nor is the Release supported by objective and relevant public interests. In fact, Defendants'
municipal prosecutor stated, *"my attitude is, if his [an accused victim's] case is so strong, you'll
[accused victim] try it here [in municipal court] and win and try it in the civil case and win."*
The stronger an accused victim's case for police misconduct relating to the facts of resisting
arrest or interference with a police officer, the more aggressive the Defendants are with pushing
the case to criminal trial.

41.     Defendant City of St. Louis supervised, controlled, and trained the prosecutors
on its blanket release policy, during the relevant period, which has resulted in numerous, widely
known and accepted practices of prosecutorial overreaching to obtain signatures on blank
Release forms or force falsely accused victims to trial.

42.     Currently, the City Counselor, Julian Bush (hereinafter also referred to as
"Bush" or "Julian Bush") in his official capacity, supervises, controls, and trains the Municipal
Court Division, who continues to engage in prosecutorial overreaching to obtain signatures on
blank release forms.

43.     Bush trained, supervised, and controlled its prosecutors seek a Release
agreement of all civil rights claims regardless of any exonerating facts a defendant presents. In
fact, the policy itself is contained in the Defendants' "Intern Guide" used as a training guide for
new and prospective attorneys for Bush's office.

44.     Defendant City through, Julian Bush, trained, supervised, and controlled its

prosecutors to obtain a signed Release agreement after discovering possible civil rights violations, as a result of Defendants' blanket release policy.

45.   Defendant City through, Julian Bush, trained, supervised, and controlled its p prosecutors to obtain a signed Release agreement without an analysis of any civil rights violation, as a result of Defendants' blanket release policy.

46.   Defendant City through, Julian Bush, trained, supervised, and controlled its prosecutors to obtain a signed Release agreement without an impartial and fair analysis of any civil rights violation, as a result of Defendants' blanket release policy.

47.   Defendant City through, Julian Bush, trained, supervised, and controlled its prosecutors to obtain Release agreements although arresting officers were not present to testify in court, as required by city ordinances.

48.   Defendant City through, Julian Bush, trained, supervised, and controlled its prosecutors to omit material facts related to Plaintiffs' resisting arrest or interference with police officer charges, as a result of, its blanket release policy to obtain signatures on blank Release agreements.

49.   Defendant City through, Julian Bush, trained, supervised and controlled its prosecutors to seek signed Releases using any means available and without regard to ethical, legal, factual, or moral independent obligations. This Rec policy and practice became the foundational policy which, together with Dotson's special order "Normal policy," concealed unjustified use of force and illegal arrests committed at the hands of the SLMPD.

**b. The "Rec" policies and practices motivated SLMPD's Special Order 8-01 §7 ("Normal Policy") which directed officers to "normally" charge municipal resisting arrest violations over state resisting arrest.**

50.    The SLMPD training procedures and policies direct officers to charge resisting arrest as a municipal violation instead of a state misdemeanor resisting arrest. SO 8-01 §7 (C) is a special order directly from the Chief of Police and was implemented as a direct response, and in concert with, the Rec Practices and Policy from the City Counselor's Office.

51.    On September 15, 2012, the SLMPD amended its previous order and issued Special Order 8-01 §7 (also referred to as the "Normal Policy" "Normal practices" "Normal") which states:

> C. CHARGING OF DEFENDANT
> 1. Under normal circumstances, the defendant will be charged with a city ordinance violation of resisting arrest or interfering with an officer. The information application will be made at the City Counselor's Office.

52.    On September 15, 2012, the SLMPD issued Special Order 8-01§ 5 which states:

> NOTE: The Public Defenders will not be required to provide legal services to persons charged with a violation of county or municipal ordinances. (no emphasis added).

53.    As alleged herein, SLMPD officers' "normal practice" to charge resisting arrest in violation of Muni Code.15.10.10, is designed to matriculate claims of excessive force to the municipal court, where municipal prosecutors are waiting to obtain a 'Rec for Release' of all civil claims as a blanket policy and practice.

54.   The Normal policies required that the SLMPD officer charge state misdemeanor

resisting arrest in extenuating circumstances, such as, the suspect used or threatened the use of physical force. However, officers used deadly force, which presupposes the officer was in fear for his or her life *i.e.* extenuating circumstances, but officers charged the alleged suspect with municipal resisting arrest because deadly force was not justified, and the Rec policies obfuscate and conceal the officer's conduct.

55.   After a SLMPD officer is involved in an incident involving resisting arrest, the watch commander and higher ranking SLMPD officers make the ultimate decision on what charge(s) to pursue. The watch commanders and high-ranking SLMPD officials have provided and continue to provide consult on SO 8-01 §7.

56.   As a direct result of the Normal policies, the use of excessive force by SLMPD officers in resisting arrest cases charged in municipal court was and continues to be undetected, concealed, and obfuscated. This method of concealment was the motivating and driving force behind the SLMPD's tyrannical practices throughout the SLMPD.

57.   As a direct result of the Rec & Normal practices and policies over the last two decades, the practices and policies of using excessive force and obfuscating or concealing the officer's conduct grew out of control.

58.   Today, those policies and practices created a brutal culture where SLMPD use

unjustified force any time an alleged offender walked away, ran, protested his or her innocence, or even recorded officers violating civil rights whether or not the offender was charged with violating Muni. Code. 15.10.10.

59.    As direct result of the Rec & Normal practices and policies, officers over the
past

decade developed a distinct and clear pattern of using unjustified force or illegally seizing and searching a citizen and claiming in written reports the accused victim, "resisted arrest."

### i.  The Rec & Normal policy and practices are the root cause and method of concealing SLMPD's Tyrannical Practices.

60.    Without the Rec policy, SLMPD tyrannical practices could not, and would not have been concealed. The Rec policy and practice motivated the SLMPD to train officers to charge, as a "normal practice," resisting arrest over the state misdemeanor regardless of the use of force. Defendants Rec & Normal policies concealed minor constitutional violations, and over the course of decades the minor constitutional violations adapted into a method of intimidation and control, ("tyrannical practices").

61.    Plaintiff defines SLMPD tyrannical practices as (1) excessive force when the

14

accused victim runs, pulls away, or protests and (2) unlawful arrests to search and destroy evidence. These tyrannical practices are designed to inflict fear and control over citizens. Illustrative examples of SLMPD tyrannical practices in just the last five years include, but are not limited to the following[1]:

    a. July 23, 2017, SLMPD Officer Marcus Biggins discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10. The officer reported no injuries.

    b. January 24, 2018, SLMPD Officer Colin Dowd discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10. The officer reported no injuries.

    c. July 22, 2017, SLMPD Officer Brendan Whitted discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10. The officer reported no injuries.

    d. May 7, 2018, SLMPD Officer Dereck Phillip discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10. The officer reported no injuries.

    e. August 14, 2017, SLMPD Officer Adam Feaman used deadly force and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10. The officer reported no injuries; however, the suspect suffered a blow to the head and face ultimately requiring jaw reconstruction.

62.    In, *Vonderitt Meyers v. GCI Security Inc., et al.,* plaintiff, Mr. Myers ran and resisted the arrest of an off-duty SLMPD officer, which resulted in the officer fatally shooting the Plaintiff in the legs and head. The plaintiff would have been charged with the city ordinance resisting arrest. The off-duty police officer is no longer with the police force.

63.    On June 11, 2014, three friends Anthony Tobias, Brian Davis, and Keyon Bennett

---

[1] Using a random sample of cases.

were stopped by SLMPD Officer James Zwillings, (partner of SLMPD Officer Jason Flannery, who killed Vonderitt Myers). Mr. Bennett ran across a vacant lot and Officer Zwilling pursued them on foot. All three boys heard Officer Zwilling fire his weapon – while their backs were turned and running away. None of the bullets fired by Officer Zwillings struck the boys.  The boys did not threaten the officer.

64.     Jorveius Scruggs, a 15-year old high school student, was shot in the back and killed by SLMPD Officer Murphy as Mr. Scruggs fled on foot. Mr. Scruggs allegedly resisted arrest and was shot while attempting to escape through a fence. Mr. Scruggs did not threaten the officer.

65.     In, *Antoinette Liggins, on behalf of a minor B.C. v. City of St. Louis et al.,* Eastern
District of Missouri, 16-cv-00413, plaintiff was a 16-year old boy and was playing at the playground with his brother. SLMPD Officer Michael Cohen pulled up in his squad car and the boys started running. SLMPD Officer Michael Cohen discharged his weapon and fired four shots at the boys striking the minor B.C. and permanently paralyzing him. The minor did not threaten the officer.

66.     T.E., was 15-years-old as he walked down the street to exchange video games with his friend. SLMPD officers approached T.E. and T.E. fled, as did all the children. SLMPD Officers Murphy and Streckfuss followed Mr. Edwards and shot him in the back although Mr. Edwards was unarmed did not threaten the officers. T.E. was charged in juvenile court, however, the case was dismissed because the officer intended to plead the Fifth amendment.

67.    SLMPD's tyrannical patterns and practices were so entrenched throughout the department, that SLMPD officers accidently beat their own undercover officer to within an inch of his life, and alleged, as in the cases discussed above, the undercover officer resisted.

68.    In a federal criminal indictment, federal prosecutors explain undercover officer was assigned to walk through a group of protestors to monitor and report unlawful activity. The SLMPD officers brutally beat the undercover officer L.H. and alleged that Officer L.H. resisted arrest and was not compliant. The indictment further read:

> It was part of the manner and means of the conspiracy that the defendants… made false statements regarding their conduct and the conduct of L.H. during the course of the arrest in an effort to justify their use of force on L.H., including falsely claiming that L.H. resisted arrest and was not compliant, despite the fact that LH. was an experienced undercover officer who specifically wore a shirt that revealed his waistband so that he would not be mistaken for being armed during the Stockley protests. (emphasis in underlined only).

69.    The common denominator in all these cases is that the accused victim allegedly pulled away, ran, or walked away, *e.g*. resisted arrest as defined by the SLMPD. The SLMPD officer used excessive force, including deadly force, and charged, or alleged the accused victim(s) resisted arrest.

## ii.    The "Rec & Normal Policy and Practices" Established and Cultivated SLMPD's Unlawful Search and Seizure Practices and Customs.

70.    SLMPD officers unlawfully arrest citizens to obtain camera and video footage and charge the accused victims with violation of Muni. Code. 15.10.10 because prosecutors will aggressively seek to obtain Release agreements.

71.    For example, *Kristine Hendrix v. City of St. Louis, et al.,* the plaintiff Ms.

Hendrix was a peaceful protester videotaping several officers using their taser on innocent protesters. Suddenly, SLMPD Officer Stephen Ogunjobi saw Ms. Hendrix video recording and tased her. Officer Ogunjobi tased Ms. Hendrix three times without giving a single command. Ms. Hendrix was charged with violation of Muni. Code 15.10.10 resisting arrest. Ms. Hendrix had the financial means to retain counsel. On the advice of counsel, Ms. Hendrix refused to sign any release agreement. Ms. Hendrix was acquitted. She later filed suit for malicious prosecution.

72.     In another example, *David Witt v. City of St. Louis,* Eastern District of Missouri, 18-cv-01294, plaintiff, Mr. Witt, was a prominent activist for civil rights and was unlawfully arrested and charged with interfering with a police officer. The officers arrested Mr. Witt to gain access to his camera under the auspice that it was criminal evidence. Despite the obvious unlawful nature of the arrest, the municipal prosecutors attempted to force Mr. Witt to plead down his case by signing a "Release" ('Rec'). Mr. Witt was represented by the MacArthur Justice Center, whom described the process as:

> The City engaged in multiple attempts to negotiate dismissal of the case with prejudice via a plea deal, or "rec"—including presenting a release of liability form at counsel's first municipal appearance and as a purported condition to any kind of plea deal. A true and correct copy of the release form is attached hereto as **Exhibit C**. The City abandoned the prosecution by *nolle prosequi* on May 22, 2017.

73.     Lakenia Mahdi, video recorded three SLMPD officers violating the civil rights of minors. Mrs. Mahdi began recording the incident while holding her one-month old new born. Officers approached Mrs. Mahdi and threatened to break her finger if Mrs. Mahdi did not release her one-month old and comply with an arrest for "interfering with a police officer." Mrs. Mahdi complied, and the officers gained access to Mrs. Mahdi's phone and deleted the video. Mrs. Mahdi was then forced to sign a Rec despite her protest to the prosecutor that she was innocent.

74.     As a result of Defendants' blanket Rec Policy and practices the SLMPD developed its own practice, culture, and customs of using excessive force and unlawful seizures on citizens who ran, pulled away, protested or recorded officers.

75.     If the suspect did not die, and absent unrelated charges, the suspect would be charged with violation of Muni. Code 15.10.10., appear in the St. Louis Municipal court and pressured to sign the "Rec."

76.     Plaintiff, Mansur Ball-Bey, like many before and after him, was unarmed, ran and was shot by Defendants Chandler and Vaughn as a result of SLMPD's tyrannical pattern and practices, and, these tyrannical patterns and practices were created, motivated, protected, and encouraged directly and indirectly by Defendants' Rec & Normal policies and practices.

## COUNT I – DEFENDANTS CHANDLER AND VAUGHN

### Excessive Use of Force in Violation of the Fourth and Fourteenth Amendments of the United States Constitution
### (42 U.S.C. §1983)

77.     Plaintiff incorporates by reference each and every allegation alleged in paragraphs 1 through 76 as though fully set forth herein.

78.     Defendants Chandler and Vaughn's above conduct constitutes actions that shocks the conscience under the Fourth Amendment of the United States Constitution.

79.     Defendants Chandler and Vaughn were chasing Mansur who had not committed

any crime.

80.     Defendants Chandler and Vaughn lacked any probable cause to kill Mansur,
        who

was unarmed.  In addition, Defendants Chandler and Vaughn were not in any danger when they

shot Mansur to death.


81.     Defendants Chandler and Vaughn used deadly force on Mansur and violated his

Fourth and Fourteenth Amendment rights in one or more of the following respects:

f.   The use of deadly force on Mansur was excessive and not objectively
     reasonable as he had not committed any crime;

g.   There was no reason to use the amount of force used by Defendants
     Chandler and Vaughn because Mansur did not pose an immediate threat to
     the safety of the Defendants Chandler and Vaughn or the others that were in
     the area; and

h.   There was no reason to use the amount of force used by Chandler and
     Vaughn because Mansur had not committed any crime and running along an
     alley way is not justification for gunning him down.

82.     The conduct of Defendants Chandler and Vaughn as described above deprived

Mansur of his right to be secure in his person against unreasonable searches and seizures as

guaranteed to him under the Fourth Amendment to the United States Constitution, of his right

not to be subjected to any cruel and unusual punishment as secured to him under the Eighth

Amendment to the United States Constitution, and his right not to be deprived of life, liberty, or

property without due process of law and to be accorded the equal protection of the law as

guaranteed to him under the Fourteenth Amendment to the United States Constitution.

83.     As a direct and proximate result of the unlawful conduct of Defendants

Chandler and Vaughn, Mansur was caused to suffer severe pain, mental anguish, and an

agonizing death. Additionally, the actions of Defendants Chandler and Vaughn caused or

contributed to cause Plaintiff to incur funeral and burial expenses. As a result of Mansur's death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

84.    The conduct of Defendants Chandler and Vaughn was reckless, malicious, wanton, and willful and violated Mansur's constitutional rights and the award of punitive damages is necessary to punish Defendants Chandler and Vaughn in their individual capacity and to deter them and others from the same or similar transgressions in the future.

### Compensatory Damages

Under 42 U.S.C. § 1983, Plaintiff is entitled to an award of compensatory damages against Defendant Vaughn and Defendant Chandler.

### Punitive Damages

85.    Defendant Vaughn and Defendant Chandler's actions against Mansur were reckless.

86.    Defendant Vaughn and Defendant Chandlers actions against Decedent Mansur showed callous indifference toward the rights of Mansur.

87.    Defendant Vaughn and Defendant Chandler's actions against Mansur were taken in the face of a perceived risk that the actions would violate federal law.

88.    Plaintiff is entitled to an award of punitive damages against Defendant Vaughn and Defendant Chandler in order to punish them and to deter others.

**Attorney's Fees**

89.     Under 42 U.S.C. § 1988, if Plaintiff is the prevailing party in this litigation, then he will be entitled to receive an award of reasonable attorney's fees, non-taxable expenses and costs.

WHEREFORE, Plaintiff prays for judgment under 42 U.S.C. § 1983 and 1988 against Defendant Chandler and Defendant Vaughn in their individual capacity for compensatory damages in a fair and reasonable amount, for punitive damages, for reasonable attorney's fees, for and non-taxable expenses, for costs, and Plaintiff prays for such other relief as may be just under the circumstances and consistent.

## COUNT II – DEFENDANTS CHANDLER AND VAUGHN

**Wrongful Death/Assault & Battery v. Defendant
(R.S.Mo. §537.080(1) and 516.120))**

90.     Plaintiff incorporates each and every allegation in paragraphs 1 through 89 by reference as though fully set forth herein.

91.     36. Plaintiff maintains this action for wrongful death pursuant to R.S.Mo. §537.080(1).

92.     Defendants Chandler and Vaughn intentionally discharged their firearms without justification causing an unreasonable apprehension of harm and death to Mansur.

93.     Defendants Chandler and Vaughn fired their weapons at Mansur without justification, intentionally and wrongfully causing the death of Mansur.

94.     Defendants Chandler and Vaughn shooting death of Mansur was done in bad faith and with malice in that they intended to cause injury and done with a wicked purpose.

95.     Defendants Chandler and Vaughn shooting death of Mansur heretofore

described needlessly manifested a reckless indifference to Mansur's constitution rights under the 4th and 14th amendments to the U.S. Constitution.

96.     As a direct and proximate result of the unlawful conduct of Defendants Chandler and Vaughn described above, Mansur was caused to suffer severe pain, mental anguish, and an agonizing death. Additionally, the actions of Defendants Chandler and Vaughn caused or contributed to cause funeral and burial expenses. As a result of Mansur's death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

97.     Plaintiff is entitled to recover for all damages, including pain and suffering experienced by Mansur, for which Mansur would be entitled to claim had death not ensued.

**WHEREFORE**, Plaintiff prays for judgment under Count II against Defendants Chandler and Vaughn for a sum of actual damages that a jury determines to be fair and reasonable and for punitive damages that will deter and prevent the Defendants from engaging in this type of conduct in the future. Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

### COUNT III – DEFENDANT CITY OF ST. LOUIS, and DOTSON
### Failure to Train, Supervise and Control
### (42 U.S.C § 1983)

98.     Plaintiff by reference incorporates each and every allegation as though fully set forth herein.

99.     At all times mentioned herein City of St. Louis was responsible for the hiring, training, supervising, and controlling all police officers of the City of St. Louis, and their use of firearms including, Defendant's Chandler and Vaughn.

23

100.   At the time of the occurrence, Defendants Chandler and Vaughn were acting within the course and scope of their agency and/or employment with Defendant City of St. Louis.

101.   Defendants' Rec & Normal policies and practices were the motivating and driving policy and practice that resulted in SLMPD's tyrannical practices customs and patterns. Defendants specifically acted under the color of statute, custom, usage, law, ordinance and policies, including, the "Rec Policy," which created, promoted, and trained SLMPD to use tyrannical customs, tactics, patterns and practices including:

   a.   A common custom, pattern, and practice of using deadly force to effectuate resisting arrest violations, with no threat to the officer's safety;
   b.   A common custom, pattern, and practice of using unjustified force to effectuate municipal ordinance violations of resisting arrest;
   c.   A common custom, pattern, and practice to conceal, obfuscate, and hide civil rights violations through charging municipal resisting arrest or interference with a police officer;
   d.   A common custom, pattern, and practice of using excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments.
   e.   A common custom, pattern, and practice of unlawful search and seizures and charging violation of Muni. Code. 15.10.10;
   f.   A common custom, pattern, and practice to tolerate, overlook, and obfuscate police misconduct in incidents where the alleged offender runs, pulls away, or flees.
   g.   A common custom, pattern, and practice to use deadly force when the offender does not present a threat, but the offender runs, pulls, away, or protest his innocence.
   h.   A common custom, pattern and practice to use excessive force as a means to punish, control, and deter accused victims.

102.   As a direct, substantial and proximate result of the SLMPD tyrannical patterns and practices born from the Defendants' Rec & Normal policies and practices, as alleged herein, Plaintiff was severely injured and deprived of his constitutional rights guaranteed under the Fourth, Fifth, Eighth, and Fourteenth Amendments.

103.   Defendant City of St. Louis was negligent in its supervision, training and

control, which led to tyrannical practices, customs, and patterns of the SLMPD. Defendant

was negligent in its supervision of Defendants Chandler and Vaughn in the following respects:

a.   Defendant City of St. Louis failed to train Defendants Chandler and Vaughn in the proper use of firearms.

b.   Defendant City of St. Louis failed to supervise and train defendants Chandler and Vaughn in their use of department issued firearms and weapons on unarmed citizens who have not committed any crime.

c.   Defendant City of St. Louis failed to supervise and train Defendants Chandler and Vaughn to stop using force to limit the amount of harm caused when there is no threat to them or others; and

d.   Defendant City of St. Louis failed to supervise and train Defendants Chandler and Vaughn not to use deadly force on a citizen when the lives of Chandler and Vaughn and others are not in danger.

104.   After creating the Rec & Normal policies and practices, the failure to properly

supervise was the direct and proximate cause of Defendants Vaughn and Chandler's conduct.

105.   The conduct of Defendant City of St. Louis as described above deprived

Mansur of his right to be secure in his person against unreasonable searches and seizures as

guaranteed to him under the Fourth Amendment to the United States Constitution, of his right

not to be subjected to any cruel and unusual punishment as secured to him under the Eighth

Amendment to the United States Constitution, and his right not to be deprived of life, liberty, or

property without due process of law and to be accorded the equal protection of the law as

guaranteed to him under the Fourteenth Amendment to the United States Constitution.

106.   Defendant City of St. Louis was deliberately indifferent to the obvious need and

foreseeable consequence of failing to train, supervise, and control Defendants Chandler and

Vaughn and as a result Mansur was deprived of life and liberty under the constitution.

107.   As a direct and proximate result of the negligent conduct of Defendant City of

St. Louis described above, Mansur was caused to suffer severe pain, mental anguish, and an

agonizing death.   Additionally, the actions of Defendants Chandler and Vaughn caused or

contributed to cause Plaintiff to incur funeral and burial expenses. As a result of Mansur death,

Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

108.   The conduct of the City of St. Louis was reckless, malicious, wanton, and willful with Mansur's constitutional rights and the award of punitive damages is necessary to punish Defendant City of St. Louis in its individual capacity and to deter it and others from the same or similar transgressions in the future.

WHEREFORE, the Plaintiff prays for judgment under Count III against Defendant City of St. Louis for a sum of actual damages that a jury determines to be fair and reasonable and for punitive damages that will deter and prevent the Defendant from engaging in this type of conduct in the future. The Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

### <u>COUNT IV – DEFENDANT DOTSON</u>

**Failure to Train, Supervise and Control**
**(42 U.S.C § 1983)**

109.   Plaintiff incorporates each and every allegation as set forth in paragraphs 1 through 108 as though fully set forth herein.

110.   At all times mentioned herein Defendant Dotson was in charge of training, supervising, and controlling all police officers and personnel of the City of St. Louis, including Defendants Chandler and Vaughn.

111.   At the time of the occurrence, Defendants Chandler and Vaughn and Defendant Chief Dotson were acting within the course and scope of their agency and/or employment with Defendant City of St. Louis.

112.   Defendant Police Chief Dotson was negligent in his supervision of Defendants Chandler and Vaughn in the following respects:

a.     Defendant Dotson failed to train Defendants Chandler and Vaughn in the proper use of firearms;

b.     Defendant Dotson failed to supervise and train Defendants Chandler and Vaughn's use of department issued firearms and weapons on a citizen who has not committed any crime;

c.     Defendant Dotson failed to supervise and train Defendants Chandler and Vaughn to stop using force to limit the amount of harm caused; and

d.     Defendant Dotson failed to supervise and train not to use deadly force on a citizen when the lives of Chandler and Vaughn and others are not in danger.

113.   Defendant Dotson was deliberately indifferent to the obvious need and foreseeable consequence of failing to train, supervise, and control Defendants Chandler and Vaughn, when Defendant Dotson had fully knowledge of the Rec & Normal policies and practices that cultivated SLMPD's tyrannical conduct, and as a result Mansur was deprived of life and liberty under the constitution.

114.   Specifically, Defendant Dotson was deliberately indifferent to the obvious Pattern and practices:

a.   A common custom, pattern, and practice of using deadly force to effectuate resisting arrest violations, with no threat to the officer's safety;
b.   A common custom, pattern, and practice of using unjustified force to effectuate municipal ordinance violations of resisting arrest;
c.   A common custom, pattern, and practice to conceal, obfuscate, and hide civil rights violations through charging municipal resisting arrest or interference with a police officer;
d.   A common custom, pattern, and practice of using excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments.
e.   A common custom, pattern, and practice of unlawful search and seizures and charging violation of Muni. Code. 15.10.10;
f.   A common custom, pattern, and practice to tolerate, overlook, and obfuscate police misconduct in incidents where the alleged offender runs, pulls away, or flees.
g.   A common custom, pattern, and practice to use deadly force when the offender does not present a threat, but the offender runs, pulls, away, or protest his innocence.

27

h.  A common custom, pattern and practice to use excessive force as a means to punish, control, and deter accused victims.

115.   Defendant Dotson was deliberately indifferent to the instances and patterns described throughout paragraph 60-73. Defendant Dotson failed to properly make reports, discipline or act against officers as described in paragraph 60-73.

116.   As a direct and proximate result of the negligent conduct of Defendant Dotson described above, Mansur was caused to suffer severe pain, mental anguish, and an agonizing death.  Additionally, the actions of Defendants Chandler and Vaughn caused or contributed to cause Plaintiff to incur funeral and burial expenses.  As a result of Mansur's death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

117.   The conduct of Defendant Dotson was reckless, malicious, wanton, and willful with Mansur constitutional rights and the award of punitive damages is necessary to punish Defendant Dotson in his individual capacity and to deter him and others from the same or similar transgressions in the future.

**WHEREFORE**, the Plaintiff prays for judgment under Count IV against Defendant Dotson for a sum of actual damages that a jury determines to be fair and reasonable and for punitive damages that will deter and prevent the Defendant from engaging in this type of conduct in the future. The Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

## COUNT V – DEFENDANTS CITY OF ST. LOUIS AND DOTSON

### Municipal Liability
### (42 U.S.C § 1983)

118.   Plaintiff incorporates by reference each and every allegation in paragraphs 1

through 117 as though fully set forth herein.

119.   Instead of reports being made against other police officers within the City of St. Louis for excessive use of force, no action has been taken against these officers.  Therefore, there exist within the City of St. Louis and its respective police department, tyrannical policies or customs, practices and usages that are so pervasive that they constitute the policies of these Defendants, which caused the constitutional deprivations of Mansur as have been fully set forth above.  The tyrannical policies, customs, practices, and usages that exist including, but not limited, to the following:

      a.      To use excessive force when it is not reasonably necessary;
      b.      To use excessive force against persons who have not committed any crime;
      c.      To use excessive force against persons who pose no danger or harm to police officers or the public; and
      d.      By continuing to use excessive and deadly force against a person who has been incapacitated.

120.   Defendant Dotson is a person in a supervisory position with the City of St. Louis police department and his deliberate indifference to affirmatively act in the face of transgressions about which he knew or should have known, has established the policies of the City of St. Louis to condone or otherwise tolerate constitutionally violative conduct and generally and specifically the constitutionally violative conduct set forth in this complaint.

121.   As a direct and proximate result of the aforementioned conduct, Mansur was killed by Defendants Chandler and Vaughn.

**WHEREFORE,** Plaintiff prays for judgment against Defendant City of St. Louis and Police Chief Dotson in their official capacities for compensatory damages in an amount that is fair and reasonable; for the costs of this action, reasonable attorney fees and costs; and for such other relief as the court deems just and proper under the circumstances.

## <u>COUNT VI – CITY OF ST. LOUIS, DOTSON, CHANDLER AND VAUGHN</u>

### (42 USC § 1988)

122.   Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 121 as though fully set forth herein.

123.   For all claims in this complaint on which Plaintiff prevails, Plaintiff requests compensation for her reasonable attorney's fees and other costs as provided under 42 U.S.C § 1988 (b).

### DEMAND FOR JURY TRIAL

Plaintiff requests a Demand for Jury Trial on all issues.

THE LEGAL SOLUTION GROUP

By: _/s/ Jermaine Wooten_____
**Jermaine Wooten #MO59338**
*Attorney for Plaintiff*
10250 Halls Ferry Road
St. Louis, MO  63136
Phone:  (314) 736-5770
Fax:      (314) 736-5772
Email:   jwooten@lsgstl.com

30

Daniel A. Dailey, Esq. . (*pro hac vice pending*)
**Kingdom Litigators, Inc.**
**A Public Interest Law Firm**
Attorney for Plaintiff
3131 McKinney Ave Suite 600
Dallas, TX 75204
p: (214) 422-9350
ddailey@kingdomlitigators.com
IL Bar: 6312616