**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| DENNIS BALL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 4:18-cv-01364 |
| | ) | |
| CITY OF ST. LOUIS ET AL, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

1.    This is an action for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth Amendment to the United States Constitution, as made applicable to the States through the Fourteenth Amendment, and the Eighth Amendment, against Officers Kyle Chandler and Ronald Vaughn, police officers of the City of St. Louis, in their individual and official capacities, against the City of St. Louis, Missouri, and against Former Police Chief Sam Dotson, in his official capacity.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.

2.    This action also asserts state law wrongful death claim against Kyle Chandler, Ronald Vaughn and the City of St. Louis, Missouri. The Court can and should exercise supplemental jurisdiction over these claims, pursuant to 28 U.S.C. § 1367, as they are so related to the other claims in the action already under the Court's original jurisdiction and form part of the same case or controversy under Article 3 of the United States Constitution.

3.    It is alleged that the individual police officers, Kyle Chandler, and Ronald

Vaughn, engaged in an action which resulted in the unreasonable seizure of Plaintiff's Decedent, Mansur Ball-Bey, thereby violating his rights under the Fourth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, which grants Plaintiff's Decedent freedom from unreasonable seizure.

4.      It is further alleged that this violation was committed as a result of the policies and customs, including the Rec & Normal policies and practices of the St. Louis Police Department, under the supervision of Police Chief Sam Dotson and Julian Bush, City Counselor.

5.      Regarding the remaining claims, it is alleged that Kyle Chandler and Ronald Vaughn intentionally caused the wrongful death of Plaintiff's son, Mansur Ball-Bey, by responding with inappropriate force.  Plaintiff maintains this action for wrongful death pursuant to R.S.Mo. §537.080(1).

6.      The City of St. Louis is a municipal corporation charged with and responsible for appointing and promoting the members of the Police Department and for the supervision, training, instruction, discipline, control and conduct of the Police Department and its personnel.  At all times relevant, Defendant City of St. Louis had the power, right and duty to control the way individual police officers carried out the objectives of their employment and to see that all orders, rules, instructions, and regulations promulgated for the Police Department were consistent with applicable laws.

7.      Defendant Sam Dotson was at all times relevant to the incidents which are the subject of this lawsuit, the Chief of Police of the City of St. Louis.  As such, he is the responsible party for supervising the training, instruction, discipline, control and conduct of all police officers. He is also charged with promulgating all orders, rules, instructions and regulations of the police Department including but not limited to those orders, rules, instructions and regulations concerning

2

the use of force and of deadly weapons.  He also has the authority to approve all weapons to be used by members of the Police Department.  He is sued in his official capacity.

8.     Defendant Police Officer Kyle Chandler (hereinafter "Defendant Chandler") was at all times relevant to this Petition a male police officer employed by the St. Louis Metropolitan Police Department.  He is being sued in both his individual capacity and his official capacity as a law enforcement officer.

9.     Defendant Police Officer Ronald Vaughn (hereinafter "Defendant Vaughn") was at all times relevant to this Petition a male police officer employed by the St. Louis Metropolitan Police Department.  He is being sued in both his individual capacity and his official capacity as a law enforcement officer.

**PARTIES**

10.     That at all times pertinent to this lawsuit, Plaintiff Dennis Ball-Bey was the father of decedent, Mansur Ball-Bey.

11.     Defendant City of St. Louis, Missouri (hereinafter "City of St. Louis") is a first class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

12.     Defendant Chandler was at all times relevant to this complaint duly appointed and acting as an officer of the St. Louis Police Department, State of Missouri, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the City of St. Louis, State of Missouri.

13.     Defendant Vaughn was at all times relevant to this complaint duly appointed

and acting as an officer of the St. Louis Police Department, State of Missouri, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the City of St. Louis, State of Missouri.

14.    Defendants Chandler and Vaughn are residents of the City of St. Louis, State of Missouri, in the United States District Court for the Eastern District of Missouri.

15.    Defendant Sam Dotson was at all times relevant to this complaint duly appointed and acting as an officer of the St. Louis Police Department, State of Missouri, acting under the color of law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usages of the City of St. Louis, State of Missouri. Defendant Dotson is the policymaker and responsible for training officers, including Chandler and Vaughn.

16.    Defendant Sam Dotson is a resident of the City of St. Louis, State of Missouri, in the United States District Court for the Eastern District of Missouri.

**Waiver of Sovereign of Immunity**

17.    At all relevant times, Defendant City of St. Louis had purchased and had in effect a policy of insurance to insure itself against claims or causes of action for damages caused by city employees engaged in government functions, including those as described herein. The purchase of that insurance constitutes a waiver of sovereign immunity by the Defendant City of St. Louis.

**BACKGROUND**

18.    According to a University of Missouri-Louis Report, by criminologist David Klinger, St. Louis police officers fired their weapons at people 98 times from 2008-11, and 12 suspects died. About half of the incidents took place during foot chases (where the offenders alleged to have resisted). Here, Mansur was chased on foot and shot in the back. Officers struck

their targets less than half of the time.[1] Here, Defendants fired several times, however only one bullet struck Mansur in the back severing his spinal cord. Less than 27 percent of "resisting suspects" were actually armed. Likewise, in this case Mansur was not armed.

19.   The report further found: Officer-involved shootings by the numbers, 2008-11

• 115 officers fired at suspects in 97 incidents[2]
• Five officers fired in two separate incidents, one fired in three and two fired in four.
• 25 percent of shootings began as investigations of suspicious persons
• 65 percent involved a single suspect
• 20 percent of suspects under fire were younger than 18
• At least 48 suspects were struck* (some suspects under fire escaped)
• 12 suspects died
• 39 suspects were armed and 11 of them fired their weapons
• Officers typically fired fewer than six shots, and only Six officers suffered minor injuries, two suffered major wounds, and one died.

20.   In a 2015 study, criminologists examined police shooting from 2003-2012. This number was 230, presumably[3] covering all police involved shootings in St. Louis from 2003-2012. The City of St. Louis has a population of 318,000, with a percentage of 50% black 44% white and 5.5% two or more other races. The study used a block-group level in a spatial analysis. The block groups consisted of clusters of contiguous census blocks and houses between 600 and 3,000. The average population of the 355 St. Louis block groups were 1,000 (standard deviation of 399). Notably, no shootings occurred in 208 of the blocks groups. (Race, Crime, and the Micro-Ecology of Deadly Force, 2016, Vol. 15 (1)).

21.   After controlling for variables such as a single officer shooting multiple times, or

---

[1] David Klinger, University of St. Louis-Missouri, a paid independent contractor of UMSL. (See also e.g. https://www.stltoday.com/news/local/crime-and-courts/study-of-st-louis-police-shootings-recommends-transparency-training/article_fa40beca-e401-5d05-bc60-34ea1923b296.html ). (Study of St. Louis police shootings recommends transparency, training." (Ex. B).

[2] Id.

[3] Plaintiff has uncovered hundreds more police shootings that did not involve serious injury or death, as alleged herein, concealed within the executed settlement release agreements.

multiple officers shooting in one incident, only 117 or 51% of the incidents did an officer ***actually*** hit any suspects.

22.    The number one common pattern of incidents which gave rise to officer involved shootings were with one or more "suspicious persons" who were on foot or in a vehicle. (Race, Crime, and the Micro-Ecology of Deadly Force, 2016, Vol. 15 (1). This group included Mansur Ball-Bey.

23.    In summary, the 230 police shootings were concentrated in a relatively small number of St. Louis neighborhoods. Again, no shootings took place in 208 or 58.6% of the 355 block groups during the ten-year investigation. Yet one shooting occurring in each of 92 block groups; two occurred in each of 36 block groups; ***and between three to five shootings occurred in each of 19 block groups.***  It was concluded, that "the larger the proportion of Black residents in a neighborhood, the greater the number of police shootings." Mansur was killed in one of the 19 block groups with the highest number of police involved shooting— Fountain Park Neighborhood.

24.    Upon information and belief, from 2012 through 2014, police officers discharged their firearms approximately 183 times.[4]  More than half took place during foot chases (where the offender alleged to have resisted). And officers struck their targets less than half the time. By way of information and belief, Plaintiff obtained numerous release agreements just in the Fountain Park Neighborhood in which, offenders were charged with resisting arrest, alleged a firearm discharge by a police officer, and signed a "release agreement," including:

- On December 20, 2012, Edward Wills was charged with resisting arrest, signed a release agreement on June 26, 2013. The officer discharged his firearm which

---

[4] Plaintiff obtained data from the SLMPD's "RAM" system that tracked and reported, resisting arrest claims, use of force, including firearm discharges. The RAM's system is no longer used to track these incidents.

occurred at the location of the incident 4924 Maple, St. Louis, MO—Fountain Park Neighborhood, and upon information and belief.

- On February 7, 2013, Shonettda Ball was charged with interfering with officer, signed a release agreement on March 22, 2013. The officer discharged his firearm which occurred at the location of the incident 1241 N, Walton Ave. St. Louis—Fountain Park Neighborhood and upon information and belief.

- On June 19, 2013, Marquise Elliott was charged with resisting arrest and signed a release agreement on November 13, 2013. The officer discharged his firearm at the location of the incident 1208 Aubert St. Louis, MO—Fountain Park Neighborhood and upon information and belief.

25.    According to the SLMD's legal department, "the RAMS[5] system was discontinued in 2014" rendering the collection of this data even more difficult. ("Seemingly, the most straightforward of these recommendations is to produce an accurate of count of instances I which police officers use deadly force.") Race, Crime, and the Micro-Ecology of Deadly Force, Klinger, Rosenfeld, Isom, Deckard, 2015. Nonetheless, by 2017, St. Louis Cops led the nation in the rate of police shootings.[6] To date, Plaintiff has discovered that the driving force behind St. Louis police officer's rate of police shootings was the blanket Rec practice and policy at the City Counselor's office.

---

[5] RAMS was designed to track the number police firearm discharges within the SLMPD and resisting arrest cases. The Source of Plaintiff's numbers are derived from this database; however, RAMS does not account for firearm discharges that are unreported due to execution of a release agreement release agreement.

[6] https://www.riverfronttimes.com/newsblog/2017/12/12/st-louis-cops-lead-nation-in-rate-of-police-shootings. (Ex A).

ii.   **Defendants Settled Numerous Excessive Force Claims in which, the Officer Discharged his/her Firearm, and charged the Defendant with resisting arrest.**

26.   Craig Higgins, the Defendant's municipal division attorney manager, made clear that Defendants aggressively pursue settlement releases in claims of excessive force in only "resisting arrest" type cases. Higgins specifically stated, "So, I can't say that this is just how we do business down here. But in those instances where there are physicality is in involved," the City seeks to obtain a settlement release. Craig Higgins, further clarified,

> If, you know, if a person says you're under arrest and you start running away, and now they catch you and beat you down, yeah, that's civil, but we started with the premise that you ran away. So, you did resist. So, I would issue that case.
>
> But since I now know that was a beat down after the fact, I may be more amenable to say well, if you wanna take a release, I'll dismiss the charges. Some people might say, no, 'cause they may say, the beat down happened after the fact. I'm like, I understand.
>
> But in that instance I can't say that the resistance didn't occur. So, I think if we're tryin' to say that, you know on every resistance case or in defense case I require a release before I dismiss it. I would- I would say yeah, that's true, but it's not like I'm making an issue of determinations. To issue or not issue.

27.   Initially, the public believed that the City of St. Louis had only settled 44 cases since 2010 totaling $4.7 million for various injuries, wrongful imprisonment or death.[7] However, Plaintiff uncovered over 14 times the amount of "secretly settled" cases, totaling over 650 executed settlement release agreements stored in boxes at the St. Louis Metropolitan Police Department. Of

---

[7] https://www.ktrs.com/st-louis-police-shell-out-millions-in-secret-settlements/ (Ex. A).

the total executed release agreements settled by the City of St. Louis, 94% settled allegations for excessive force, unlawful search and seizures arising from the specific charge of "resisting arrest."

28.     The Defendants were on full notice that officers were beating and discharging their firearms because "suspects" ran away. Hundreds of victims settled their excessive force claims for "running away" from Defendants, under the Defendant's blanket Rec practice and policy.

29.     For example, between 2013-2014, all of the individuals described below secretly settled their claims for allegations including excessive force and unlawful seizure arising from their arrest for running away. Until late 2014, the Defendants tracked the use of force and the use of firearms, taser, mace, baton/nightstick, hands, and others using a system called RAMS. As a result, Plaintiff alleges firearm discharges upon information and belief from compiling all reports available in this investigation and the newly obtained executed release agreements.

30.     According to the RAMS 2013, Monthly Statistical report, in January there was seven firearm discharges reported; in February there were five firearm discharges reported; in March there were three firearm discharges reported; in April there were five firearm discharges reported; in May there were three firearm discharge reports; in June and July there were two firearm discharge reported in each respective month; in August there was one firearm discharge reported; in September there was five firearm discharges reported; and in October there were eight firearm discharges reported. Below is a reflection of the corresponding release agreement and firearm discharge.

1.  On January 16, 2013, Calvin Waler was charged with resisting arrest regarding an incident at 5915 Laura Ave. St. Louis, Mo 63136.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.
2.  On January 23, 2013, Molly Gott was charges with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

3.  On January 24, 2013, Jacob L. Ragland was charged with resisting arrest regarding an incident at 5853 Saloma, St. Louis, MO.   Upon information and belief, the officer discharged his firearm but did not strike the defendant.

4.  On January 25, 2013, Harry Joseph Alper was charged with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

5.  On January 25, 2013, Michael Bowerson was charged with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101.   Upon information and belief, the officer discharged his firearm but did not strike the defendant.

6.  On January 25, 2013, David R. Cohen was charged with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101.   Upon information and belief, the officer discharged his firearm but did not strike the defendant.

7.  On January 25, 2013, Richard Adam Hall was charged with resisting arrest regarding an incident at Peabody Energy HQ.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

8.  On January 25, 2013, Daniel Ryskiewich was charged with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101.

9.  On January 25, 2013, Christopher Singer was charged with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101

10. On February 1, 2013, A Corey Hunter was charged with resisting arrest regarding an incident at 4863 Margaretta.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

11. On February 1, 2013, William D. Shirley was charged with resisting arrest regarding an incident at 4109 Clara Pl.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

12. On February 2, 2013, Nicholas Busch was charged with resisting arrest regarding an incident at 721 N. 2nd St., St. Louis, MO 63102. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

13. On February 6, 2013, Tricia Nevler was charged with resisting arrest regarding an incident at 3741 Texas Ave., St. Louis, MO 63118.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

14. On February 9, 2013, Reese Benson was charged with resisting arrest regarding an incident at 815 Russell Blvd., St. Louis, MO 63104.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

15. On February 10, 2013, Nika Ponder was charged with resisting arrest regarding an incident at 999 N. 2nd St., St. Louis, MO 63102.

16. On February 10, 2013 ,Cedric Roden was charged with resisting arrest regarding an incident at 1917 Washington.

17. On February 11, 2013, Tara Morris was charged with resisting arrest regarding an incident at 3100 Olive St., St. Louis, MO 63103.

18. On February 14, 2013, Kristina Felix was charged with resisting arrest regarding an incident at 5514 Ashland.

19. On February 27, 2013, Carlos Booze was charged with resisting arrest regarding an incident at 1324 Laselle St., St. Louis, MO 63104.

20. On March 8, 2013, Charles Brown was charged with resisting arrest regarding an incident at 3426 Chippewa.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

21. On March 14, 2013, Myron Spears was charged with resisting arrest regarding an incident at 900 Angelrodt.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

22. On March 15, 2013, Brian Sieve was charged with resisting arrest regarding an incident at 959 Dover.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

23. On March 16, 2013, Matthew O'Donnell was charged with resisting arrest regarding an incident at 2000 Market St., St. Louis, MO 63103.

24. On March 16, 2013, Robert Stump was charged with resisting arrest regarding an incident at 1025 Washington Ave., St. Louis, MO 63101.

25. On March 16, 2013, James Thornton was charged with resisting arrest regarding an incident at 5244 Buncroft Ave.

26. On March 17, 2013, John Poeschl was charged with resisting arrest regarding an incident at 195 Washington St.

27. On April 3, 2013, John Powell was charged with resisting arrest regarding an incident at 3941 S. Grand Blvd., St. Louis, MO 63118.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

28. On April 7, 2013, Mathew Hester was charged with resisting arrest regarding an incident at 721 N. 2nd St., St. Louis, MO 63102.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

29. On April 12, 2013, Jadda Kennedy was charged with resisting arrest regarding an incident at 4500 Fais Ave. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

30. On April 14, 2013, Derrick Whitfield was charged with resisting arrest regarding an incident at 713 Lami St., St. Louis, MO 63104.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

31. On April 28, 2013, Andrew Brooks was charged with resisting arrest regarding an incident at 999 N. 2nd St., St. Louis, MO 63102.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

32. On April 28, 2013, Jeffrey Simmons was charged with resisting arrest regarding an incident at 1901 Wash Ave.

33. On April 28, 2013, Ricardo Sunray was charged with resisting arrest regarding an incident at 101 N. Broadway, St. Louis, MO 63102.

34. On May 14, 2013, Enrique Garcia-Bronr was charged with resisting arrest regarding an incident at 7201 Landsdown Ave. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

35. On May 16, 2013, Salvatore Botini was charged with resisting arrest regarding an incident at 7425 Parkwood Dr., St. Louis, MO 63116. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

36. On May 17, 2013, Christopher Clarett was charged with resisting arrest regarding an incident at 1029 Alara.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

37. On May 20, 2013, Adrie E. Leonard was charged with resisting arrest regarding an incident at 3200 Nebraska Ave., St. Louis, MO 63118.

38. On May 25, 2013, Elizabeth A. Purder was charged with resisting arrest regarding an incident at 2736 Chareton.

39. On May 26, 2013, Nicholas Vericella was charged with resisting arrest regarding an incident at 6177 Delmar Blvd., St. Louis, MO 63112.

40. On June 1, 2013, Kevin Augustine was charged with resisting arrest regarding an incident at 618n. 7th St. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

41. On June 3, 2013, Anastasia Ewing was charged with resisting arrest regarding an incident at 3105 N. Taylor.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

42. On June 4, 2013, Tammy Lynn Mouata was charged with resisting arrest regarding an incident at 1827 S. 10th St.

43. On June 12, 2013, Caroline Gray was charged with resisting arrest regarding an incident at 3631 Gravois Ave., St. Louis, MO, 63116.

44. On June 13, 2013, James Booker was charged with resisting arrest regarding an incident at Enright/Pendelton.

45. On June 13, 2013, Cyntoria Larry was charged with resisting arrest regarding an incident at 2800 Cherokee.

46. On June 16, 2013, Kristopher Williams was charged with resisting arrest regarding an incident at 5595 Grand Dr., St. Louis, MO 63112.

47. On June 16, 2013, Travon Niggins was charged with resisting arrest regarding an incident at 4474 Lexington.

48. On June 18, 2013, Kevion Mitchell was charged with resisting arrest regarding an incident at 3589 Minnesota.

49. On June 19, 2013, Renesha Baldwin was charged with resisting arrest regarding an incident at 2111 Sulphur.

50. On June 19, 2019, Marquis Elliot was charged with resisting arrest regarding an incident at 1208 Aubert.

51. On June 25, 2013, Arthur S. Parott was charged with resisting arrest regarding an incident at 4119 Minnesota.

52. On July 6, 2013, Larry Allen Brown, Jr. was charged with resisting arrest regarding an incident at 2332 Dodier.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

53. On July 6, 2013, William Dunigan was charged with resisting arrest regarding an incident at 101 N. Broadway, St. Louis, MO 63102.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

54. On July 9, 2013, Corey E. Williams was charged with resisting arrest regarding an incident at 3637 S. Kingshighway Blvd., St. Louis, MO 63109.

55. On July 9, 2013, Keenon Plott was charged with resisting arrest regarding an incident at 5421 Vera.

56. On July 16, 2013, Justin Jenninos was charged with resisting arrest regarding an incident at 118 N. 2nd St., Bay St. Louis, MS 39520.

57. On August 5, 2013, Brian Comes was charged with resisting arrest regarding an incident at 210 Morgan St., St. Louis, MO 63102.  Upon information and belief, the officer discharged his firearm but did not strike the defendant.

58. On August 8, 2013, Robert Cohen was charged with resisting arrest regarding an incident at 1300 Washington Ave., St. Louis, MO 63103.

59. On August 11, 2013, Maria Sanchez was charged with resisting arrest regarding an incident at 420 S.8th St., St. Louis, MO 63102.

60. On August 13, 2013, Samuel Adam Katz was charged with resisting arrest regarding an incident at 5800 Lagoon Dr.

61. On August 18, 2013, Eboni R. Gamble was charged with resisting arrest regarding an incident at 3921 N. 21st St., St. Louis, MO 63107.

62. On August 18, 2013, Destini R. Gamble was charged with resisting arrest regarding an incident at 3921 N. 21st St., St. Louis, MO 63107.

63. On August 18, 2013, Amanda Hecthormar was charged with resisting arrest regarding an incident at 1300 Washington Ave., St. Louis, MO 63103.

64. On August 18, 2013, Debra A. Townsend was charged with resisting arrest regarding an incident at 3921 N. 21st St., St. Louis, MO 63107.

65. On August 22, 2013, Ricky Utley was charged with resisting arrest regarding an incident at 4014 Union Blvd., St. Louis, MO 63115.

66. On August 25, 2013, Oddie J. Powell was charged with resisting arrest regarding an incident at 710 North 2nd St., St. Louis, MO 63102.

67. On August 25, 2013, Bernard A. Ransom was charged with resisting arrest regarding an incident at 1201 Washington Ave., St. Louis, MO 63103.

68. On August 26, 2013, Oddie J. Powell was charged with resisting arrest regarding an incident at 710 N. 2nd St., St. Louis, MO 63102.

69. On August 29, 2013, Dominic Howell-Butler was charged with resisting arrest regarding an incident at 3100 S. Grand Blvd., St. Louis, MO 63118.

70. On August 31, 2013, Joshua Graham was charged with resisting arrest regarding an incident at 720 N. 2nd St.

71. On September 3, 2013, Marlen Waller was charged with resisting arrest regarding an incident at 1200 S. Tucker Blvd., St. Louis, MO 63104. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

72. On September 10, 2013, Oshea Adnre Wilson was charged with resisting arrest regarding an incident at 1452 Chouteau Ave., St. Louis, MO 63103. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

73. September 15, 2013, Sean Dula was charged with resisting arrest regarding an incident at Delmar & Skinker. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

74. On September 17, 2013, Matgher Fine was charged with resisting arrest regarding an incident at 1234 Washington Ave., St. Louis, MO 63103. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

75. On September 18, 2013, Leonard Riggins, Jr. was charged with resisting arrest regarding an incident at 2820 Goodfellow. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

76. On September 20, 2013, Gregg Traupe was charged with resisting arrest regarding an incident at 4740 Vernon.

77. On September 27, 2013, Michael Johnson was charged with resisting arrest regarding an incident at 4909 Lindenwood.

78. On September 29, 2013, Anthony Tate was charged with resisting arrest regarding an incident at 331 De Baliviere Ave.

79. On September 30, 2013, Donesha Howlett was charged with resisting arrest regarding an incident at 4415 Natural Bridge.

80. On October 1, 2013, Kenneth Robinson was charged with resisting arrest regarding an incident at 4201 Meramac. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

81. On October 13, 2013, Steven A. Cohen was charged with resisting arrest regarding an incident at 1117 Hampton Ave., St. Louis, MO 63139. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

82. On November 3, 2013, Joshuan Thomas Bey was charged with resisting arrest regarding an incident at 1025 Washington Ave., St. Louis, MO 63101.

83. On November 3, 2013, Cory Penn was charged with resisting arrest regarding an incident at 701 Convention Plaza.

84. On November 7, 2013, Devin Canion was charged with resisting arrest regarding an incident at 2607 Gravois Ave., St. Louis, MO 63118.

85. On November 8, 2013, Kenneth Robinson was charged with resisting arrest regarding an incident at 2504 California.

86. On November 9, 2013, Brian Timothy Rando was charged with resisting arrest regarding an incident at 939 Lebanon Dr.

87. On November 13, 2013, Tyler Behiter was charged with resisting arrest regarding an incident at 6109 Gravois Ave., St. Louis, MO 63116.

88. On December 1, 2013 Marrkeith Smith was charged with resisting arrest regarding an incident at 3635 Vista.

89. On December 3, 2013, Lindom B Chillers was charged with resisting arrest regarding an incident at 2317 Texas Ave., St. Louis, MO 63104.

90. On December 5, 2013, Natalie Grybauskas was charged with resisting arrest regarding an incident at 701 Market St., St. Louis, MO 63101.

91. On December 22, 2013, Shannon Morgan was charged with resisting arrest regarding an incident at 1236 Washington Ave., St. Louis, MO 63103.

92. On December 22, 2013, Franco Pica was charged with resisting arrest regarding an incident at 2144 Market St., St. Louis, MO 63103.

31.    In January 2014, there were three firearm discharges reported; in February there were eight firearm discharges reported; in March there were two firearm discharges reported; and in April there were five firearm discharges reported. The release agreement and firearm discharges correlated as follows:

93. On January 3, 2014, Maximilian Straubha was charged with resisting arrest regarding an incident. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

94. On January 23, 2014, Natalie Turner was charged with resisting arrest regarding an incident at 4018 Cord. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

95. On February 2, 2014, Christopher Mooney was charged with resisting arrest regarding an incident at 2141 Geyer Ave. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

96. On February 3, 2014, Perry Purnell was charged with resisting arrest regarding an incident at 3500 Bingham. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

97. On February 14, 2014, Brooklynn Pennington was charged with resisting arrest regarding an incident at 430 S. 15th St. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

98. On March 16, 2014, Peter J. Gioia was charged with resisting arrest regarding an incident at 541 N. Grand Blvd., St. Louis, MO 63103. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

99. On March 16, 2014, Christopher A, Thomas was charged with resisting arrest regarding an incident at 315 N. 9th St. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

100. On March 19, 2014, Demarko Smith was charged with resisting arrest regarding an incident at 4300 S. 38th St., St. Louis, MO 63116.

101. On March 20, 2014, Anthony Roher was charged with resisting arrest regarding an incident at 3934 S. Grand Blvd., St. Louis, MO 63118.

102. On March 22, 2014, Shune D. Heard was charged with resisting arrest regarding an incident at 2101 Lucas.

103. On March 30, 2014, Dimitrieus Rose was charged with resisting arrest regarding an incident at 2600 Natural Bridge.

104. On April 9, 2014, Ashley E. Smith was charged with resisting arrest regarding an incident at 6002 Oleatha.

105. On April 12, 2014, Derek Tuchmann was charged with resisting arrest regarding an incident at 601 Clark Ave., St. Louis, MO 63102. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

106. On April 27, 2014, Ryan Mender was charged with resisting arrest regarding an incident at 4127 Manchester Ave., St. Louis, MO 63110.

107. On May 16, 2014, Travis Mosberger was charged with resisting arrest regarding an incident at 420 S. 8th St., St. Louis, MO 63102.

108. On May 22, 2014, Lonnie Cole, Jr. was charged with resisting arrest regarding an incident at 3934 S. Grand Blvd., St. Louis, MO 63118.

109. On May 23, 2014, Justin Wright was charged with resisting arrest regarding an incident at 4600 Morgan Ford Rd., St. Louis, MO 63116.

110. On May 28, 2014, Brittany Owens was charged with resisting arrest regarding an incident at 4112 W. Belle.

111. On June 3, 2014, John R. Dickmann was charged with resisting arrest regarding an incident at 7411 S. Broadway, St. Louis, MO 63111.

112. On June 4, 2014, Annie Cunningham was charged with resisting arrest regarding an incident at 3000 Park Ave., St. Louis, MO 63104.

113.   On June 6, 2014, Dale McGinnis was charged with resisting arrest regarding an incident at 707 N. Kingshighway.

114.   On June 7, 2014, Kyle M. Cain was charged with resisting arrest regarding an incident at 4266 E. Natural Bridge Ave., St. Louis, MO 63115.

115.   On June 20, 2014, Kevin Moore was charged with resisting arrest regarding an incident at 5099 Minerva.

116.   On June 28, 2014, IIro Suljic was charged with resisting arrest regarding an incident at 6254 Cravois.

117.   On June 28, 2014, Darrell Laney was charged with resisting arrest regarding an incident at 5555 Etzel.

118.   July 1, 2014, Jerome Stone was charged with resisting arrest regarding an incident at 5093 Ridge Ave.

119.   On July 8, 2014, Michael Walton was charged with resisting arrest regarding an incident at 420 S. 8th St., St. Louis, MO 63102.

120.   On July 10, 2014, Larry D. McInnis was charged with resisting arrest regarding an incident at 3934 S. Grand Blvd., St. Louis, MO 63118.

121.   On July 12, 2014, Austin J. Winn was charged with resisting arrest regarding an incident at 6252 Famous Ave., St. Louis, MO 63139.

122.   On July 20, 2014, Connor McClanahan was charged with resisting arrest regarding an incident at 6001 Manchester Ave., St. Louis, MO 63110.

123.   On August 2, 2014, Ebony Phillips was charged with resisting arrest regarding an incident at 5355 Alfred.

124.   On September 3, 2014, Brandon Storman was charged with resisting arrest regarding an incident at 1000 Spruce St., St. Louis, MO 63102.

125.   On September 3, 2014, Barbara Smith was charged with resisting arrest regarding an incident at 4157 Peck Ave.

126.   On September 13, 2014, Khawaja M. Munir was charged with resisting arrest regarding an incident at 4630 Lindell Blvd., St. Louis, MO 63108.

127.   On September 22, 2014, Lewis Ware was charged with resisting arrest regarding an incident at 1526 Lipton.

128.   On September 25, 2014, Christopher Johnson was charged with resisting arrest regarding an incident at 5384 Patton.

129.   On September 28, 2014, Jon Morrison was charged with resisting arrest regarding an incident at 4615 Macklind Ave., St. Louis, MO 63109.

130.   On October 4, 2014, Steve Johnson was charged with resisting arrest regarding an incident at 3934 S. Grand Blvd., St. Louis, MO 63118.

131.   On October 4, 2014, Brian J. Dorsey was charged with resisting arrest regarding an incident at 1402 Clark Ave., St. Louis, MO 63103.

132.    On October 6, 2014, James C. Perry, Jr. was charged with resisting arrest regarding an incident at 2618 Dr. MLK.

133.    On October 7, 2014, Joseph T. Clamase was charged with resisting arrest regarding an incident at 601 Clark St., St. Louis, MO 63102.

134.    On October 7, 2014, Justin Bryson was charged with resisting arrest regarding an incident at 420 S. 8th St., St. Louis, MO 63102.

135.    On October 7, 2014, Terrance Martin was charged with resisting arrest regarding an incident at 4321 Warne.

136.    On October 11, 2014, Jeremy Bryson was charged with resisting arrest regarding an incident at 601 Clark St., St. Louis, MO 63102.

137.    On October 19, 2014, Joshua Mathis was charged with resisting arrest regarding an incident at 601 Clark St., St. Louis, MO 63102.

138.    On October 25, 2014, William Parks was charged with resisting arrest regarding an incident at 711 N. Tucker.

139.    On October 27, 2014, James Dixon was charged with resisting arrest regarding an incident at 4774 Kings.

140.    On October 29, 2014, Stephanie Zemblidge was charged with resisting arrest regarding an incident at the corner of Russell and Gravois.

141.    On October 30, 2014, Carl Garland was charged with resisting arrest regarding an incident at 100 Elmond Ave.

142.    On November 2, 2014, Alex H. Mueller was charged with resisting arrest regarding an incident at 6051 W. Cahame.

143.    On November 5, 2014, Carvelle L. Jones was charged with resisting arrest regarding an incident at 1150 Riverview Blvd., St. Louis, MO 63147.

144.    On November 9, 2014, Destany Bagby was charged with resisting arrest regarding an incident at 5476 Genevieve.

145.    On November 11, 2014, Donald R. Norris was charged with resisting arrest regarding an incident at 4684 S. Grand Blvd., St. Louis, MO 63111.

146.    On November 30, 2014, Nicholas A, Jackson was charged with resisting arrest regarding an incident at N. 7th St. & Chestnut St., St. Louis, MO 63101.

147.    On November 30, 2014, Nile McClain was charged with resisting arrest regarding an incident at 700 Chestnut St., St. Louis, MO 63101.

148.    On December 9, 2014, Carl D. Gray was charged with resisting arrest regarding an incident at 3203 Delar St.

149.    On December 11, 2014, Timothy Baumer was charged with resisting arrest regarding an incident at 1401 Clark Ave., St. Louis, MO 63103.

150.    On December 11, 2014, Julie Noonan was charged with resisting arrest regarding an incident at 1401 Clark Ave., St. Louis, MO 63103.

151.   On December 12, 2014, Chana Akushe was charged with resisting arrest regarding an incident at 4026 Dryden Ave., St. Louis, MO 63115.

152.   On December 21, 2014, Sokol Zuko was charged with resisting arrest regarding an incident at N. Broadway & St. Laus Ave.

153.   On December 28, 2014, Paul Davis was charged with resisting arrest regarding an incident at 4635 Alaska Ave., St. Louis, MO 63111.

154.   On December 31, 2014, Ella Rose Davis was charged with resisting arrest regarding an incident at 1915 Olive Blvd., St. Louis, MO 63141.

32.   By 2015, the Defendant stopped using RAMS to record the resisting arrest and use of force, with the manner of force, e.g. firearm discharge. However, Plaintiff was able to confirm upon information and belief the following:

155.   On January 29, 2015, Erione Watson was charged with resisting arrest regarding an incident at 1015 S. Broadway, St. Louis, MO 63104.

156.   February 8, 2015, Jacob Julius was charged with resisting arrest regarding an incident at 601 Clark Ave., St. Louis, MO 63102.

157.   On February 8, 2015, Torrence Smith was charged with resisting arrest regarding an incident at 4659 Maryland. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

158.   On February 15, 2015, William J. Tucker was charged with resisting arrest regarding an incident at 6543 Hancock.

159.   On February 18, 2015, Florentino Contreras was charged with resisting arrest regarding an incident at 4434 Oleatha.

160.   On March 7, 2015, Ryan J. Banning was charged with resisting arrest regarding an incident at 5206 Devonshire.

161.   On March 14, 2015, Ronald Declue was charged with resisting arrest regarding an incident at 3505 Park Ave., St. Louis, MO 63104.

162.   On April 1, 2015 Yingkai Tan was charged with resisting arrest regarding an incident at 3320 Locust St., St. Louis, MO 63103.

163.   On April 9, 2015, Javonte O. Tompsin was charged with resisting arrest regarding an incident at 3710 N. Grand Blvd., St. Louis, MO 63107. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

164.   On April 29, 2015, Christopher Upchurch was charged with resisting arrest regarding an incident at 4250 S. Broadway.

165.   On May 2, 2015, Angela Landis was charged with resisting arrest regarding an incident at 3868 Dr. MLK.

166.    On May 17, 2015, Arther Elly was charged with resisting arrest regarding an incident at 4301 Wayne. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

167.    On May 29, 2015, Frederick McGee was charged with resisting arrest regarding an incident at 415 Holly Hills Ave., St. Louis, MO 63111. Upon information and belief, the officer discharged his firearm but did not strike the defendant.

168.    On July 4, 2015, Syed Haider was charged with resisting arrest regarding an incident at 601 Clark St., St. Louis, MO 63102.

169.    On August 8, 2015, Aaron J. Wienmann was charged with resisting arrest regarding an incident at 1115 Hampton Ave., St. Louis, MO 63139.

33.    In all 1-169 incidents alleged herein, the Defendants were fully aware of allegations that the Defendants used excessive force and were discharging their firearms at the defendants because the release agreements were executed and hand delivered to the St. Louis Metropolitan Police Department. The settlement release agreements specifically released excessive force claims. The executed release agreements were stored in boxes at the SLMPD. However, Defendants failed to investigate any of the facts underlying a single executed release agreement and/or the corresponding allegation of the officer discharging his firearm.

34.    In a federal criminal indictment, federal prosecutors explain undercover officer was assigned to walk through a group of protestors to monitor and report unlawful activity. The SLMPD officers brutally beat the undercover officer L.H. and alleged that Officer L.H. resisted arrest and was not compliant. The indictment further read:

> It was part of the manner and means of the conspiracy that the defendants… made false statements regarding their conduct and the conduct of L.H. during the course of the arrest in an effort to justify their use of force on L.H., including falsely claiming that L.H. resisted arrest and was not compliant, despite the fact that LH. was an experienced undercover officer who specifically wore a shirt that revealed his waistband so that he would not be mistaken for being armed during the Stockley protests. (emphasis in underlined only).

20

## FACTS

35.     Against this backdrop, Mansur Ball-Bey was killed because he was in the wrong neighborhood (Fountain Park) and ran from police. On or about August 19, 2015, Defendants Chandler and Vaughn and other police officers went to a residence located at 1241 Walton Avenue, St. Louis, MO 63108 to execute a search warrant.  Defendants Chandler, Vaughn, and an ATF Agent were assigned to cover the backyard of 1241 Walton Avenue.

36.     While there, Plaintiff's decedent, Mansur Ball-Bey, and a 14-year-old were walking in alley way behind 1241 Walton when they first made visual contact with Defendant's Vaughn and Chandler.  The Defendants, with their guns drawn, chased them.  The 14-year-old juvenile stopped running and hid behind an abandoned car parked in an empty lot next to 1241 Walton.  While Mansur continued to run southbound in the alley way.

37.     Mansur, who was unarmed, turned into the backyard of 1233 Walton Avenue, and began to run eastbound toward the front of the property.

38.     The Defendants continued to chase Mansur through the back yard of 1233 Walton, and fired multiple shots striking him once in the back.

39.     The gunshot wound severed Mansur's spinal cord which caused him to fall face first in the front yard at 1233 Walton Avenue and died.  Mansur was employed with UPS and was a youth leader at his church.  He did not have a criminal record.

40.     That at all times mentioned, Defendants Chandler and Vaughn were acting under the color of the statutes, ordinances, regulations, customs, and usages of Defendant City of St. Louis and the State of Missouri and under the authority of their respective office as police officers.

41.     Specifically, Defendants Chandler and Vaughn were driven, motivated, and

protected as a direct result of Defendant Dotson's 'Rec & Normal' policies and practices which permeated throughout the City of St. Louis for the preceding three years.

### a.   "THE RELEASE or "REC"

42.    The Defendant City of St. Louis incorporated, and enforced a blanket release practice and policy (referred to as the "The Release, or ""Rec policy" "the Rec"), spanning over two decades under the direction, supervision and authority of City of St. Louis Counselor's office.

43.    The City Counselor's policy states:

> **3. "Resisting arrest & Interfering with a Police Officer charges <u>cannot</u> be amended without first obtaining a signed release from defendant (See Sample)."** (no emphasis added)

44.    The policy provides a sample of "The Release" which Plaintiffs by reference incorporate as Exhibit A.

45.    The Rec Policy requires the releasor to enter into a contract between, the City of St. Louis, the Mayor's office (whose name appear), Bush and Garvin the Police department, and any employee of SLMPD, under the threat of criminal prosecution.

46.     "The Release" was written to censor, restrain, and deter civil rights' lawsuits against the Defendant City of St. Louis. The Release further acted as a method to conceal and obscure civil rights violations by the Defendant City of St. Louis Metropolitan Police Department.

47.    Plaintiff has not found a single case that Defendants "legally enforced" a Release agreement against a plaintiff in federal court because The Release was not created for its legal effect. Instead, the Release was created for its psychological effects that resulted, and continue to result, in censorship and prior restraints on accused victims to petition the courts for redress of civil rights violations.

22

48.     Defendant City consulted experienced attorneys with strong marketing and constitutional law backgrounds. Consultant-1, was an experienced civil defense attorney who was also a constitutional law professor.   Consultant-1, had a strong background in marketing, advertising and mass communication holding advanced degrees in both. Consultant-1 ultimately became the top enforcer for the Rec practice and policy, and regularly consulted Defendant Dotson and the St. Louis Metropolitan Police Department on planning and policy.

49.     Since 1987, prosecutors and legal practitioners have been aware of the psychological effects of release agreements. Defendants knew and should have known of these widely known effects. In an interview with John Palermo, Former Assistant City Attorney, Personnel Litigation; Former Acting Supervisor, City Court Division, of Denver City Attorney's Office, he said the, *"effect of releases was largely psychological, although releases were probably unenforceable."*

50.     That same year, James Fais, Former Chief Prosecutor, City Attorney's Office in Columbus, Ohio, explained, *"the release convinces defendants that there is no legal redress, and they do not go to lawyers."*

51.     Renowned Constitutional Law professor from Suffolk University School of Law Michael Avery explained, *"if the person believes in it [The Release], they don't sue; it's like Santa Claus."*

52.     The Defendants' blanket Release policy acts as an end around, for municipal immunity against §1983 claims. Defendants have relied on Release agreements to act as legal immunity from civil rights claim *without* judicial oversight. As, one prosecutor of Defendant City of St. Louis explained, *"…my whole point, why would I plead down a charge, and potentially be looking at civil liability, I'm not doing myself any favors by doing that."*

23

53.     The City prosecutors were trained under this blanket Release policy, which inherently conflicts with the prosecutor's ethical duty. The prosecutor in a criminal case shall: (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause. Missouri Special Responsibilities for Prosecutors, Rule 4-3.8. To force prosecutors to obtain Release agreements by presenting the appearance they have probable cause, thus forcing cases to trial, is an ethical and legal dilemma, requiring obvious training for prosecutors themselves.

54.     Instead, The City prosecutors are motivated and base decisions to amend or dismiss solely on a blanket Release policy. Even a current prosecutor in Defendants' municipal division stated, "*if its a clear cut "bogus" arrest, then the defendant shouldn't be asking for a plea, tell em' put it on the docket set it for trial.*"

55.     Defendants' prosecutors believe, an arrest that is clearly improper and violative of an accused victims' civil rights will not be dismissed or amended, instead, the accused victim's only relief is to take the matter to trial.

56.     When asked was there any way around "a clear-cut bogus arrest," a chief prosecutor with the Defendants' municipal division replied, "*no, my whole point, why would I plead down a charge, and potentially be looking at civil liability, I'm not doing myself any favors by doing that.*" The Release's purpose has nothing to do with reducing the burden on the judicial, instead the blanket release policy is enforced to protect the City of St. Louis from paying accused victims' compensation for police misconduct.

57.     The Rec Policy does not distinguish between frivolous and meritorious claims,

nor is the Release supported by objective and relevant public interests. In fact, Defendants'

municipal prosecutor stated, *"my attitude is, if his [an accused victim's] case is so strong, you'll*

*[accused victim] try it here [in municipal court] and win and try it in the civil case and win."* The

stronger an accused victim's case for police misconduct relating to the facts of resisting arrest or

interference with a police officer, the more aggressive the Defendants are with pushing the case to

criminal trial.

58.     Defendant City of St. Louis supervised, controlled, and trained the prosecutors

on its blanket release policy, during the relevant period, which has resulted in numerous, widely

known and accepted practices of prosecutorial overreaching to obtain signatures on blank Release

forms or force falsely accused victims to trial.

59.     Currently, the City Counselor, Julian Bush (hereinafter also referred to as

"Bush" or "Julian Bush") in his official capacity, supervises, controls, and trains the Municipal

Court Division, who continues to engage in prosecutorial overreaching to obtain signatures on

blank release forms.

60.     Bush trained, supervised, and controlled its prosecutors seek a Release

agreement of all civil rights claims regardless of any exonerating facts a defendant presents. In

fact, the policy itself is contained in the Defendants' "Intern Guide" used as a training guide for

new and prospective attorneys for Bush's office.

61.     Defendant City through, Julian Bush, trained, supervised, and controlled its

prosecutors to obtain a signed Release agreement after discovering possible civil rights violations,

as a result of Defendants' blanket release policy.

62.     Defendant City through, Julian Bush, trained, supervised, and controlled its p

prosecutors to obtain a signed Release agreement without an analysis of any civil rights violation, as a result of Defendants' blanket release policy.

63.    Defendant City through, Julian Bush, trained, supervised, and controlled its prosecutors to obtain a signed Release agreement without an impartial and fair analysis of any civil rights violation, as a result of Defendants' blanket release policy.

64.    Defendant City through, Julian Bush, trained, supervised, and controlled its prosecutors to obtain Release agreements although arresting officers were not present to testify in court, as required by city ordinances.

65.    Defendant City through, Julian Bush, trained, supervised, and controlled its prosecutors to omit material facts related to Plaintiffs' resisting arrest or interference with police officer charges, as a result of, its blanket release policy to obtain signatures on blank Release agreements.

66.    Defendant City through, Julian Bush, trained, supervised and controlled its prosecutors to seek signed Releases using any means available and without regard to ethical, legal, factual, or moral independent obligations. This Rec policy and practice became the foundational policy which, together with Dotson's special order "Normal policy," concealed unjustified use of force and illegal arrests committed at the hands of the SLMPD.

b.  **The "Rec" policies and practices motivated SLMPD's Special Order 8-01 §7 ("Normal Policy") which directed officers to "normally" charge municipal resisting arrest violations over state resisting arrest.**

67.    The SLMPD training procedures and policies direct officers to charge resisting arrest as a municipal violation instead of a state misdemeanor resisting arrest. SO 8-01 §7 (C) is a special order directly from the Chief of Police and was implemented as a direct response, and in concert with, the Rec Practices and Policy from the City Counselor's Office.

68.     On September 15, 2012, the SLMPD amended its previous order and issued

Special Order 8-01 §7 (also referred to as the "Normal Policy" "Normal practices" "Normal")
which states:

> C. CHARGING OF DEFENDANT
> 1. Under normal circumstances, the defendant will be charged with
> a city ordinance violation of resisting arrest or interfering with an
> officer. The information application will be made at the City
> Counselor's Office.

69.     On September 15, 2012, the SLMPD issued Special Order 8-01§ 5 which states:

> NOTE: The Public Defenders will not be required to provide legal
> services to persons charged with a violation of county or municipal
> ordinances. (no emphasis added).

70.     As alleged herein, SLMPD officers' "normal practice" to charge resisting arrest

in violation of Muni Code.15.10.10, is designed to matriculate claims of excessive force to the

municipal court, where municipal prosecutors are waiting to obtain a 'Rec for Release' of all civil

claims as a blanket policy and practice.

71.     The Normal policies required that the SLMPD officer charge state misdemeanor

resisting arrest in extenuating circumstances, such as, the suspect used or threatened the use of

physical force. However, officers used deadly force, which presupposes the officer was in fear for

his or her life *i.e.* extenuating circumstances, but officers charged the alleged suspect with

municipal resisting arrest because deadly force was not justified, and the Rec policies obfuscate

and conceal the officer's conduct.

72.     After a SLMPD officer is involved in an incident involving resisting arrest, the

watch commander and higher ranking SLMPD officers make the ultimate decision on what

charge(s) to pursue. The watch commanders and high-ranking SLMPD officials have provided and

continue to provide consult on SO 8-01 §7.

73.     As a direct result of the Normal policies, the use of excessive force by SLMPD officers in resisting arrest cases charged in municipal court was and continues to be undetected, concealed, and obfuscated. This method of concealment was the motivating and driving force behind the SLMPD's tyrannical practices throughout the SLMPD.

74.     As a direct result of the Rec & Normal practices and policies over the last two decades, the practices and policies of using excessive force and obfuscating or concealing the officer's conduct grew out of control.

75.     Today, those policies and practices created a brutal culture where SLMPD use unjustified force any time an alleged offender walked away, ran, protested his or her innocence, or even recorded officers violating civil rights whether or not the offender was charged with violating Muni. Code. 15.10.10.

76.     As direct result of the Rec & Normal practices and policies, officers over the past decade developed a distinct and clear pattern of using unjustified force or illegally seizing and searching a citizen and claiming in written reports the accused victim, "resisted arrest."

### i. The Rec & Normal policy and practices are the root cause and method of concealing SLMPD's Tyrannical Practices.

77.     Without the Rec policy, SLMPD tyrannical practices could not, and would not have been concealed. The Rec policy and practice motivated the SLMPD to train officers to charge, as a "normal practice," resisting arrest over the state misdemeanor regardless of the use of force. Defendants Rec & Normal policies concealed minor constitutional violations, and over the course of decades the minor constitutional violations adapted into a method of intimidation and control, ("tyrannical practices").

78.     Plaintiff defines SLMPD tyrannical practices as (1) excessive force when the

accused victim runs, pulls away, or protests, "resisted" and (2) unlawful arrests to search and destroy evidence. These tyrannical practices are designed to inflict fear and control over citizens. Illustrative examples of SLMPD tyrannical practices perpetuated causing the death of individuals that resist include:

79.     On October 8, 2014, Vonderitt Myers ran and resisted the arrest of a SLMPD officer, which resulted in the officer fatally shooting the Plaintiff in the legs and head. The plaintiff would have been charged with the city ordinance resisting arrest. The off-duty police officer is no longer with the police force.

80.     On June 11, 2014, three friends Anthony Tobias, Brian Davis, and Keyon Bennett were stopped by SLMPD Officer James Zwillings, (partner of SLMPD Officer Jason Flannery, who killed Vonderitt Myers). Mr. Bennett ran across a vacant lot and Officer Zwilling pursued them on foot. All three boys heard Officer Zwilling fire his weapon – while their backs were turned and running away. None of the bullets fired by Officer Zwillings struck the boys.  The boys did not threaten the officer.

81.     SLMPD's tyrannical patterns and practices were so entrenched throughout the department, that SLMPD officers accidently beat their own undercover officer to within an inch of his life, and alleged, as in the cases discussed above, the undercover officer resisted.

82.     The common denominator in all these cases is that the accused victim allegedly pulled away, ran, or walked away, *e.g.* resisted arrest as defined by the SLMPD. The SLMPD officer used excessive force, including deadly force, and charged, or alleged the accused victim(s) resisted arrest.

83.     SLMPD officers unlawfully arrest citizens to obtain camera and video footage

and charge the accused victims with violation of Muni. Code. 15.10.10 because prosecutors will aggressively seek to obtain Release agreements.

84.    As a result of Defendants' blanket Rec Policy and practices the SLMPD developed its own practice, culture, and customs of using excessive force and unlawful seizures on citizens who ran, pulled away, protested or recorded officers.

85.    If the suspect did not die, and absent unrelated charges, the suspect would be charged with violation of Muni. Code 15.10.10., appear in the St. Louis Municipal court and pressured to sign the "Rec" i.e. the 169  individuals as alleged herein.

86.    Plaintiff, Mansur Ball-Bey, like many before and after him, was unarmed, ran and was shot by Defendants Chandler and Vaughn as a result of SLMPD's tyrannical pattern and practices, and, these tyrannical patterns and practices were created, motivated, protected, and encouraged directly and indirectly by Defendants' Rec & Normal policies and practices.

## COUNT I – DEFENDANTS CHANDLER AND VAUGHN

### Excessive Use of Force in Violation of the Fourth and Fourteenth Amendments of the United States Constitution
### (42 U.S.C. §1983)

87.    Plaintiff incorporates by reference each and every allegation alleged in paragraphs 1 through 86 as though fully set forth herein.

88.    Defendants Chandler and Vaughn's above conduct constitutes actions that shocks the conscience under the Fourth Amendment of the United States Constitution.

89.    Defendants Chandler and Vaughn were chasing Mansur who had not committed any crime.

90.    Defendants Chandler and Vaughn lacked any probable cause to kill Mansur, who

was unarmed.  In addition, Defendants Chandler and Vaughn were not in any danger when they shot Mansur to death.

91.    Defendants Chandler and Vaughn used deadly force on Mansur and violated his Fourth and Fourteenth Amendment rights in one or more of the following respects:

     a. The use of deadly force on Mansur was excessive and not objectively reasonable as he had not committed any crime;

     b. There was no reason to use the amount of force used by Defendants Chandler and Vaughn because Mansur did not pose an immediate threat to the safety of the Defendants Chandler and Vaughn or the others that were in the area; and

     c. There was no reason to use the amount of force used by Chandler and Vaughn because Mansur had not committed any crime and running along an alley way is not justification for gunning him down.

92.    The conduct of Defendants Chandler and Vaughn as described above deprived Mansur of his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution, of his right not to be subjected to any cruel and unusual punishment as secured to him under the Eighth Amendment to the United States Constitution, and his right not to be deprived of life, liberty, or property without due process of law and to be accorded the equal protection of the law as guaranteed to him under the Fourteenth Amendment to the United States Constitution.

93.    As a direct and proximate result of the unlawful conduct of Defendants Chandler and Vaughn, Mansur was caused to suffer severe pain, mental anguish, and an agonizing death. Additionally, the actions of Defendants Chandler and Vaughn caused or contributed to cause Plaintiff to incur funeral and burial expenses. As a result of Mansur's death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

94.    The conduct of Defendants Chandler and Vaughn was reckless, malicious,

31

wanton, and willful and violated Mansur's constitutional rights and the award of punitive damages is necessary to punish Defendants Chandler and Vaughn in their individual capacity and to deter them and others from the same or similar transgressions in the future.

### Compensatory Damages

Under 42 U.S.C. § 1983, Plaintiff is entitled to an award of compensatory damages against Defendant Vaughn and Defendant Chandler.

### Punitive Damages

95.    Defendant Vaughn and Defendant Chandler's actions against Mansur were reckless.

96.    Defendant Vaughn and Defendant Chandlers actions against Decedent Mansur showed callous indifference toward the rights of Mansur.

97.    Defendant Vaughn and Defendant Chandler's actions against Mansur were taken

in the face of a perceived risk that the actions would violate federal law.

98.    Plaintiff is entitled to an award of punitive damages against Defendant Vaughn and Defendant Chandler in order to punish them and to deter others.

### Attorney's Fees

99.     Under 42 U.S.C. § 1988, if Plaintiff is the prevailing party in this litigation, then he will be entitled to receive an award of reasonable attorney's fees, non-taxable expenses and costs.

WHEREFORE, Plaintiff prays for judgment under 42 U.S.C. § 1983 and 1988 against Defendant Chandler and Defendant Vaughn in their individual capacity for compensatory damages in a fair and reasonable amount, for punitive damages, for reasonable attorney's fees,

for and non-taxable expenses, for costs, and Plaintiff prays for such other relief as may be just

under the circumstances and consistent.

<u>COUNT II – DEFENDANTS CHANDLER AND VAUGHN</u>

**Wrongful Death/Assault & Battery v. Defendant**
**(R.S.Mo. §537.080(1) and 516.120))**

100.   Plaintiff incorporates each and every allegation in paragraphs 1 through 100 by

reference as though fully set forth herein.

101.   Plaintiff maintains this action for wrongful death pursuant to R.S.Mo.

§537.080(1).

102.   Defendants Chandler and Vaughn intentionally discharged their firearms

without justification causing an unreasonable apprehension of harm and death to Mansur.

103.   Defendants Chandler and Vaughn fired their weapons at Mansur without

justification, intentionally and wrongfully causing the death of Mansur.

104.   Defendants Chandler and Vaughn shooting death of Mansur was done in bad

faith and with malice in that they intended to cause injury and done with a wicked purpose.

105.   Defendants Chandler and Vaughn shooting death of Mansur heretofore

described needlessly manifested a reckless indifference to Mansur's constitution rights under the

4th and 14th amendments to the U.S. Constitution.

106.   As a direct and proximate result of the unlawful conduct of Defendants

Chandler and Vaughn described above, Mansur was caused to suffer severe pain, mental anguish,

and an agonizing death. Additionally, the actions of Defendants Chandler and Vaughn caused or

contributed to cause funeral and burial expenses. As a result of Mansur's death, Plaintiff has been

deprived of the decedent's valuable services, society, companionship, comfort, instruction,

guidance, counsel, training, support, love, affection and income.

107.   Plaintiff is entitled to recover for all damages, including pain and suffering experienced by Mansur, for which Mansur would be entitled to claim had death not ensued.

**WHEREFORE**, Plaintiff prays for judgment under Count II against Defendants Chandler and Vaughn for a sum of actual damages that a jury determines to be fair and reasonable and for punitive damages that will deter and prevent the Defendants from engaging in this type of conduct in the future. Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

### COUNT III – DEFENDANT CITY OF ST. LOUIS, and DOTSON
### Failure to Train, Supervise and Control
### (42 U.S.C § 1983)

108.   Plaintiff by reference incorporates each and every allegation as though fully set forth herein.

109.   At all times mentioned herein City of St. Louis was responsible for the hiring, training, supervising, and controlling all police officers of the City of St. Louis, and their use of firearms including, Defendant's Chandler and Vaughn.

110.   At the time of the occurrence, Defendants Chandler and Vaughn were acting within the course and scope of their agency and/or employment with Defendant City of St. Louis.

111.   Defendants' Rec & Normal policies and practices were the motivating and driving policy and practice that resulted in SLMPD's tyrannical practices customs and patterns. Defendants specifically acted under the color of statute, custom, usage, law, ordinance and policies, including, the "Rec Policy," which created, promoted, and trained SLMPD to use tyrannical customs, tactics, patterns and practices including:

  a.  A common custom, pattern, and practice of using deadly force to effectuate resisting arrest violations, with no threat to the officer's safety;

34

b. A common custom, pattern, and practice of using unjustified force to effectuate municipal ordinance violations of resisting arrest;

c. A common custom, pattern, and practice to conceal, obfuscate, and hide civil rights violations through charging municipal resisting arrest or interference with a police officer;

d. A common custom, pattern, and practice of using excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments.

e. A common custom, pattern, and practice of unlawful search and seizures and charging violation of Muni. Code. 15.10.10;

f. A common custom, pattern, and practice to tolerate, overlook, and obfuscate police misconduct in incidents where the alleged offender runs, pulls away, or flees.

g. A common custom, pattern, and practice to use deadly force when the offender does not present a threat, but the offender runs, pulls, away, or protest his innocence.

h. A common custom, pattern and practice to use excessive force as a means to punish, control, and deter accused victims.

112.   As a direct, substantial and proximate result of the SLMPD tyrannical patterns and practices born from the Defendants' Rec & Normal policies and practices, as alleged herein, Plaintiff was severely injured and deprived of his constitutional rights guaranteed under the Fourth, Fifth, Eighth, and Fourteenth Amendments.

113.   Defendant City of St. Louis was negligent in its supervision, training and control, which led to tyrannical practices, customs, and patterns of the SLMPD. Defendant was negligent in its supervision of Defendants Chandler and Vaughn in the following respects:

a. Defendant City of St. Louis failed to train Defendants Chandler and Vaughn in the proper use of firearms.

b. Defendant City of St. Louis failed to supervise and train defendants Chandler and Vaughn in their use of department issued firearms and weapons on unarmed citizens who have not committed any crime.

c. Defendant City of St. Louis failed to supervise and train Defendants Chandler and Vaughn to stop using force to limit the amount of harm caused when there is no threat to them or others; and

d. Defendant City of St. Louis failed to supervise and train Defendants Chandler and Vaughn not to use deadly force on a citizen when the lives of Chandler and Vaughn and others are not in danger.

114.   After creating the Rec & Normal policies and practices, the failure to properly

supervise was the direct and proximate cause of Defendants Vaughn and Chandler's conduct.

115.   The conduct of Defendant City of St. Louis as described above deprived Mansur of his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution, of his right not to be subjected to any cruel and unusual punishment as secured to him under the Eighth Amendment to the United States Constitution, and his right not to be deprived of life, liberty, or property without due process of law and to be accorded the equal protection of the law as guaranteed to him under the Fourteenth Amendment to the United States Constitution.

116.   Defendant City of St. Louis was deliberately indifferent to the obvious need and foreseeable consequence of failing to train, supervise, and control Defendants Chandler and Vaughn and as a result Mansur was deprived of life and liberty under the constitution.

117.   As a direct and proximate result of the negligent conduct of Defendant City of St. Louis described above, Mansur was caused to suffer severe pain, mental anguish, and an agonizing death.   Additionally, the actions of Defendants Chandler and Vaughn caused or contributed to cause Plaintiff to incur funeral and burial expenses. As a result of Mansur death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

118.   The conduct of the City of St. Louis was reckless, malicious, wanton, and willful with Mansur's constitutional rights and the award of punitive damages is necessary to punish Defendant City of St. Louis in its individual capacity and to deter it and others from the same or similar transgressions in the future.

WHEREFORE, the Plaintiff prays for judgment under Count III against Defendant City of St. Louis for a sum of actual damages that a jury determines to be fair and reasonable and for

punitive damages that will deter and prevent the Defendant from engaging in this type of conduct in the future. The Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

## COUNT IV – DEFENDANT DOTSON

### Failure to Train, Supervise and Control
### (42 U.S.C § 1983)

119.   Plaintiff incorporates each and every allegation as set forth in paragraphs 1 through 119 as though fully set forth herein.

120.   At all times mentioned herein Defendant Dotson was in charge of training, supervising, and controlling all police officers and personnel of the City of St. Louis, including Defendants Chandler and Vaughn.

121.   At the time of the occurrence, Defendants Chandler and Vaughn and Defendant Chief Dotson were acting within the course and scope of their agency and/or employment with Defendant City of St. Louis.

122.   Defendant Police Chief Dotson was negligent in his supervision of Defendants Chandler and Vaughn in the following respects:

    a. Defendant Dotson failed to train Defendants Chandler and Vaughn in the proper use of firearms;

    b. Defendant Dotson failed to supervise and train Defendants Chandler and Vaughn's use of department issued firearms and weapons on a citizen who has not committed any crime

    c. Defendant Dotson failed to supervise and train Defendants Chandler and Vaughn to stop using force to limit the amount of harm caused; and

    d. Defendant Dotson failed to supervise and train not to use deadly force on a citizen when the lives of Chandler and Vaughn and others are not in danger.

    e. Defendant Dotson had a duty to train Defendants Chandler and Vaughn on the proper use of force when an offender runs, but Dotson failed to properly institute training and policies to prevent the use of deadly force when an offender runs.

    f. Defendant Dotson failed to properly train officers on charging resisting arrest.

123.   Defendant Dotson was deliberately indifferent to the obvious need and foreseeable consequence of failing to train, supervise, and control Defendants Chandler and Vaughn, when Defendant Dotson had fully knowledge of the Rec & Normal policies and practices that cultivated SLMPD's tyrannical conduct, and as a result Mansur was deprived of life and liberty under the constitution.

124.   Specifically, Defendant Dotson was deliberately indifferent to the obvious Pattern and practices:

   a.   A common custom, pattern, and practice of using deadly force to effectuate resisting arrest violations, with no threat to the officer's safety;
   b.   A common custom, pattern, and practice of using unjustified force to effectuate municipal ordinance violations of resisting arrest;
   c.   A common custom, pattern, and practice to conceal, obfuscate, and hide civil rights violations through charging municipal resisting arrest or interference with a police officer;
   d.   A common custom, pattern, and practice of using excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments.
   e.   A common custom, pattern, and practice of unlawful search and seizures and charging violation of Muni. Code. 15.10.10;
   f.   A common custom, pattern, and practice to tolerate, overlook, and obfuscate police misconduct in incidents where the alleged offender runs, pulls away, or flees.
   g.   A common custom, pattern, and practice to use deadly force when the offender does not present a threat, but the offender runs, pulls, away, or protest his innocence.
   h.   A common custom, pattern and practice to use excessive force as a means to punish, control, and deter accused victims.

125.   Defendant Dotson was deliberately indifferent to the instances and patterns described throughout paragraph 60-73. Defendant Dotson failed to properly make reports, discipline or act against officers as described in paragraph 60-73.

126.   As a direct and proximate result of the negligent conduct of Defendant Dotson

described above, Mansur was caused to suffer severe pain, mental anguish, and an agonizing death. Additionally, the actions of Defendants Chandler and Vaughn caused or contributed to cause Plaintiff to incur funeral and burial expenses.  As a result of Mansur's death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

127.   The conduct of Defendant Dotson was reckless, malicious, wanton, and willful with Mansur constitutional rights and the award of punitive damages is necessary to punish Defendant Dotson in his individual capacity and to deter him and others from the same or similar transgressions in the future.

**WHEREFORE**, the Plaintiff prays for judgment under Count IV against Defendant Dotson for a sum of actual damages that a jury determines to be fair and reasonable and for punitive damages that will deter and prevent the Defendant from engaging in this type of conduct in the future, and a permanent injunction for Defendant's normal policy and practice. The Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

## COUNT V – DEFENDANTS CITY OF ST. LOUIS AND DOTSON

### Municipal Liability
### (42 U.S.C § 1983)

128.   Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 127 as though fully set forth herein.

129.   Instead of reports being made against other police officers within the City of St. Louis for excessive use of force, no action has been taken against these officers.  Therefore, there exist within the City of St. Louis and its respective police department, tyrannical policies or customs, practices and usages that are so pervasive that they constitute the policies of these

Defendants, which caused the constitutional deprivations of Mansur as have been fully set forth above.  The tyrannical policies, customs, practices, and usages that exist including, but not limited, to the following:

    a.   To use excessive force when it is not reasonably necessary;
    b.   To use excessive force against persons who have not committed any crime;
    c.   To use excessive force against persons who pose no danger or harm to police officers or the public; and
    d.   By continuing to use excessive and deadly force against a person who has been incapacitated.

130.   Defendant Dotson is a person in a supervisory position with the City of St. Louis police department and his deliberate indifference to affirmatively act in the face of transgressions about which he knew or should have known, has established the policies of the City of St. Louis to condone or otherwise tolerate constitutionally violative conduct and generally and specifically the constitutionally violative conduct set forth in this complaint.

131.   As a direct and proximate result of the aforementioned conduct, Mansur was killed by Defendants Chandler and Vaughn.

**WHEREFORE,** Plaintiff prays for judgment against Defendant City of St. Louis and Police Chief Dotson in their official capacities for compensatory damages in an amount that is fair and reasonable; for the costs of this action, reasonable attorney fees and costs; and for such other relief as the court deems just and proper under the circumstances. Plaintiff further prays for a permanent injunction from Defendants' Rec & Normal practices and policies.

## COUNT VI – CITY OF ST. LOUIS, DOTSON, CHANDLER AND VAUGHN
### (42 USC § 1988)

132.   Plaintiff incorporates by reference each and every allegation in paragraphs 1 through 131 as though fully set forth herein.

133.   For all claims in this complaint on which Plaintiff prevails, Plaintiff requests

compensation for her reasonable attorney's fees and other costs as provided under 42 U.S.C § 1988 (b).

## DEMAND FOR JURY TRIAL

Plaintiff requests a Demand for Jury Trial on all issues.

**Dated: February 4, 2020**

Respectfully submitted,

**LEGAL SOLUTION GROUP**

**By**:___/s/ Jermaine Wooten_____

**Jermaine Wooten #59338**

St. Louis Office, MO
10250 Halls Ferry Road
St. Louis, MO  63136
314-736-5770
314-736-5772 (Fax)
jwooten@lsgstl.com

**KINGDOM LITIGATORS, INC.**

(*admitted pro hac vice*)

By: ___/s/ Daniel A. Dailey_____
**Chief Federal Litigation Counsel**
IL Bar#: 6312616
3131 McKinney Blvd. Ste. 600,
Dallas, TX 75204
p:(214) 422-9350
ddailey@kingdomlitigators.com
www.kingdomlitigators.com