UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DENNIS BALL-BEY,                                  )
                                                 )
              Plaintiff,                          )
                                                 )
v.                                               )        Case No. 4:18-CV-01364-SPM
                                                 )
KYLE CHANDLER, et al.,                           )
                                                 )
              Defendants.                         )

## MEMORANDUM AND ORDER

This matter is before the Court on the Motion to Dismiss Counts III, IV, and V of Plaintiff's

Second Amended Petition for Failure to State a Claim, filed by Defendants City of St. Louis

("City") and Samuel Dotson ("Dotson"), Kyle Chandler, ("Chandler") and Ronald Vaughn

("Vaughn"), in their official capacities (collectively, the "Municipal Defendants").[1] (Doc. 76). The

motion has been fully briefed, and the parties have consented to the jurisdiction of the undersigned

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Doc. 12). For the following

reasons, the motion will be granted in part and denied in part.

### I.   BACKGROUND

Following the filing of Plaintiff's First Amended Complaint, Defendants City and Dotson

filed a motion to dismiss all of the claims against them failure to state a claim. The Honorable

Stephen R. Clark, United States District Judge, consolidated the instant case with several similar

cases for purposes of resolving the motions to dismiss in those cases. (Doc. 50). Judge Clark later

entered a Memorandum and Order granting the motion and dismissing the claims against the City

---

[1] The complaint at issue is titled "First Amended Complaint," but because Plaintiff has already
filed an amended complaint, the Court will refer to this as the Second Amended Complaint.

and Dotson, as well as the official capacity claims against Chandler and Vaughn. *Ball-Bey v. Chandler*, 415 F. Supp. 3d 884 (E.D. Mo. 2019)

In the Second Amended Complaint, Plaintiff asserts the same causes of action against the Municipal Defendants, but he adds several additional factual allegations in an attempt to address the deficiencies identified by Judge Clark. In the instant motion, the Municipal Defendants argue that the new allegations are not sufficient and that Plaintiff has still failed to state a claim against them. Thus, the Court will begin with a discussion of the allegations in the First Amended Complaint and a brief discussion of the Memorandum and Order dismissing the claims against the Municipal Defendants. The Court will then discuss the factual allegations in the Second Amended Complaint and will address whether those allegations are sufficient to state a claim against the Municipal Defendants.

## A.  Allegations in the First Amended Complaint

On January 3, 2019, Plaintiff Dennis Ball-Bey filed the First Amended Complaint in this case against four defendants: Kyle Chandler, a police officer employed by the St. Louis Metropolitan Police Department ("SLMPD"); Ronald Vaughn, a police officer employed by the SLMPD; Sam Dotson, former SLMPD police chief; and the City of St. Louis.  1st Am. Compl. Plaintiff alleged that on or around August 19, 2015, Chandler, Vaughn, and other officers went to a residence to execute a search warrant. *Id.* at ¶ 18. Chandler, Vaughn, and an ATF agent were assigned to cover the backyard of the residence. *Id*. While there, Plaintiff's son, Mansur Ball-Bey ("Mansur"), and a fourteen-year-old were walking in an alley way behind the residence when they first made visual contact with Chandler and Vaughn. *Id.* at ¶ 19. Chandler and Vaughn, with guns drawn, chased Mansur and the fourteen-year-old. *Id.* The fourteen-year-old stopped and hid, and Mansur continued to run. *Id*. Chandler and Vaughn chased Mansur through the backyard of a

neighboring property and fired multiple shots, striking him once in the back and killing him. *Id.* at ¶ 21. Mansur was unarmed and had no criminal record. *Id.* at ¶¶ 20, 22. Plaintiff alleged that in shooting Mansur, Chandler and Vaughn were driven, motivated, and protected as a direct result of several policies and customs that permeated the City of St. Louis for the three years preceding his death. *Id.* at ¶¶ 24-76.

Plaintiff asserted five claims in the First Amended Complaint: (I) use of excessive force in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, against Chandler and Vaughn in their official and individual capacities; (II) wrongful death/assault and battery pursuant to Missouri Revised Statutes §§ 537.080(1) and 516.120, against Chandler and Vaughn in their individual and official capacities; (III) failure to train, supervise, and control in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against Sam Dotson, former Chief of Police of the City of St. Louis, in his official capacity, and the City of St. Louis; (IV) failure to train, supervise, and control pursuant to 42 U.S.C. § 1983 against Dotson, in his official capacity; and (V) municipal liability under 42 U.S.C. § 1983 against the City and Dotson, in his official capacity. (Doc. 21).

The basis for Plaintiff's claim of municipal liability was his allegation that the City of Saint Louis had two policies and a custom that were the driving force behind the shooting of his son: the written "Normal Policy," the written "Rec Policy," and the unwritten "You Run, You Pay" custom that arose out of the two policies.

Under the written "Normal Policy," defendants accused of resisting arrest are normally charged with a municipal ordinance violation, for which public defenders are not provided, instead of with a state misdemeanor charge. 1st Am. Compl. ¶¶ 50-53. Specifically, SLMPD's Special Order 8-01 § 7, issued September 15, 2012, states:

### B.  CHARGING OF DEFENDANT

1. Under normal circumstances, the defendant will be charge under a city ordinance violation of resisting arrest or interfering with an officer. The information application will be made at the City Counselor's Office.

*Id.* at ¶ 51. In addition, SLMPD's Special Order 8-01 § 5, also issued on September 15, 2012, states:

NOTE: The Public Defenders will not be required to provide legal services to persons charged with a violation of county or municipal ordinances.

*Id.* at ¶ 52. Plaintiff alleged that this policy was designed to place defendants charged with resisting arrest who might have excessive force claims into municipal court. *Id.* at ¶ 53. The Normal Policy required the SLMPD officer to charge individuals with a state misdemeanor arrest in extenuating circumstances, such as where the suspect used or threatened the use of physical force. *Id.* at ¶ 54.

Under the written "Rec Policy" (also sometimes called the "Blanket Release Policy"), prosecutors will not amend a  municipal resisting arrest charge unless the accused person signs a release of all civil claims against the City. Specifically, the City of St. Louis Counselor's office has a policy that states:

3. Resisting arrest & Interfering with a Police Officer charges **cannot** be amended without first obtaining a signed release from defendant (See Sample.)

*Id.* at ¶ 26 (emphasis in original). The Rec Policy requires the releasor to enter into a contract between the City of St. Louis, any employee of SLMPD, and others, under threat of criminal prosecution. *Id.* at ¶ 28. Plaintiff alleged that the release was written to censor, restrain, and deter civil rights lawsuits against Defendant City of St. Louis. *Id.* at ¶ 29. Plaintiff also alleged that it acted as a method to conceal and obscure civil rights violations by SLMPD. *Id.* Plaintiff had not found a single case in which Defendants legally enforced one of these release agreements; the release was not created for its legal effect, but for its psychological effects, resulting in accused

4

victims not petitioning the court for redress of civil rights violations. *Id.* at ¶ 30. Plaintiff cited statements from former prosecutors and a law professor who have opined that although these releases are probably unenforceable, they have the effect of convincing defendants that they have no legal redress, and they do not sue. *Id.* at ¶¶ 32-34.

City prosecutors were trained under this Blanket Release policy, and they base their decisions about whether to amend or dismiss charges solely based on the Blanket Release Policy. *Id.* at ¶¶ 53-54. The policy does not distinguish between frivolous and meritless claims. 1st Am. Compl. ¶ 40. The City Counselor, Julian Bush, trained, supervised, and controlled prosecutors to seek a release agreement of all civil rights claims, regardless of any exonerating facts presented by a defendant. *Id.* at ¶ 43. Defendant City, through Bush, trained, supervised and controlled prosecutors to obtain a signed release agreement after discovering possible civil rights violations and without analyzing any civil rights violations. *Id.* at ¶ 49. When asked whether there was any way around "a clear cut bogus arrest," a chief prosecutor with Defendants' municipal division replied, "no, my whole point, why would I plead down a charge, and potentially be looking at civil liability. I'm not doing myself any favors by doing that." *Id.* at ¶ 39. The policy has resulted in numerous, widely known, and accepted practices of prosecutorial overreaching to obtain signatures on blank release forms or force falsely accused victims to trial. *Id.* at ¶ 41.

Plaintiff alleged that under these two policies, the use of excessive force by SLMPD officers in "resisting arrest" cases has been concealed and shielded from judicial oversight, because suspects who resist arrest are charged in municipal court (where they do not have a public defender), and then forced to release their excessive force claims or face a criminal resisting arrest charge. *Id.* at ¶¶ 30, 35, 49, 52-53, 56-57. Plaintiff also alleged that, as a direct result of the Rec and Normal Policies, a custom developed under which SLMPD officers use unjustified force

5

and/or make unlawful arrests for the purpose of seizing evidence any time an alleged offender walks away, runs, or protests his or her innocence, then claim that the suspect "resisted arrest." *Id.* at ¶¶ 57-59. This custom is referred to as the "SLMPD tyrannical practices" or as the "You Run, You Pay" ("YRYP") custom. To support the existence of the YRYP custom, Plaintiff alleged fourteen prior incidents of alleged misconduct, including five instances in which an officer discharged a weapon and charged a suspect with resisting arrest as a municipal violation, four instances in which officers shot at suspects running away, and three instances in which officers unlawfully arrested individuals, charged them, then tried to get them to sign release agreements. *Id.* at ¶¶ 61-73. Plaintiff alleged that Mansur was shot by Defendants Chandler and Vaughn as a result of these tyrannical practices, and the practices "were created, motivated, protected, and encouraged directly and indirectly by Defendants' Rec & Normal policies and practices." *Id.* at ¶ 76.

In Plaintiff's failure to train, supervise, and control claims, Plaintiff alleged that Defendant City of St. Louis and Dotson trained SLMPD to use tyrannical customs and practices, including using deadly force to effectuate resisting arrest violations with no threat to officer safety; using unjustified force to effectuate municipal ordinance violations of resisting arrest; using excessive force; conducting unlawful searches and seizures and then charging municipal violations; and using deadly force when the offender does not present a threat but the offender runs, pulls away, or protests his innocence. *Id.* at ¶ 101. Plaintiff also alleged that Defendant City of St. Louis was negligent in its supervision, training, and control by failing, *inter alia*, to train Chandler and Vaughn in the proper use of firearms and deadly force in situations where their lives and the lives of others were not in danger. *Id.* at  ¶¶ 103. 112. Plaintiff also alleged that the City and Dotson were deliberately indifferent to these patterns and practices and to the obvious need for training

and the foreseeable consequences of these failures to train, supervise, and control Chandler and Vaughn. *Id.* at ¶¶ 106, 113-14.

### B.  Judge Clark's Dismissal of the Claims Against the Municipal Defendants

Judge Clark found that Plaintiff had not alleged sufficient facts to plausibly suggest the existence of a widespread, persistent pattern of unconstitutional misconduct, as is required to establish municipal liability based on an unofficial custom. *Ball-Bey*, 415 F. Supp. 3d at 895-97. He also found that Plaintiff had not pleaded sufficient facts to show a causal link between the Rec & Normal policies and the alleged custom or a direct causal link between the alleged YRYP custom and Chandler and Vaughn's killing of Plaintiff's son. *Id.* at 897-99. In addressing Plaintiff's failure to train or supervise claims (Counts III and IV) Judge Clark found that Plaintiff had not included any facts to support his conclusion that the City failed to train Chandler and Vaughn in the areas identified; did not allege any facts about what the SLMPD training program includes or does not include; and did not plead facts showing a pattern of constitutional violations of which policy-making officials could be charged with knowledge of a failure to train their employees. *Id.* at 900-01.

After dismissing the claims against Municipal Defendants, Judge Clark unconsolidated the cases, and the case is now before the undersigned. (Doc. 52).

### C.  Additional Allegations in Plaintiff's Second Amended Complaint

In the Second Amended Complaint, Plaintiff alleges the same claims against the same defendants, based on the same theories of liability, and he includes nearly all of the same factual

allegations as he did in the First Amended Complaint.[2] He also includes several new factual allegations, including the following.

First, Plaintiff alleges several statistics regarding past incidents involving shootings by SLMPD officers. These facts include a criminologist's report finding that St. Louis police officers fired their weapons at people 98 times from 2008 through 2011, and 12 suspects died; the same report's finding that about half of those incidents took place during foot chases (like the instant case), where the offenders were alleged to have resisted; the same report's finding that (like Mansur) fewer than 27% of the "resisting arrest" suspects were actually armed; a criminologist's report finding that of the 230 police-involved shootings in the City of St. Louis (population 318,000) between 2003 and 2012, most were concentrated in a relatively small number of areas, with the area where Mansur was shot being one of those with the highest numbers of shootings; the same criminologist's report finding that the most common pattern of incidents giving rise to shootings were incidents that  involved "suspicious persons" who (like Mansur) were on foot or in a vehicle; that between 2012 and 2014, SLMPD officers discharged their firearms approximately 183 times, with more than half of those incidents taking place during foot chases where the offender is alleged to have resisted; and that three specific incidents occurred in a six-month period in the neighborhood where Mansur was shot that involved an officer discharging a firearm, the individual involved being charged with resisting arrest, and the individual involved signing a release agreement. 2d Am. Compl. ¶¶ 18-24. Plaintiff further alleges that the "RAMS" system used to track firearm discharges, use of force, and resisting arrest claims was discontinued in 2014, making data collection difficult. *Id.* at ¶ 25. Plaintiff also cites, and attaches an exhibit to the

---

[2] The Second Amended Complaint does not include all fourteen specific instances of past police force used against suspects resisting arrest. The Court sets forth in this section the instances that are included in the Second Amended Complaint.

Second Amended Complaint, a media report from 2017 showing that St. Louis police led the nation in the rate of police shootings, with a per capita yearly average nearly double that of the next highest department on the list. *Id.* at ¶ 25; Ex. A. to 2d Am. Compl., Doc. 59-2, at pp. 23-24.

Plaintiff also includes in the Second Amended Complaint some descriptions of specific incidents involving the use of excessive force against individuals who resisted arrest: a 2014 incident in which an individual ran and resisted arrest, which resulted in an SLMPD officer fatally shooting the individual in the legs and head; a 2014 incident in which three friends were stopped by an SLMPD officer, the friends ran, the officer pursued them, and the officer fired at them while they were running away; and a federal criminal indictment in which federal prosecutors described an incident in which SLMPD brutally beat an unarmed undercover officer, then falsely claimed that the officer had resisted arrest and was not compliant in an effort to justify their use of force. *Id.* at  ¶¶ 34, 79-80.The news articles attached as exhibits to the Second Amended Complaint describe additional incidents: a 2011 incident in which an individual was fatally shot and the City of St. Louis paid family members $900,000; a 2013 incident in which an individual was shot 21 times after he crashed his car following a police pursuit and his family was awarded $400,000; and a 2010 incident in which an individual was shot after he ran from police who were trying to arrest him for alleged drug activity, and his family was awarded $212,500. Ex. A to 2d Am Compl., Doc. 59-2, at pp. 7-8.

Plaintiff also included new allegations related to the City's use of the Rec Policy/Blanket Release Policy. Plaintiff alleges that Craig Higgins, the Defendant's municipal division attorney manager, made clear that Defendants aggressively pursue settlement releases in claims of excessive force in only "resisting arrest" type cases. 2d. Am. Compl. ¶ 26. Plaintiff quotes Higgins as stating, "So, I can't say that this is just how we do business down here. But in those instances

where there are physicality is in involved [sic], the City seeks to obtain a settlement release." *Id.*

Higgins further clarified:

> If, you know, if a person says you're under arrest and you start running away, and now they catch you and beat you down, yeah, that's civil, but we started with the premise that you ran away. So, you did resist. So, I would issue that case.
>
> But since I now know that was a beat down after the fact, I may be more amenable to say well, if you wanna take a release, I'll dismiss the charges. Some people might say, no, 'cause they may say, the beat down happened after the fact. I'm like, I understand.
>
> But in that instance I can't say that the resistance didn't occur. So, I think if we're tryin' to say that, you know on every resistance case or in defense case I require a release before I dismiss it. I would- I would say yeah, that's true, but it's not like I'm making an issue of determinations. To issue or not issue.

*Id.* at ¶ 26.

Plaintiff also added factual allegations regarding the numbers of settlement releases executed under the Rec Policy/Blanket Release Policy. Plaintiff alleges that under this policy, hundreds of victims settled their excessive force claims for running away from Defendants. *Id.* at ¶¶ 28-29. Plaintiff alleges that initially, the public believed that the City had only settled 44 cases since 2010, totaling $4.7 million for various injuries, wrongful imprisonment, or death. *Id.* at ¶ 27. However, Plaintiff alleges that he has uncovered 650 executed settlement agreements, since 2010, stored in boxes at the SLMPD, 94% of which settled allegations for excessive force, unlawful searches, and seizures arising from the specific charge of "resisting arrest." *Id.* at ¶ 27. Plaintiff alleges that Defendants were on notice that officers were beating suspects and discharging their firearms because suspects ran away. *Id.* at ¶ 28. As examples of individuals who were charged with municipal resisting arrest violations and pressured to sign releases of excessive force claims, Plaintiff alleges the names, dates, and locations of 169 specific incidents between January 2013 and August 2015 in which individuals were charged with resisting arrest and secretly settled claims for allegations including excessive force and unlawful seizure arising from their arrest for running

away; 46 of these incidents involved discharge of a firearm. *Id.* at ¶¶ 29-33, 85.[3] Plaintiff alleges that Defendants were fully aware of the excessive force allegations, yet failed to investigate any of the facts underlying any of the executed release agreements and/or the corresponding allegations. *Id.* at ¶ 33.

Plaintiff also includes some new factual allegations related to his failure to train and supervise claims, including allegations that Defendant Dotson had a duty to train Defendants Chandler and Vaughn on the proper use of force when an offender runs, but that Dotson failed to properly institute training and policies to prevent the use of deadly force when an offender runs and that Dotson failed to properly train officers on charging resisting arrest *Id.* at ¶ 22(e)-(f).

## II.    LEGAL STANDARD FOR MOTION TO DISMISS

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint "does not need detailed factual allegations" to survive a motion to dismiss, but it must contain factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (2007).

---

[3] Plaintiff's allegations are not crystal clear on the question of whether all 169 individuals were charged with resisting arrest as a municipal code violation, rather than with a state misdemeanor. However, in light of Plaintiff's allegation that a "suspect would be charged with violation of Muni. Code 15.10.10, appear in St. Louis Municipal court and [be] pressured to sign the 'Rec' i.e. the 169 individuals as alleged herein," 2nd Am. Compl. ¶ 85, and drawing all reasonable inferences in favor of Plaintiff as the non-moving party, the Court will assume that all 169 incidents involved municipal resisting arrest charges.

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept as true all of the factual allegations in the complaint, though it need not accept the legal conclusions. *Iqbal*, 556 U.S. at 678. The Court must make "all reasonable inferences in favor of the nonmoving party." *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019).

## III.  DISCUSSION

In their motion to dismiss, Municipal Defendants ask the Court to dismiss Counts III, IV, and V. They make three arguments: (1) that Plaintiff fails to state a claim against the City for municipal liability or failure to train, supervise, and control, because Plaintiff fails to allege an unconstitutional policy or custom that caused a constitutional injury; (2) that Plaintiff fails to state an actionable claim for injunctive relief against the City because Plaintiff lacks standing to assert such a claim and, in any event, the complaint fails to allege an unconstitutional policy or custom causing constitutional injury; and (3) that the Court should dismiss the claims against Dotson, Chandler, and Vaughn in their official capacities, because such claims are redundant. The Court will address each issue in turn.

### A.    Municipal Liability and Failure to Train, Supervise, and Control Claims

#### 1.  *Municipal Liability*

Section 1983 of Title 42 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. Municipalities and other local government units are "included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality may be liable under § 1983 where either "the action that is alleged to be

12

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" (a "policy" claim) or where the alleged constitution deprivation is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels" (a "custom" claim). *Id.* at 690-91. However, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Instead, "[m]unicipal liability exists 'only where the municipality *itself* causes the constitutional violation.'" *Perkins v. Hastings*, 915 F.3d 512, 520-21 (8th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

In the instant case, Plaintiff alleges that two official policies—the Rec Policy and the Normal Policy—helped to create a custom (the You Run, You Pay custom) that caused his son's injuries. To establish a claim based a custom, the plaintiff must demonstrate "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 700 (8th Cir. 2016) (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)). "[T]he pattern of unconstitutional conduct must be so pervasive and widespread so 'as to have the effect and force of law.'" *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996)). The Court will address each element in turn.

### i. Widespread pattern of unconstitutional misconduct

With respect to the first element of the municipal liability claim, the Municipal Defendants argue that here, as in the First Amended Complaint, Plaintiff has not included factual allegations sufficient to show the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by SLMPD officers.

As Judge Clark noted in his Memorandum and Order, "[t]he Eighth Circuit has not directly addressed the quantum of 'continuing, widespread, persistent' conduct a plaintiff must allege to satisfy the *Iqbal* standard in this context, though it has held that isolated incidents do not suffice and that allegations of 'many' incidents do establish liability." *Ball-Bey v. Chandler*, 415 F. Supp. 3d 884, 895 (E.D. Mo. 2019) (citing *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322-23 (8th Cir. 1996), & *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987)). *See also Plamp v. Mitchell Sch. Dist. No.* 17-2, 565 F.3d 450, 460 (8th Cir. 2009) ("[T]hree concrete complaints . . . scattered over approximately twelve years and contain[ing] little in terms of content" were insufficient to show a widespread pattern of conduct at the summary judgment stage).

In assessing the allegations in the First Amended Complaint, Judge Clark found that the fourteen instances alleged by Plaintiff over a six-year time period, occurring in a city of 319,000 residents (fewer than 2.5 instances per year), did not plausibly suggest the existence of a widespread, persistent pattern of unconstitutional misconduct. *Ball-Bey*, 415 F. Supp. 3d at 895-97. In making this finding, Judge Clark contrasted Plaintiff's allegations in the First Amended Complaint with those made in two cases where courts *did* find that the plaintiffs had made allegations of a custom of use of excessive force to sufficient withstand a motion to dismiss: *Simpson v. Ferry*, 202 F. Supp. 3d 444, 453 (E.D. Pa. 2016), and *Flanagan v. City of Dallas, Texas*, 48 F Supp. 3d 941 (N.D. Tex. 2014).

14

In *Simpson*, the plaintiff alleged that he was injured when a Philadelphia police officer used excessive force against him, and he asserted claims against the City based on the department's policy or custom of allowing and acquiescing in its officers' use of excessive force. 202 F. Supp. 3d at 447-48. The plaintiff alleged that the City had failed to conduct proper investigations of complaints of use of force or to discipline officers for using excessive force, thereby allowing officers to use excessive force with impunity; that from 2009 to 2014, approximately 1,223 lawsuits were brought against the City for police misconduct; that during that period the City paid more than $40 million in damages and settlements for police misconduct lawsuits; and that a news article revealed that one-third of the police misconduct lawsuit payouts during the time period involved allegations of excessive force. *Id.* at 452-53. The court noted that it was "cognizant that mere allegations, and even settlements, do not establish liability or the existence of an unlawful custom." *Id.* at 453. However, the court also noted that at this early stage, it  must assume the veracity of the statistics and view them in the light most favorable to the plaintiff. *Id.* The court concluded that the statistics alleged by the plaintiff, in conjunction with the plaintiff's personal history of being targeted by police, were sufficient to plead a widespread practice of excessive force. *Id.* at 53. The court also found that in light of these statistics, the plaintiff had pleaded sufficient facts to plausibly suggest that the former mayor and former police commissioner were generally aware of the frequency with which excessive force violations occurred. *Id*. at 43.

In *Flanagan*, the plaintiffs' child was shot during a struggle with a Dallas police officer. 48 F. Supp. 3d at 944-45. The plaintiffs asserted, *inter alia*, that the City had a persistent, widespread practice of using excessive force that rose to the level of a custom having the force of official City policy. *Id.* at 953-54. Plaintiff alleged that the policy of the police department was to shoot first and ask questions later, that a councilman had informed the media that there were

training issues in the department that had resulted in the killing of an unarmed individual, that Dallas was at the top of the list of police misconduct statistics in the South, along with several other Texas cities; that Dallas is ranked number 11 in police misconduct incidents; that the total number of officer-involved shootings was 144; that 86 grand juries had been convened to investigate police misconduct; that 60 unarmed African-American men had been killed by Dallas police officers over the past 13 years; that at least 12 other shootings of unarmed individuals by Dallas police officers took place during the year of the plaintiffs' son's death (and including descriptions of three of the shootings, all of which occurred after the incident involving the plaintiffs' son); and that there were 94 open department internal investigations into officer-involved shootings. *Id.* at 953. The court found that the plaintiff had pleaded facts sufficient to demonstrate a persistent, widespread practice of allegedly unlawful seizure and use of force. *Id.* at 953-54. The court also noted that because of the seriousness of shooting incidents, "it is reasonable to allow a lower number of incidents to establish a pattern of conduct in a shooting case" than in cases involving less serious police misconduct. *Id.* at 954.

As Judge Clark found, the allegations in the First Amended Complaint fell well short of those found sufficient to establish a widespread pattern in either *Simpson* or *Flanagan*. Unlike the plaintiff in *Simpson*, Plaintiff did not include in the First Amended Complaint statistics such as the number of lawsuits filed against the City for police misconduct over a particular time frame, how many of those included allegations of excessive force, or the amount of money paid to settle such lawsuits. Unlike the plaintiff in *Flanagan*, Plaintiff did not include allegations such as how police misconduct statistics in St. Louis compared to those in other cities, the total number of officer-involved shootings in the City, the number of unarmed individuals killed by City police officers, or the number of open internal affairs investigations into officer-involved shootings. Judge Clark

16

also pointed out that Plaintiff did not include other allegations that might have bolstered his allegations, such as the number of complaints, claims, or lawsuits asserting excessive use of force in similar circumstances and how those were resolved; the population of the City; the number of officers in the SLMPD; the number of stops made or encounters involving SLMPD officers; facts to show that the force used in the fourteen incidents alleged was excessive or that the individuals involved had protested unlawful arrests; how long Chandler and Vaughn had been police officers, how many times they had been accused of alleged excessive use of force, or other facts from which conclusions about patterns could be drawn. *Ball-Bey*, 415 F. Supp. 3d at 896-98.

The allegations in the Second Amended Complaint, however, bring this case much closer to the facts of *Simpson* and *Flanagan.* First, like the Plaintiff in *Simpson*, Plaintiff has now alleged statistics that plausibly suggest significant numbers of incidents involving allegations of excessive force by SLMPD officers against individuals who resisted arrest. Plaintiff now alleges the existence of at least 611 settlement agreements (94% of 650 total settlement agreements) that settled allegations of excessive use of force, false imprisonment, and illegal searches, occurring since 2010. The latest date of those settlements is unclear,[4] but even if they span the entire 10 years from 2010 through the filing of the proposed Second Amended Complaint in 2020, that translates to approximately 61 settlement agreements involving allegations of excessive force per year. In addition, Plaintiff has identified 169 specific incidents of executed settlement agreements involving claims of excessive force and unlawful seizures arising from arrests for resisting or running away from 2013 through 2015, and 46 of those incidents involved discharge of a firearm; this translates to 56 incidents per year, 15 per year involving discharge of a firearm. Although

---

[4] In his Sur-Reply, Plaintiff states that these settlements were dated between 2010 and 2015 (Doc. 89, at 2); however, that is not apparent from the language of the Second Amended Complaint.

these numbers are not as high as the number found sufficient to show a pattern in *Simpson*  (68 lawsuits per year involving allegations of excessive force),[5] *Simpson* involved a city with a population more than four times that of St. Louis.[6]

Like the *Simpson* court, this Court is cognizant of the fact that "mere allegations, and even settlements, do not establish liability or the existence of an unlawful custom." 202 F. Supp. 3d at 453. However, also like the court in *Simpson*, at this stage the Court must treat Plaintiff's allegations as true and must draw all reasonable inferences in favor of Plaintiff. The Court also acknowledges that Plaintiff here alleges settlement agreements rather than lawsuits, and Plaintiff does not allege that the City paid large amounts of money to settle excessive force claims. However, the lack of such allegations makes sense in light of Plaintiff's theory that the effect of the Rec and Normal policies is to deter victims of excessive force from filing lawsuits, instead pushing them into signing releases to avoid criminal prosecution.

As the Municipal Defendants point out, Plaintiff includes few details regarding the specific facts surrounding most of these incidents. However, the same was true in *Simpson*, where the allegations of a widespread practice of excessive force were based on general statistics rather than specific, factually similar cases. Moreover, as Plaintiff points out, the allegation that the 169 incidents involved municipal charges of resisting arrest (rather than state misdemeanor charges,

---

[5] The plaintiff in *Simpson* alleged 1223 lawsuits in six years, one-third of which involved allegations of excessive force, giving rise to an average of 68 lawsuits per year.

[6] Judge Clark previously took judicial notice of the fact that according to the 2010 United States Census, the population of the City of St. Louis was over 319,000 according to the 2010 United States Census. *See Ball-Bey v. Chandler*, 415 F. Supp. 3d 884, 896 (E.D. Mo. 2019) (citing U.S. Dep't of Commerce, 2010 Census of Population and Housing (2012)). According to the same source cited by Judge Clark, the population of the City of Philadelphia in 2010 was more than 1,526,000.

which Plaintiff alleges are required where the suspect used or threatened the use of physical force)—supports the inference that any force used, especially deadly force, was excessive.

Plaintiff's new allegations also bring this case closer to the facts in *Flanagan*. Like the Plaintiff in *Flanagan*, who alleged that Dallas was ranked highly compared to other cities in police misconduct incidents and had high rates of officer-involved shootings and shootings of unarmed suspects, Plaintiff has now included allegations that the SLMPD had an unusually high per capita rate of police shootings compared to other cities; that between 2012 and 2014, SLMPD officers discharged their firearms approximately 183 times, with more than half of those incidents taking place during foot chases where the offender is alleged to have resisted; and the most common pattern of incidents giving rise to shootings were incidents that, like the one here, involved "suspicious persons" who were on foot or in a vehicle. In addition, like the plaintiff in *Flanagan*, who provided details for three of the alleged shooting incidents showing similarities to the case at hand, Plaintiff has provide more details regarding six incidents—five in which a suspect was shot while running away from police, and one in which an one in which an undercover officer was severely beaten and falsely accused of having resisted arrest.

The Municipal Defendants correctly point out that Plaintiff has provided details regarding fewer incidents, occurring over a longer time frame, than did the plaintiff in *Flanagan*. The Court agrees with the Municipal Defendants that, standing alone, the allegations regarding six incidents would not show a widespread practice of use of excessive force. However, those allegations do not stand alone; they stand together with Plaintiff's allegations regarding shooting statistics in St. Louis; Plaintiff's allegations regarding the manner in which the Municipal Defendants' policies have the effect of discouraging victims of excessive force who resist arrest from filing lawsuits by causing victims to choose between executing releases or face criminal prosecution; the statement

of Craig Higgins, the Defendant's municipal division attorney manager, that in situations in which an officer "beats down" an individual who ran away, a resisting arrest charge would be made and would not be dismissed unless the individual signed a release of civil claims; Plaintiff's allegations of over 600 settlement agreements releasing excessive force claims in resisting arrest cases since 2010; and Plaintiff's allegations of 169 specific incidents between 2013 and 2015 where individuals charged with resisting arrest settled excessive force claims through releases.

Although it is a somewhat close call, the Court finds that in light of the new allegations in the Second Amended Complaint, Plaintiff has sufficiently pleaded the existence of a widespread, persistent custom of use of excessive force against individuals who resist or run away.

## ii. Deliberate indifference

As discussed above, to establish liability based on an unofficial custom, a plaintiff must show "deliberate indifference to or tacit authorization of [the pattern of misconduct] by the governmental entity's policymaking officials after notice to the officials of that misconduct." *Corwin*, 829 F.3d at 700. The Municipal Defendants do not specifically challenge the element of deliberate indifference. Taking Plaintiff's allegations as true, the Court finds that Plaintiff has met his burden of pleading facts sufficient to show deliberate indifference. As discussed above, Plaintiff alleges that the Municipal Defendants were on notice that officers were beating suspects and discharging their firearms because suspects ran away, and Plaintiff alleges that the Municipal Defendants were aware of large numbers of excessive force allegations in large numbers of settlement agreements related to resisting arrest cases in the three years prior to Mansur's shooting death, yet failed to investigate any of the facts underlying any of the executed release agreements and/or the corresponding allegations and failed to provide proper training to their officers in the use of force. These allegations are sufficient to plausibly suggest that the Municipal Defendants

20

were aware of the misconduct and were deliberately indifferent to it or tacitly authorized it. *See, e.g., Simpson*, 202 F. Supp. 3d at 454 (holding that the plaintiff had adequately pleaded knowledge of a custom of excessive force and acquiescence by a decisionmaker; reasoning in part that "in light of the statistics cited above, if [the defendants] were aware of the frequency with which excessive force claims occurred (or, at a minimum, were at least alleged and documented), but failed to conduct proper investigations into those alleged violations, and further failed to implement procedures to prevent future violations, this could plausibly suggest a disregard for known threats of constitutional injuries to civilians, or, at a minimum, a high likelihood of such injuries).

### iii. Causation/Moving Force

The Court next considers the Municipal Defendants' argument that Plaintiff has not pleaded sufficient facts to show a direct causal link between the policies and customs and the injury in this case. As discussed above, to establish a claim for municipal liability based on a custom, the Plaintiff must show that he "was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Corwin,* 829 F.3d at 700. In analyzing the Second Amended Complaint, Judge Clark found that aside from Plaintiff's conclusory allegations of causation, which were not entitled to the presumption of truth, Plaintiff had pleaded no facts from which the Court could infer either that the Rec & Normal policies were the moving force behind the YRYP custom or that the YRYP custom was the moving force behind Chandler and Vaughn's conduct toward Mansur.

The Municipal Defendants argue that the Second Amended Complaint, like the First Amended Complaint, contains only conclusory allegations to suggest a causal connection between the policies and customs at issue and the shooting in this case. Plaintiff, on the other hand, argues

that the inference of a causal connection is supported by several new factual allegations in the Second Amended Complaint.

Although it is, again, a somewhat close call, the Court agrees with Plaintiff and finds that Plaintiff has adequately alleged the requisite causal links between the Rec and Normal Policies, the YRYP custom, and Chandler and Vaughn's actions here. As the Eighth Circuit has noted, "Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern for punishment." *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999). *See also Ricketts v. City of Columbia, Mo.,* 36 F.3d 775, 780 (8th Cir. 1994) ("[I]t is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future") (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)).

*Simpson* is again instructive. In *Simpson*, the court found that Plaintiff had pleaded sufficient facts to satisfy the element of causation by alleging that City officials "allowed excessive force violations to occur, failed to investigate allegations of excessive force by [Philadelphia Police Department] officers, and that this inaction encouraged police officers to further engage in excessive force violations, including the incident at issue in this case." 202 F. Supp. 3d at 454. Here, the allegations in the Second Amended Complaint are stronger than those found sufficient in *Simpson*. Plaintiff alleges both that City officials failed to investigate hundreds of incidents involving allegations of use of excessive force and that the City adopted policies that insulated officers who used excessive force in resisting arrest cases from facing lawsuits. He also alleges that Chandler and Vaughn were driven, motivated, and protected as a direct result of the Rec & Normal Policies, and that Plaintiff's injury was a direct substantial, and proximate result of the

22

SLMPD tyrannical patterns and practices. Taking all of these allegations together, Plaintiff has sufficiently alleged facts to plausibly suggest that the City's actions and inactions encouraged officers to use excessive force in resisting arrest cases, including in the specific incident at issue in this case.

The Municipal Defendants argue that because Plaintiff has not alleged that Vaughn or Chandler were aware of the practice of asking municipal court defendants charged with resisting arrest to sign releases, Plaintiff has not pleaded the requisite causation element. The Court disagrees. Plaintiff's theory is that the Rec & Normal policies caused a widespread custom of use of excessive force against suspects resisting arrest to develop among SLMPD officers, and that custom was the moving force behind Chandler and Vaughn's conduct. It is not necessary that Chandler and Vaughn had specific knowledge of the Rec & Normal policies; it is sufficient that the Court can infer that their behavior was caused by the unofficial custom that arose as a result of those policies.

The Court expresses no opinion on the likelihood that Plaintiff will be able to prove each of the elements of his municipal liability claim. However, "to survive a motion to dismiss, [Plaintiff's] allegations need only be plausible, not probable." *McDonough v. Toles*, No. 19-CV-2238 (PJS/TNL), 2020 WL 4481961, at *8 (D. Minn. Aug. 4, 2020). *See also Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement . . . ." (citation and quotation marks omitted)); *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (citation and quotation marks omitted)). At this stage, Plaintiff has met his burden. The Court also notes that the Municipal Defendants have not directed the Court to

any cases finding that allegations to those similar to the case at bar to be insufficient to state a claim for municipal liability.

For all of the above reasons, the Court will deny the Municipal Defendants' motion to dismiss the municipal liability claim in Count V.

### 2.  *Failure to Train, Supervise, or Control*

The Court next addresses the Municipal Defendants' argument that Plaintiff has failed to state a claim for failure to train, supervise, or control. To state a claim for supervisory liability under § 1983 for a failure to train or supervise, Plaintiff must plead: (1) notice of a pattern of unconstitutional acts committed by subordinates; (2) deliberate indifference to or tacit authorization of those acts; (3) failure to take sufficient remedial action; and (4) proximate cause of the plaintiff's injury. *Livers v. Shenck*, 700 F.3d 340, 355 (8th Cir. 2012). A failure to train may serve as the basis for § 1983 liability where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388. A court analyzes a claim for failure to supervise the same way it analyzes a claim for failure to train. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

The Municipal Defendants' principal argument for why Plaintiff has failed to state a claim for failure to train or supervise is similar to their argument regarding municipal liability: that Plaintiff has not alleged a pattern of constitutional violations similar to the one that allegedly occurred in this case. As discussed above, the Court finds that argument unpersuasive. The Court also finds the other elements of the claim have been adequately pleaded, at this early stage. In light

of the allegations regarding the exceptionally high rates of shootings by SLMPD officers, the specific instances of shootings and beatings of suspects running away from police, and the numerous settlement agreements involving allegations of excessive force (which Plaintiff alleges the Municipal Defendants were aware of), the Court finds that the Municipal Defendants were on notice of a pattern of unconstitutional acts caused by subordinates. Taking as true allegations that the Municipal Defendants failed to investigate any of the facts underlying any of the executed release agreements and/or the corresponding allegations; failed to train Chandler and Vaughn on the proper use of force when an offender runs;  failed to properly institute training and policies to prevent the use of deadly force when an offender runs; and failed to properly train officers on charging resisting arrest, the Court finds it plausible that the Municipal Defendants were deliberately indifferent to or tacitly authorized such conduct and failed to take appropriate remedial action. As discussed above, the Court finds that Plaintiff has also alleged sufficient facts to show that custom of using excessive force against suspects resisting arrest was the moving force behind the shooting of Mansur. The Court also finds that Plaintiff has alleged sufficient facts to suggest the Municipal Defendants' failure to address that custom—by, e.g., investigating allegations of excessive force and training officers in the appropriate use of force against offenders who run— proximately caused the injury in this case.

For all of the above reasons, the Court will deny the Municipal Defendants' motion to dismiss Plaintiff's failure to train, supervise, and control claims.

### B.    Claim for Injunctive Relief

In Count V (municipal liability), Plaintiff requests, in addition to compensatory damages, "a permanent injunction from Defendants' Rec & Normal practices and policies." 2d Am. Compl. p. 40. Defendant argues that the claim for injunctive relief should be dismissed both for lack of

standing and for failure to state a claim. Plaintiff provides no response to the Municipal

Defendants' argument that Plaintiff lacks standing to assert a claim for injunctive relief.

The Supreme Court has held that for the plaintiff to have standing to seek injunctive relief,

instead of just damages, the plaintiff must show "a real or immediate threat that the plaintiff will

be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *City of Los

Angeles v. Lyons*, 461 U.S. 95, 105 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).

In *Lyons*, a plaintiff who had been choked into unconsciousness by police during a traffic stop

brought suit for damages and injunctive relief, requesting an injunction banning the City's use of

such holds. *Id.* at 98, 105. The Supreme Court found that the plaintiff did not have standing to sue

for injunctive relief:

> Lyons' standing to seek the injunction requested depended on whether he was likely
> to suffer future injury from the use of the chokeholds by police officers. Count V
> of the complaint alleged the traffic stop and choking incident five months before.
> That Lyons may have been illegally choked by the police on October 6, 1976, while
> presumably affording Lyons standing to claim damages against the individual
> officers and perhaps against the City, does nothing to establish a real and immediate
> threat that he would again be stopped for a traffic violation, or for any other offense,
> by an officer or officers who would illegally choke him into unconsciousness
> without any provocation or resistance on his part. The additional allegation in the
> complaint that the police in Los Angeles routinely apply chokeholds in situations
> where they are not threatened by the use of deadly force falls far short of the
> allegations that would be necessary to establish a case or controversy between these
> parties.

*Id.* at 105. *See also, e.g., Brown v. City of Ferguson, Mo.*, No. 4:15CV00831 ERW, 2015 WL

8313796, at *7 (E.D. Mo. Dec. 9, 2015) (relying on *Lyons* and dismissing plaintiffs' claim for

declaratory and injunctive relief where "Plaintiffs have alleged Defendant City authorized officers

to act in a discriminatory manner, but they have not established more than a mere possibility they

will again encounter police and face discrimination").

After review of the allegations in the Second Amended Complaint, and in the absence of any contrary argument from Plaintiff, the Court agrees with the Municipal Defendants that Plaintiff lacks standing to seek injunctive relief. Plaintiff, who is the father of the man who was shot by police, does not include in the Second Amended Complaint any facts to suggest that there is any real or immediate threat that he will be arrested, resist or run away, and be subjected to excessive force. Accordingly, the Court will grant the Municipal Defendants' motion to dismiss the claim for injunctive relief. The Court need not reach the Municipal Defendants' remaining arguments regarding Plaintiff's request for injunctive relief.

### C.       Official-Capacity Claims Against Dotson, Chandler, and Vaughn

The Municipal Defendants' final argument is that the Court should dismiss the official-capacity claims against Dotson, Chandler, and Vaughn, because such claims are functionally claims against the City and thus are redundant of the claims asserted against the City. Plaintiff provides no response to this argument.

The Eighth Circuit has held that "[a] suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir.2007). Accordingly, the Eighth Circuit has held that it proper for a district court to dismiss a claim against an officer in his official capacity "as redundant of the claim against the City." *Id. See also, e.g., Taylor v. St. Louis Cmty. Coll.*, No. 4:18CV00272 SNLJ, 2018 WL 5078360, at *6 (E.D. Mo. Oct. 18, 2018) ("Because plaintiff has asserted this claim against defendant Gee in his official capacity and also against [St. Louis Community College], the court finds the claim redundant and must be dismissed.").

Because Plaintiff's claims against Dotson, Chandler, and Vaughn, in their official capacities are functionally claims against the City, and the absence of any contrary argument from Plaintiff, the Court agrees with the Municipal Defendants that these claims are redundant and will dismiss the official-capacity claims.

## IV. CONCLUSION

For all of the reasons above,

**IT IS HEREBY ORDERED** that the Motion to Dismiss Counts III, IV, and V of Plaintiff's Second Amended Petition for Failure to State a Claim (Doc. 76) will be **GRANTED IN PART and DENIED IN PART**. With respect to Defendants' request for injunctive relief, the motion is **GRANTED**. With respect to the request to dismiss the claims against Dotson, Chandler, and Vaughn in their official capacities, because they are redundant with the claims against the City, the motion is **GRANTED.** In all other respects, the motion is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's claim for injunctive relief is **DISMISSED**.

**IT IS FURTHER ORDERED** that the claims against Defendant Dotson, Chandler, and Vaughn in their official capacities are **DISMISSED**.

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of November, 2020.