UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS BALL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-CV-1364-SPM |
| | ) | **REDACTED VERSION**[1] |
| | ) | |
| KYLE CHANDLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment. (Doc. 230).

The motion has been fully briefed. The parties have consented to the jurisdiction of the undersigned

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 12). For the following

reasons, the motion will be granted in part and denied in part.

### I.  FACTUAL BACKGROUND[2]

This case arises out of the August 19, 2015 shooting death of Plaintiff Dennis Ball-Bey's

son, Mansur Ball-Bey. On that date, officers of the St. Louis Metropolitan Police Department

---

[1] This Memorandum and Order contains facts that have been filed under seal and that Defendants argue should remain completely under seal—specifically, the facts taken from Plaintiff's Supplemental Material Facts (Doc. 317-1). The sealing issue has been recently briefed and has not yet been resolved. To avoid a delay in ruling on the summary judgment motion while the Court considers the sealing issue, especially in light of the approaching trial date in this case, the Court will enter the full version of this Memorandum and Order under seal and will enter a redacted version of this Memorandum and Order in the public record that contains redactions of the facts taken from Plaintiffs' Supplemental Material Facts. If the Court later determines that some or all of the redacted facts should be made public, the Court will enter a version of this Memorandum and Order in the public record that contains only those redactions (if any) that it finds appropriate.

[2] These facts are generally taken from Defendants' Statement of Uncontroverted Material Facts ("DSUMF," Doc. 231) and Plaintiff's Response thereto (Doc. 280-2); Plaintiff's Statement of

("SLMPD") were executing a search warrant on a residence located at 1241 Walton Avenue. DSUMF ¶ 1; PSAUMF ¶ 3. Mansur Ball-Bey was present at that address, but he did not live there and was not the target of the warrant. PSAUMF ¶ 2. Officer Kyle Chandler and Officer Ronald Vaughan,[3] along with an agent from the Bureau of Alcohol, Tobacco, and Firearms, were assigned to cover the rear of the residence, and they went into the rear yard one house north of that address. DSUMF ¶¶ 1-2; PSAUMF ¶ 8. Two people—Mansur Ball-Bey and a shorter juvenile—ran out of the back of the residence at 1241 Walton Avenue and began running south in the alley. DSUMF ¶ 3, PSAUMF ¶ 3. The juvenile stopped running and hid behind an abandoned car. PSAUMF ¶¶ 3, 5. Ball-Bey continued running south down the alley. DSUMF ¶ 4. While running down the alley, Ball-Bey was carrying a handgun with an extended ammunition clip. *Id.* ¶ 5. An off-duty police officer ("the Secret Witness") happened to witness the events in question; he saw Ball-Bey carrying a gun as he ran down the alley, and yelled, "gun, gun." *Id.* ¶ 6. The parties dispute what occurred next.

Defendants' version of events is as follows. Chandler gave Ball-Bey orders to stop and drop the gun. *Id.* ¶ 7. After running south down the alley, and still carrying the gun, Ball-Bey turned east and ran from the alley into the rear yard of 1233 Walton Avenue, with Chandler

---

Additional Undisputed Material Facts ("PSAUMF," Doc. 280-2), and Plaintiff's Supplemental Material Facts ("PSMF," Doc. 317-1). Significant areas of dispute that are relevant to the instant motion are noted.

    The Court notes that Defendants did not file any responses to Plaintiff's Statement of Additional Undisputed Material Facts or Plaintiff's Supplemental Material Facts. There is a reference to a "Reply Statement of Uncontroverted Material Facts" in Defendants' Reply brief (Doc. 320), but no such statement was filed. Regardless, in light of the Court's review of evidence submitted by both parties, the Court finds that it is unlikely that any additional facts submitted in connection with the Reply would have affected the outcome of the case.

[3] Officer Ronald Vaughan's last name is spelled "Vaughn" at some places in the record. The Court uses "Vaughan," which is the spelling Ronald Vaughan gave at his deposition. *See* Pl.'s Ex. 3, First Deposition of Ronald Vaughan, Doc. 280-5, at 12:13-14.

following him. *Id.* ¶ 8. As the officers were chasing Ball-Bey, Vaughan moved past Chandler, to Chandler's right, into the rear yard of 1233 Walton Avenue. *Id.* ¶ 9. Ball-Bey raised the gun in his right hand and began to turn toward Vaughan. *Id.* ¶ 10. Both officers began firing at Ball-Bey, with Chandler firing one shot and Vaughan firing three shots. *Id.* ¶¶ 11-12. Chandler's shot hit Ball-Bey. *Id.* ¶ 19. Ball-Bey was approximately five to ten feet in front of Chandler when Chandler shot him. *Id.* ¶ 12. Ball-Bey then released the gun, and it flew over Vaughan's head or shoulder in the direction of the alley behind Vaughan. *Id.* ¶ 11. Ball-Bey then ran down the gangway in the direction of the front of 1233 Walton Avenue and collapsed in the front yard of that address. *Id.* ¶¶ 14-15. Defendants support this version of events through citations to the deposition testimony of Chandler, Vaughan, and the Secret Witness.

Plaintiff does not dispute that Vaughan fired three shots, that Chandler fired one shot, or that Chandler's shot killed Ball-Bey. Otherwise, however, Plaintiff offers a very different version of events. Plaintiff's version is as follows. As Ball-Bey was running south through the alley, he discarded the gun near the dumpster in the alley, where it was later found. PSAUMF ¶¶ 10, 21. Vaughan witnessed Ball-Bey throw the pistol and continue running down the alley. *Id.* ¶ 11. Ball-Bey then—at that point unarmed—turned east toward the backyard of 1233 Walton and ran into a gangway south of the building. *Id.* ¶ 12. Vaughan fired three shots at Ball-Bey while Ball-Bey was in the gangway, and Chandler fired one shot that hit Ball-Bey in the back, transecting his spine and causing him to collapse immediately in or near the front yard of 1233 Walton. PSAUMF ¶¶ 13-14, 16, 23-24. Plaintiff supports this version of events with deposition testimony from Vaughan and the Secret Witness in which they indicated that Ball-Bey discarded the gun when he was still in the alley (before he turned east into the yard where the officers say they shot him); physical evidence showing that Ball-Bey's gun was found by the dumpster in the alley, well behind the

3

location where the officers say they were when they shot him and approximately 150 feet behind the location where his body fell; the locations of spent shell casings showing that one of the officers' shots was fired at least 52 feet east of where the gun was found; expert testimony indicating that for the officers' accounts to be accurate in light of the locations of the gun and the shell casings, Ball-Bey would have had to have thrown the gun around 60 feet behind him, after being shot, in the opposite direction from that in which he was running—a proposition that Plaintiff argues is contrary to common sense and expert testimony; the initial autopsy indicating that Plaintiff's spinal cord was transected; the statement of the Chief Medical Examiner for the City of St. Louis that it would be impossible for an individual with a transected spine to continue running; the lack of any blood evidence between the place where Defendants claim they shot Ball-Bey and the place where he fell and died; and evidence tending to undermine Chandler's and Vaughan's credibility, including a prior case involving a motion to suppress based on falsified evidence in which a judge found Chandler's credibility questionable. The Court will examine this evidence in more detail as needed in the discussion below.

The parties also set forth facts related to the City's training of police officers and the City's handling of incidents involving the use of force by its police officers. These facts can be grouped into categories, as set forth below.

### *Officer Training Regarding Excessive Force*

Both Officers Chandler and Vaughan had been trained by the St. Louis Metropolitan Police Department on use of force, specifically the use of force continuum. DSUMF ¶ 16.

### *Policy Requiring Releases Before Amending Charges of Resisting Arrest*

The City of St. Louis had a written policy for its municipal prosecutors that reads, "Resisting arrest and Interfering with a Police Officer charges <u>cannot</u> be amended without first

obtaining a signed release from defendant." PSAUMF ¶ 99.[4] In a typical release form, the arrestee would release the City of St. Louis from any and all liability arising from the arrest at issue. *Id.* ¶ 100; Pl.'s Ex. 38, Release Form, Doc. 280-38. Chandler had never heard of any policy that the City Counselor's Office had of amending Resisting Arrest charges only if a defendant agreed to execute a release. DSUMF ¶ 18.

### *City Procedures for Reviewing Officer-Involved Shootings and Uses of Force*

Before 2013, officer-involved shootings were investigated by the Homicide Division. PSAUMF ¶ 63. In 2013, SLMPD Chief Samuel Dotson hired Roger Engelhardt to run the first Force Investigation Unit ("FIU") at the SLMPD. PSAUMF ¶ 62. The FIU, headed by Engelhardt, investigated officer-involved shootings until early 2018. *Id.* ¶¶ 62-63. A Special Order stated that "anytime an officer is involved in an officer-involved shooting ('OIS') either on or off-duty, he/she will be subject to a criminal investigation conducted by the Force Investigation Unit **and** an internal review of his/her adherence to Department policies conducted by the Internal Affairs Division." *Id.* ¶ 68. A Special Order also stated that a "Deadly Force Review Board will review all deadly force incidents involving police officers." *Id.* ¶ 89. That Special Order also required the Deadly Force Review Board to review FIU investigative files and to submit a report to the Chief of Police with recommendations for action. *Id.* ¶¶ 90-91.

From 2012 to April of 2014, the City of St. Louis had a system of tracking officers' uses of force, called RAMS. *Id.* ¶ 94. Starting in January 2018, the City had a similar program called

---

[4] Defendants contend that this was not a policy of the City Counselor's Office but was a guideline for new interns and was not strictly enforced. DSUMF ¶ 17. Viewing the facts in the light most favorable to Plaintiff, for purposes of this motion, the Court will assume that this was a policy of the City Counselor's Office.

Blue Team. *Id.* From April 2014 to January 2018, the City had no system in place to track allegations of excessive force by officers. *Id.* ¶ 95.

### Issues with FIU Staffing

The FIU was comprised of four people, but the head of the FIU testified that he could have used twenty full-time people. *Id.* ¶ 79. Neither the head of FIU nor its full-time employees were evaluated during the time they worked for the FIU. *Id.* ¶¶ 81-82. For the majority of the time from 2014 to 2018, there were no African-American officers in the FIU. *Id.* ¶ 80. One of the detectives in the FIU engaged in misconduct both before and after being part of the FIU. *Id.* ¶¶ 64-67. Engelhardt, who headed the FIU, was terminated from the SLMPD for misconduct that included working secondary while on the clock for SLMPD, approving a police report without the name of a deceased offender in it, allowing a father to investigate a shooting that his son had been a witness to, and approving an FIU report with 146 errors in it. *Id.* ¶ 77.

### Issues with FIU Investigations

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

Plaintiff also identifies several problems with the FIU's investigation of the Ball-Bey shooting after it occurred. Plaintiff asserts FIU officers asked the Secret Witness a series of leading questions related to the shooting, PSAUMF ¶ 39, that Engelhardt asked the Chief Medical Examiner to re-examine his findings in light of Chandler and Vaughan's stories, *id.* ¶ 41, that FIU detectives did not ask either Vaughan or Chandler about the location of the cartridge casings, *id.* ¶ 45, that the Circuit Attorney's Office's diagram of the locations of the cartridge casings was inconsistent with the SLMPD's own evidence report, *id.* ¶ 46, and that Engelhardt stated that the announcement by the Circuit Attorney that it would be doing joint investigations of officer-involved shootings was only political theater because the Circuit Attorney's Office had no way of doing its own investigation. *id.* ¶ 47. ██████████████████████████████

███████████████████████████████████████████████████

████████████████████

### Issues with the Circuit Attorney's Office's Review of Cases

Although the FIU did about 35 to 45 investigations from 2014 to 2018, Engelhardt only heard back from the Circuit Attorney's Office about whether that office decided to press charges in four to six cases. PSAUMF ¶ 83; Pl.'s Ex. 25, Deposition of Roger Engelhardt in *Green v. St. Louis*, Doc. 280-43, at 119:4-25, 120:1. The Circuit Attorney's Office did not decide to bring charges in any of those cases. PSAUMF ¶ 84. Beginning in 2016 or so, there was an issue wherein the Circuit Attorney's Office was not reviewing cases and the police division tried to convince the

7

Circuit Attorney's Office to start reviewing them. *Id.* ¶ 76; Pl.'s Ex. 29, Testimony of Corporate Designee Eddie Roth in *Green v. St. Louis*, Doc. 280-29, 103:1-23.

### *Issues with Internal Affairs Division Investigations*

Engelhardt testified that he did not know whether the IAD was opening cases or not. *Id.* ¶ 72.The City has not produced an IAD report on the shooting in this case. PSAUMF ¶ 73. There was an unwritten custom of waiting for IAD investigations until after the Circuit Attorney's Office had decided to issue charges on the matter. *Id.* ¶ 74.

### *Issues with the Deadly Force Tactical Review Board*

Plaintiff also suggests that the Deadly Force Tactical Review Board did not consistently meet. The City has not produced any record of Deadly Force Review Board documentation regarding the Ball-Bey shooting. *Id.* ¶ 92. At a December 2022 deposition, a representative of the City stated that there was no Deadly Force Tactical Review Board, but there had been in the past and it had convened twice. *Id.* ¶ 93; Pl.'s Ex. 29, Testimony of Corporate Designee Eddie Roth in *Green v. St. Louis*, Doc. 280-29, 194:18-25.

### *Other Police Shooting Incidents*

In 2011, the SLMPD Officer Jason Stockley said on video that he was going to "kill this mother fucker" and proceeded to shoot and kill Anthony Lamar Smith with his personal AK-47. *Id.* ¶ 96. In October 2014, Jason Flanery shot and killed Vonderitt Myers, a young black man, in a gangway; Flanery was later found to have drugs in his system. *Id.* ¶¶ 97-98. On June 7, 2017, an officer-involved shooting occurred that is the subject of a pending lawsuit. *See Torres et al. v. City of St. Louis et al.*, 4:19-CV-1525-DDN.

## II.      PROCEDURAL BACKGROUND

On August 17, 2018, Plaintiff Dennis Ball-Bey, Mansur Ball-Bey's father, filed the instant action against Kyle Chandler, Ronald Vaughan, the City of St. Louis, Missouri, and Sam Dotson (former chief of police), asserting various claims under 42 U.S.C. § 1983 and Missouri state law. In the Second Amended Complaint, Plaintiff asserted five claims: (I) excessive use of force in violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983 (against Chandler and Vaughan); (II) wrongful death and assault & battery under Mo. Rev. Stat. § 537.080(1) and § 516.120 (against Chandler and Vaughan); (III) failure to train, supervise, and control under 42 U.S.C. § 1983 (against the City of St. Louis and Dotson); (IV) failure to train, supervise, and control under 42 U.S.C. § 1983 (against Dotson); and (V) municipal liability under 42 U.S.C. § 1983 (against the City of St. Louis and Dotson).[5]  The claims were brought against Chandler and Vaughan in their individual and official capacities and against Dotson in his official capacity only. 2d Am. Compl., ¶ 1. The Court subsequently dismissed the official-capacity claims against Dotson (which were the only claims against him), the official-capacity claims against Chandler and Vaughan, the assault and battery claims against Chandler and Vaughan (but not the wrongful death claim) in Count II, and the aspect of Count V that sought injunctive relief. (Doc. 103; Doc. 104). Plaintiff later voluntarily dismissed all claims against Vaughan. (Doc. 325).

The claims remaining for resolution are the § 1983 excessive force claim against Chandler in his individual capacity in Count I; the state-law wrongful death claim against Chandler in Count II; the failure to train, supervise and control claim against the City of St. Louis in Count III; and

---

[5] Plaintiff also included a Count VI, which is a prayer for reasonable attorney's fees and costs under 42 U.S.C. § 1988 (against all defendants)

the municipal liability claim against the City in Count V. Defendants now move for summary judgment on all of these claims.

### III.   LEGAL STANDARDS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). The movant "bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.*, and "must provide more than conjecture and speculation," *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022).

A dispute about a material fact is genuine, making summary judgment inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

## IV.  DISCUSSION

### A.  Count I: § 1983 Excessive Force Claim Against Chandler

In Count I, Plaintiff alleges Chandler violated Ball-Bey's rights under the Fourth and Fourteenth Amendments when they used deadly force on him that was excessive and not objectively reasonable. In the instant motion, Chandler argues that the undisputed material facts show that he is entitled to qualified immunity on the excessive force claim against him and that the Court should therefore grant summary judgment in his favor on Count I.

### 1.  The Fourth Amendment and Excessive Force

"A police officer's use of deadly force against a suspect is a 'seizure' under the Fourth Amendment." *Cole Estate of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020). "As such, the use of deadly force is subject to the Fourth Amendment's reasonableness requirement," and "[t]hat requirement prohibits the use of excessive force in effectuating a seizure." *Id.* "The test for whether force is 'excessive' asks 'whether the amount of force used was objectively reasonable under the particular circumstances.'" *Id.* (quoting *Z.J. ex rel. Jones v. Kan. City Bd. Of Police Comm'r*s, 931 F.3d 672, 681 (8th Cir. 2019)). The Court must "evaluate the reasonableness of an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Whether the use of deadly force is reasonable turns on 'the totality of the circumstances, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether the suspect is actively fleeing or resisting arrest.'" *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)); citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). "[A]n officer may not use deadly force against a

11

fleeing suspect *unless* the suspect poses an *immediate and significant threat* of serious injury or death to the officer or to bystanders." *Wallace*, 843 F.3d at 769 (quoting *Thompson v. Murray*, 800 F.3d 979, 982 (8th Cir. 2015)). *See also Garner*, 471 U.S. at 11-12 (holding that a police officer may deploy deadly force against an individual if the officer "has probable cause to believe that the [person] poses a threat of serious physical harm, either to the officer or to others.").

### 2.  *Qualified Immunity*

"'Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). A government official is "entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff[], demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Aldridge v. City of St. Louis*, 75 F. 4th 895, 898 (8th Cir. 2023) (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotation marks omitted). In order for a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

### 3.  *Whether Chandler Is Entitled to Qualified Immunity on the Excessive Force Claim*

Defendants argue that Chandler is entitled to qualified immunity because it was not clearly established on August 19, 2015, that it was a Fourth Amendment violation for an officer to use deadly force against a suspect who pointed a gun at a police officer. They cite several cases in

which the Eighth Circuit has found the use of deadly force in similar circumstances to be objectively reasonable. *See Partlow v. Stadler*, 774 F.3d 497, 502-03 (8th Cir. 2014) (holding that officers who fired shots at an armed individual who turned a gun toward them were entitled to qualified immunity on an excessive force claim, because a reasonable officer would have had probable cause to believe that the individual posed a threat of serious physical harm; noting that "[e]ven if Partlow intended to do no harm to the officer as he moved the shotgun, the officers' use of force was objectively reasonable," because "[t]hey had no way of knowing what Partlow planned to do); *Estate of Morgan v. Cook*, 686 F.3d 494, 497-98 (8th Cir. 2012) (holding that an officer who fired a shot at an individual who was holding a knife, who refused to comply with orders to drop the knife, and who instead stood up and moved toward the officer, was entitled to qualified immunity; finding that the officer "had probable cause to believe that the individual posed a threat of imminent, substantial bodily injury to" the officer and that the officer's "act of shooting [the individual] was objectively reasonable"); *Sok Kong v. City of Burnsville*, 960 F.3d 985, 993-94 (8th Cir. 2020) (holding that officers who shot at an individual holding a knife and running away from them and toward bystanders were entitled to qualified immunity; reasoning that they would have reasonably believed that the law would have allowed them to shoot him given the threat he posed to bystanders). Defendants argue that here, because it is undisputed that Ball-Bey pointed his gun in the direction of Vaughan, it was entirely reasonable for Chandler to believe that Ball-Bey was going to shoot Vaughan, and therefore Chandler's use of deadly force was constitutionally reasonable.

In his Memorandum in Opposition, Plaintiff agrees that "if Ball-Bey had pointed his weapon at two officers, the officers would be entitled to qualified immunity, because their actions of shooting at him would have [been] objectively reasonable." Pl.'s Mem. Opp'n, Doc. 280-1, at

24. But Plaintiff contends that "the Court could only arrive at that conclusion if it takes the facts in the light most favorable to the Defendants, which the law does not permit, and which a plethora of evidence contradicts." *Id.* Plaintiff argues that when the facts are viewed in the light most favorable to Plaintiff, Plaintiff was *unarmed* at the time of the shooting and was not posing an immediate or significant threat of injury to the officers or anyone, such that none of the cases cited by Defendants are applicable. Plaintiff then cites several cases finding constitutional violations where police used deadly force against individuals who did not pose an immediate or significant threat of injury to anyone.

In their Reply, Defendants do not argue that Chandler would be entitled to qualified immunity even if Ball-Bey had been unarmed. Instead, they argue only that there is no evidence to support Plaintiff's argument that Ball-Bey was unarmed.

The Court thus begins with the only real issue in dispute: whether there is a genuine issue of material fact regarding whether Chandler had probable cause to believe that Ball-Bey was armed—and therefore posed an immediate and significant threat of serious injury—when Chandler shot him. Defendants argue that the only "actual evidence" in this case is the testimony of the eyewitnesses that Plaintiff was holding a gun at the time he was shot, and that Plaintiff's position to the contrary is "based on nothing but speculation, supposition, breathless indignation, and misquoted testimony." Defs.' Reply, Doc. 320, at 1, 3. After careful review of the record, the Court disagrees and finds that Plaintiff has produced sufficient evidence from which a reasonable jury could find that Ball-Bey was unarmed at the time Chandler shot him and that Chandler had no reasonable basis for a belief that Plaintiff posed a serious threat to anyone.

14

First, the Court agrees with Plaintiff that there is some eyewitness testimony that tends to support Plaintiff's contention that Ball-Bey threw the gun when he was in the alley, before he turned east into the yard where he was shot.[6] At his first deposition, Vaughan testified as follows:

Q.   And did you observe Mansur Ball-Bey throw the pistol and continue south down the alley?

A.   Yes.

Q.   Okay. You can hand that--and after you observed Mr. Ball-Bey throw the pistol and continue south down the alley, why did you then shoot him?

   Ms. McGowan:      Objection, foundation, form
   The Witness:   Can you repeat the question?

Q.   (By Mr. Dailey) After you observed Mansur Ball-Bey throw the pistol and continue south down the alley, what, if anything, did Mansur Ball-Bey do?

A.   He ran.

Q.   Where did he go?

A.   To the front yard.

Q.   Okay. He's in the alley. From the alley which way did he turn?

A.   Left.

Q.   And when he turned left --

A.   Would depend on the direction you're going in the alley, I guess.

Q.   Can you speak up, please?

A.   It would depend on the direction you're going in the alley.

Q.   Okay. I'm talking about the direction that Mansur Ball-Bey was traveling, okay? You stated that he made eye contact with you, threw the pistol and then continued running south down the alley, correct?

A.   Yes.

Q.   Okay. And he made a left on -- into the back of 1233 Walton, correct?

A.   I'm not sure –

   Ms. McGowan:      Objection, as to vague. It's vague.
   The Witness:   I don't know. I don't know the address.

Q.   (By Mr. Dailey) He made a left into the backyard of a house, correct?

A.   Correct.

Q.   And after he made that left, you fired your pistol, correct?

A.   Correct.

---

[6] Defendants argue that in Plaintiff's brief, Plaintiff is "misquoting deposition testimony." *See* Defs.' Reply, Doc. 320, at 1. It is unclear what Defendants are referring to. Regardless, the Court's quotations are taken directly from the relevant transcripts and not from Plaintiff's briefs.

Pl.'s Ex. 3, First Deposition of Ronald Vaughan, Doc. 280-5, 28: 12-25, 29:1-25, 30:1-4. Shortly

thereafter, Vaughan testified as follows:

> Q.      So did he have another gun?
> A.      I have -- I don't know what that means.
> Q.      I'm saying, did you observe Mr. Ball-Bey with a second pistol?
> A.      No.
> Q.      You observed him throw one pistol at the dumpster and continue running south, correct?
> A.      I didn't see where it initially went but, yes.
> Q.      And then he turned left into the parking pad of, which we know is 1233 Walton, correct?
> A.      Correct.
> Q.      And then you discharged your weapon, correct?
> A.      Correct

*Id.* at 31:1-12.

The off-duty police officer Secret Witness also gave a statement and deposition testimony

suggesting that he saw Ball-Bey throw the gun while he was in the alley (where the dumpster was

located), rather than throwing it from the yard over Vaughan's head or shoulders as Defendants

contend. In the statement he gave to the FIU, the Secret Witness stated that "Ball Bey throws the

gun up against the dumpster and he's steady running." Pl.'s Ex. 1, FIU Report, Doc. 280-3, at p.

20. In his deposition testimony, the Secret Witness testified:

> Q.      Just to be -- let me rephrase it because she just objected.· I want to make sure I'm clear. You saw the taller kid throw the gun prior to entering the back yard, correct?
> A.      Yes, sir. . . .

Pl.'s Ex. 16, Secret Witness Deposition, Doc. 280-18, at 164:20-24. The Secret Witness also drew

an X on a map the location where he saw Plaintiff throw the gun, and the X was in the alley. *Id.* at

193:19-24, 194:1-25; 195:1-8; Pl.'s Ex. 18, Exhibit from Secret Witness Depo, Doc. 280-20. He

testified, "Where I marked the X is where I believe he threw the weapon and continued to run

east." Pl.'s Ex. 16, Secret Witness Dep., Doc. 280-18, at 195:7-8; 196:13-20.

16

These statements constitute evidence in support of Plaintiff's contention that he threw the gun when he was in the alley, before he went into the backyard where Chandler shot him. The Court acknowledges that Defendants will likely argue that Plaintiff is misinterpreting the cited testimony and will point to contrary testimony from those same witnesses that is more consistent with Defendants' version of events. However, resolving which part of each witness's testimony is most credible and consistent with the other evidence is a task for the jury, not the Court.

In addition to the statements above, the Court agrees with Plaintiff that the physical evidence and expert testimony provide support for Plaintiff's version of events. As Plaintiff points out, the gun was found by the dumpster in the alley—where Plaintiff contends Ball-Bey discarded it. Additionally, evidence technicians found four shell casings at the scene, all to the east of the alley, with one ("number 7") approximately 52 feet east of the alley. Pl.'s Ex. 12, ETU Report, Doc. 280-14, at p. 7. Plaintiff's shooting reconstruction expert, Michael Knox, has opined that the locations of those shell casings do not support the officers' testimony as to where they were when Chandler fired, because shell casings eject to the rear or the shooter and the officers were moving east toward Ball-Bey when they fired.[7] Pl.'s Ex. 23, Expert Report of Michael Knox ("Knox Report"), Doc. 280-24, at pp. 52-53; Deposition of Michael Knox ("Knox Dep."), Doc. 225-3, at 37:1-25. Mr. Knox also opined, based on the testimony of the officers and the locations of the shell casings, that Chandler's shot most likely corresponded to the shell casing number 7 and was thus made at least 52 feet of the alley. *Id.* at 48:23-25; 49:1-25; 50:1-22. Mr. Knox also opined that Ball-Bey was most likely unarmed at the time of the shooting. Knox Report, at p. 54; Knox Dep.,

---

[7] The Court's discussion is based on evidence from Mr. Knox rather than evidence from Plaintiff's other retained expert, Mr. Harmening, because Mr. Harmening's opinions have now been excluded.

at 52:1-25; 53:1-19. Mr. Knox reasoned in part that in order to throw the gun into the alley after the number 7 shot was fired, Ball-Bey would have had to throw the gun more than 60 feet behind him, which would have required him to turn around and pitch the gun "like a pitcher" at 40 miles an hour. Knox Dep., 225-3, at 52:3-25; 53:1-7. Mr. Knox found that this was not a "reasonable possibility," in part because the officers did not describe Ball-Bey turning around and pitching the gun like a pitcher and in part because the gun does not have the signs of interaction with the concrete that would be expected from that sort of throw. *Id.* at 52:12-25, 53:1-7.

Additionally, even without the testimony of Mr. Knox, a reasonable juror could find that the physical evidence, which shows a shell casing 52 feet east of where the gun was found, is more consistent with Plaintiff's version of events than with Defendants' version of events. Notably, Defendants do not address the physical evidence at all and make no attempt to harmonize the locations of the shell casings, the location of the gun, and the officers' testimony.

Finally, the Court notes that if the jury does find that Ball-Bey threw the gun into the alley before the shooting, Defendants point to no other evidence in the record to show that Chandler had some other reasonable basis for believing that Ball-Bey posed a serious threat of injury or death to anyone. Defendants do not argue that Ball-Bey had a second gun or other weapon. Nor do Defendants argue that Chandler may have mistakenly but reasonably believed that Ball-Bey had a gun at the time of the shooting[8]—an argument that would be inconsistent with Chandler's own testimony that he saw the gun fly backwards from Ball-Bey's hand after the shooting. Defs.' Ex.

---

[8] "[E]ven if a suspect is ultimately found to be unarmed, a police officer who reasonably believes a suspect is armed and dangerous may still employ deadly force. 'An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment.'" *Capps v. Olson*, 780 F.3d 879, 885 (8th Cir. 2015) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 966 (8th Cir. 2012)).

1, Deposition of Kyle Chandler, Doc. 260-1, at 125:4-7, 17-20. Even if Defendants were to argue mistaken belief, they have not shown the absence of a genuine issue of material fact on that point.

The Court finds the above evidence sufficient to create a genuine issue of material fact regarding whether Chandler had a reasonable basis for believing that Ball-Bey posed a serious threat of injury or death at the time Chandler shot him.[9] The Court acknowledges that there are other possible interpretations of the testimony and physical evidence. However, deciding between those interpretations requires making credibility determinations and weighing evidence, neither of which is appropriate at the summary judgment stage.

In reaching this conclusion, the Court finds instructive the Eighth Circuit's recent decision in *Partridge v. City of Benton*, 70 F.4th 489 (8th Cir. 2023), a police shooting case in which the Eighth Circuit found that indirect evidence from an expert was sufficient to create a genuine issue of fact even where all of the eyewitness testimony supported the defendants' version of the facts. In *Partridge*, police officers shot and killed an individual who had gone into the woods holding a gun and threatening suicide. *Id.* at 490. Three officers found him, but only one had a clear view of him. *Id.* After being asked to show his hands and then to drop a gun he was holding, the decedent brought the gun to his own temple. *Id.* The decedent then moved the gun, and the officer shot and killed him. *Id.* The decedent's parents sued the officers, alleging that the shooting officer had used excessive force. *Id.* The defendants moved for summary judgment, citing officer testimony that the decedent had pointed the gun at the shooting officer the moment before the decedent was shot.

---

[9] Because the Court finds the above evidence sufficient to defeat summary judgment, the Court need not address the evidence Plaintiff cites related to the autopsy report, the findings of the medical examiner, the lack of blood found at the scene, or the evidence that undermines the officers' credibility.

*Id.* The defendants argued that in light of the absence of any eyewitness testimony to contradict the officers' account, it was "undisputed" that the decedent had pointed his gun at the officers. *Id.* at 491. The decedents' parents, relying on the testimony of a forensic expert, claimed that the decedent had never pointed a gun at the shooting officer. *Id.* at 490. The expert's testimony, based on an autopsy, was that it was highly unlikely that the decedent had pointed his gun at the officers before being shot. *Id.* at 491. The expert testified that for the decedent to have pointed his gun at the officers, the decedent would have had to perform "a very awkward, highly atypical, unnatural twisting of the wrist," and that although it might have been "anatomically possible," it would have required "a very abnormal movement." *Id.* The district court granted the defendants' motion for summary judgment. *Id.* at 490.

On appeal, the Eighth Circuit reversed the district court's decision, finding a genuine issue of material fact regarding whether the decedent had pointed his gun at the officers. It stated:

> Defendants incorrectly claim it "undisputed" that [the decedent] pointed his gun at the officers. But the parents do dispute it. A section heading in their brief opposing summary judgment says [the decedent] "Did Not Pose a Threat, Did Not Point a Firearm at Officers." They maintain this position on appeal.

> Defendants emphasize the lack of eyewitness testimony that [the decedent] did not point his gun at the officers. But a lack of eyewitness testimony is not a lack of evidence. Dr. Wecht's testimony, if believed, supports a reasonable inference that [the decedent] did not point his gun at the officers. That suffices to survive summary judgment. *See Anderson*, 477 U.S. at 255 ("[T]he drawing of legitimate inferences from the facts" is a "jury function[.]"). *See also* Judicial Comm. on Model Jury Instructions for the Eighth Circuit, Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit § 1.04 (2022) ("[T]he law makes no distinction between the weight to be given to direct and circumstantial evidence."). *Cf. Church v. Anderson*, 898 F.3d 830, 832 (8th Cir. 2018) (relying on an officer's "unrebutted" testimony where a plaintiff had no recollection of the incident and provided neither direct nor indirect evidence contradicting the officer's testimony).

*Id.* at 491-92. The court noted "internal discrepancies and variations" in the officers' testimony, including the fact that two officers changed their accounts to some extent between their police

reports and their later accounts. *Id.* at 492. The court also noted that "the officers' descriptions directly contradict the physical evidence as interpreted by [the expert]." *Id.* In video interviews, the officers had pantomimed how they believed the decedent had pointed the gun at the officers, and none had pantomimed the very awkward and unnatural movement the expert testified would have been necessary. *Id.* The court stated, "Believing Dr. Wecht's testimony—as required on appeal—requires rejecting the officers' accounts. The parties thus genuinely dispute whether [the decedent] pointed his gun at the officers." *Id.* The court found this dispute material, because it was "outcome determinative under prevailing law." *Id.* (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)).

In the instant case, as in *Partridge*, the Court is confronted with a situation wherein the defendants insist that a fact is "undisputed" because the eyewitness testimony supports the defendants' version of events, while the plaintiff contends the fact *is* disputed, based primarily on indirect evidence. As in *Partridge*, Plaintiff here points to several pieces of indirect evidence to support his version events, including physical evidence and expert testimony suggesting that Defendants' version of events is unlikely, along with some discrepancies and variations between the eyewitnesses' accounts and discrepancies between the eyewitnesses' accounts and the physical evidence. Here, as in *Partridge*, the Court finds the evidence presented sufficient to support a finding by the jury that Ball-Bey was unarmed at the time of the shooting. *See Partridge*, 70 F.4th at 492. *See also Wealot v. Brooks*, 865 F.3d 1119, 1125-28 (8th Cir. 2017) (finding genuine disputes of material fact regarding whether the officers knew the suspect was unarmed and whether the suspect was turning around to officers with his hands raised to surrender, where "[t]he officers' key testimony about the gun is controverted by other witnesses, some of their own inconsistent statements, and some physical evidence"). *Cf. Stanton v. Elliott*, 25 F. 4th 227, 234 (4th Cir. 2022)

21

(noting that in deadly force cases where the witness who might have disputed the officers' narrative has been killed, "it would be easy to overvalue the narrative testimony of an officer and to undervalue potentially contradictory physical evidence"; cautioning that "[c]ourts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence"); *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020) ("To ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts.").

Having found that the facts, viewed in the light most favorable to Plaintiff, are that Ball-Bey was unarmed at the time of the shooting and Chandler had no reason to believe he posed a threat of serious injury, the Court must address whether Chandler is entitled to qualified immunity under those facts.

With regard to the first prong of the qualified immunity inquiry, the Court finds that Chandler's actions violated Ball-Bey's constitutional right to be free from excessive force. As discussed at length above, [a]n officer may not use deadly force against a fleeing suspect *unless* the suspect poses an *immediate and significant threat* of serious injury or death to the officer or to bystanders." *Wallace*, 843 F.3d at 769. Here, viewing the facts in the light most favorable to Plaintiff, Ball-Bey threw the gun down in the alley, before the officers shot at him in the yard, and continued running away from them. If this occurred, Ball-Bey could not have turned his gun toward Vaughan while in the backyard of 1233 Walton, which Chandler testified was the reason for the shooting. Defendants do not offer any other basis (such as a claim that Chandler reasonably but mistakenly believed Ball-Bey was pointing a gun at Vaughan) on which the Court could find

22

that Chandler reasonably believed that Ball-Bey posed an immediate and serious threat of serious injury to anyone. Thus, assuming Plaintiff's version of the facts is correct, the Court finds that a reasonable officer in Chandler's position would have had no probable cause to believe, at the time of the shooting, that Ball-Bey—a fleeing, unarmed individual—posed a threat of serious physical harm to Vaughan or anyone else.

With regard to the second prong, the Court finds that the right at issue was clearly established as of August 19, 2015, such that a reasonable officer would have understood that his actions were unlawful. *Capps v. Olson*, 780 F.3d 879 (8th Cir. 2015), is instructive.[10] In *Capps*, an officer shot and killed a suspect, claiming that he saw a knife in the suspect's hand and that the suspect had been moving toward him. *Id.* at 882. The Eighth Circuit agreed with the district court that there was a genuine issue of material fact regarding whether the suspect was moving toward the officer and whether the officer believed the suspect had a weapon. *Id.* at 883. Assuming the plaintiff's version of the facts to be correct, and assessing the second prong of the qualified immunity analysis, the Eighth Circuit found even without a factually similar prior case, the law regarding use of deadly force against fleeing suspects was sufficiently clearly established that the officer was not entitled to qualified immunity:

> The use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted. *Nance v. Sammis*, 586 F.3d 604, 610 (8th Cir. 2009); *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir .2008); *Craighead [v. Lee]*, 399 F.3d [954, 963]; *cf. Krueger v. Fuhr*, 991 F.2d 435, 440 (8th Cir. 1993) (approving use of deadly force against fleeing suspect who poses threat of death or serious injury even if another officer might later apprehend suspect). "For a constitutional right to be clearly established, there does not have to be a previous case with exactly the same factual issues." *Nance*, 586 F.3d at 611. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with

---

[10] *Capps* was decided March 16, 2015, approximately six months before the shooting of Ball-Bey.

obvious clarity to the specific conduct in question . . . ." *United States v. Lanier*, 520 U.S. 259, 271, (1997). "Hence, the issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [the plaintiff's] right not to be seized by the use of excessive force." *Craighead*, 399 F.3d at 962. "[I]n an obvious case, [general] standards can clearly establish the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (internal quotations marks omitted). Based on the facts we are required to assume, Capps did not pose a threat of significant bodily injury or death to Deputy Olson or Scribner. And Deputy Olson had fair and clear warning at the time of the shooting that the use of deadly force against a suspect who did not pose a threat of serious bodily injury or death was unconstitutional.

Therefore, the contours of the right were sufficiently clear—a reasonable officer would have understood that use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted.

*Capps*, 780 F.3d at 886. *See also Nance v. Sammis*, 586 F.3d 604, 610-11 (8th Cir. 2009) (denying qualified immunity for officers who shot and killed a twelve-year-old where there was a genuine issue of material fact regarding the officers' claim that the decedent had held a toy gun that could be mistaken for a real gun and had raised it toward the shooting officer; noting that "[f]or a constitutional right to be clearly established, there does not have to be a previous cases with exactly the same factual issues" and finding that by June 2007, "[e]xisting case law would have made it sufficiently clear to a reasonable officer that a suspect cannot be apprehended by use of deadly force unless that individual poses a threat of serious physical harm."); *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) ("Since 1985, it has been established by the Supreme Court that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officers or others is not permitted.") (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Here, as in the above cases—all of which preceded the shooting in this case—the Court finds that it was clearly established as of August 19, 2015, that shooting at an unarmed individual who was running away, under circumstances wherein the officer had no other reasonable basis for

24

believing the individual posed an immediate and significant threat of serious injury to them or anyone, would violate the individual's constitutional rights. Thus, Chandler is not entitled to qualified immunity on the excessive force claim.

### B. Count II: Wrongful Death Claim Against Chandler

In the wrongful death claim in Count II, Plaintiff alleges that Chandler's shooting of Ball-Bey was done in bad faith and with malice in that Chandler intended to cause injury and acted with a wicked purpose. 2d Am. Compl. ¶ 104. Defendants argue that Chandler is entitled to summary judgment on Count II based on the doctrine of official immunity.

Under Missouri law, the doctrine of official immunity "protects public officials sued in their individual capacities 'from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'" *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019) (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008)). "The function of official immunity is to protect individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 765 (Mo. 2006). "It is generally held that official immunity applies to all discretionary acts except those done in bad faith or with malice." *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 446 (Mo. 1986). Official immunity is "unavailable to an officer who acts 'in bad faith or with malice,' where malice is defined to include 'reckless indifference to the rights of others.'" *Estate of Snyder v. Julian*, 789 F.3d 883, 887 (8th Cir. 2015) (quoting *Twiehaus*, 706 S.W.2d at 446-47). "[A] bad-faith allegation survives summary judgment if a plaintiff states 'facts from which it could reasonably be inferred that [defendant] acted in bad faith or from an improper or wrongful motive.'" *Quraishi v. St. Charles County*, 986 F.3d 831, 841 (quoting *Twiehaus*, 706 S.W.2d at 447-48).

25

Defendants argue that there is no evidence that Chandler acted in bad faith or with malice, because he acted out of a reasonable fear of serious physical harm from Ball-Bey. They also suggest that even if Chandler was mistaken in fearing Ball-Bey, that would simply constitute ordinary negligence, and he would be protected by official immunity. Plaintiff counters that when viewed in the light most favorable to Plaintiff, the evidence supports a finding that Chandler engaged in conscious wrongdoing or reckless indifference to the rights of others when he shot at an unarmed man who was running away from him and who posed no threat to the officers or anyone else.

The Eighth Circuit's decision in *Julian*, 789 F.3d 883, is instructive. In *Julian*, a parole officer shot and killed a parolee while arresting him, and the parolee's family sued the officer under Missouri's wrongful death statute and 42 U.S.C. § 1983. 789 F.3d at 883. After trial, the officer argued that the district court should have granted judgment as a matter of law in his favor based on official immunity. *Id.* at 886-87. The officer argued that his shooting was a discretionary act that was not taken in bad faith or with malice, and that he made a "split second decision to discharge his service weapon as an immediate reaction" because he believe that the parolee would attack him. *Id.*

The court noted that "a parole officer seeking to apprehend an absconding parolee presumably engages in discretionary acts, but official immunity is nonetheless unavailable to an officer who acts in bad faith or with malice, where malice is defined to include 'reckless indifference to the rights of others.'" *Id.* at 887 (quoting *Twiehaus*, 706 S.W.2d at 447; internal citation omitted). The court acknowledged the officer's version of events but found there was other evidence "sufficient to support a finding that [the officer] acted with reckless indifference to [the parolee's] rights," including evidence that "the [parolee], unarmed, was running away from [the

officer] and posed no threat when [the officer] fired the gun." *Id.* The court found that because a reasonable juror could have found that the officer shot the parolee when the parolee was running away from him, not after the parolee turned toward the officer in a threatening manner, the evidence "supported a reasonable inference that [the officer] intentionally fired his gun at [the parolee] needlessly, while manifesting a reckless indifference to the rights of others." *Id.* (quotation marks omitted). The court concluded that the officer was not entitled to official immunity, because the evidence supported a finding of malice. *Id.*

Here, as in *Julian*, the evidence, viewed in the light most favorable to Plaintiff, supports a reasonable inference that Chandler fired at an unarmed, fleeing Ball-Bey needlessly, manifesting a reckless indifference to the rights of others and showing conscious wrongdoing. Thus, Chandler is not entitled to official immunity on Count II at the summary judgment stage.

### C. Counts III and V: Municipal Liability Against the City of St. Louis

Defendants next argue that they are entitled to summary judgment on Count III (Failure to Train, Supervise, and Control) and Count V (Municipal Liability). Defendants argue that these claims appear to involve the same allegations, and Plaintiff does not dispute that characterization. Plaintiff's principal claim is that "Defendant City of St. Louis maintained a custom of failing to supervise and discipline its officers involved in officer-involved shootings and other instances of excessive force." Pl.'s Mem. Opp'n, Doc. 280-1, at 31. To the extent that Plaintiff may also be asserting a separate claim based on failure to train, the Court will address that as well.

#### 1. *Municipal liability generally*

Section 1983 of Title 42 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to

the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Municipalities and other local government units are "included among those persons to whom § 1983 applies." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality may be liable under § 1983 where either "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" (a "policy" claim) or where the alleged constitutional deprivation is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels" (a "custom" claim). *Id.* at 690-91. However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Instead, "[m]unicipal liability exists 'only where the municipality itself causes the constitutional violation.'" *Perkins v. Hastings*, 915 F.3d 512, 520-21 (8th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 390 (8th Cir. 2007) (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997)).

### 2. *Municipal liability based on custom of failing to supervise and discipline*

The Court first considers Plaintiff's claims that Defendant City of St. Louis maintained a custom of failing to supervise and discipline its officers involved in officer-involved shootings and other instances of excessive force. Plaintiff argues that part of that custom involved the City's custom of insulating officers who commit excessive force by charging the victims with crimes and then requiring them to sign releases as a way of preventing civil liability. He also argues that systematic failings in the City's supervision and investigation of shootings and excessive force

claims "created and maintained a culture in which officers—such as Chandler and Vaughan—could shoot at unarmed individuals with impunity, knowing that they would not be seriously investigated." Pl.'s Mem. Opp'n, Doc. 280-1, at 33.

"[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Perkins*, 915 F.3d at 520-21 (8th Cir. 2019) (quotation marks omitted). To establish a claim of municipal liability under § 1983 based on the existence of a custom, a plaintiff must establish the following:

(1)    The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

(2)    Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

(3)    The plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

*Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (alternations omitted). Defendants argue that Plaintiff does not have evidence sufficient to establish any of these elements.

The Court begins with an examination of whether Plaintiff has sufficient evidence to support the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees. "To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Andrews v. Fowler*, 98 F.3d 1069, 1075 (8th Cir. 1996) (quoting *Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992)). The prior incidents must be similar to the incident giving rise to the plaintiff's claim. *See, e.g.*, *Mettler*, 165 F.3d at 1205 (noting that "[e]vidence that a police department has

29

failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists," but finding no custom established where the plaintiff failed to show that prior incidents were factually similar to the plaintiff's incident); *Rogers v. City of Little Rock*, 152 F.3d 790, 798 (8th Cir. 1998) (stating that to establish municipal liability, the plaintiff "must show that the city had a policy or custom of failing to act upon prior similar complaints of unconstitutional conduct") (internal quotation marks omitted). The Eighth Circuit has also stated that "there must also be some showing that the complaints had merit." *Id.* at 799.

Neither party has directed the Court to any Eighth Circuit cases addressing what evidence is needed to survive summary judgment on a custom claim under facts similar to those here. However, the Court's own research suggests that even where the plaintiff has evidence suggesting that the municipality conducted flawed investigations, summary judgment is appropriate where the plaintiff has not adequately shown evidence of a pattern of similar constitutional violations.

In *Perkins v. Hastings*, 915 F.3d 512 (8th Cir. 2019), the plaintiff's son was in a moving vehicle when he was shot and killed by a police officer. *Id.* at 518. The plaintiff brought a municipal liability claim, asserting that the city had a custom of failing to adequately investigate police misconduct. *Id.* at 521. She presented evidence regarding six incidents in which officers had used deadly force against individuals driving vehicles, and she also pointed to evidence of some other police shootings. *Id.* at 522. She also offered the opinion of an expert, based on statistical analysis, that she claimed "established instances of 'façade' investigations and inadequate supervision." *Id.* (internal quotation marks omitted). The district court granted summary judgment in favor of the city, finding that the plaintiff had not shown a pattern of prior similar misconduct. *Id.* at 520. It found that as to the shootings involving vehicles, only one was arguably unjustified, and as to the other shootings, the plaintiff's accounts were speculative. *Id.* at 522. It also found

that the expert's statistical analysis could not substantiate his opinion. *Id.* at 520. The Eighth Circuit affirmed the district court's decision, finding that "[t]he district court did not err when it required [the plaintiff] to establish a pattern of constitutional violations to prove her claim." *Id.* at 521. It stated:

> Perkins claims on appeal that the City maintained a custom of façade investigations based on alleged shortcomings in the City's investigations into officer-involved shootings. The actionable municipal custom here must be one of deliberate indifference to a pattern of excessive force, however, which Perkins has not established in light of the fact that she has not shown a pattern of underlying constitutional violations.

*Id.* at 523.

District courts within the Eighth Circuit have reached similar conclusions. In *Cole v. Hutchins*, an individual was shot and killed by a city police officer, and his representative asserted a municipal liability claim against the city, arguing that the city had a custom of tolerating police misconduct by conducting biased investigations into police shootings. No. 4:17-CV-00553, 2019 WL 903844, *1, *4 (E.D. Ark. Feb. 22, 2019). The plaintiff pointed to a fatal shooting four years earlier that a review board had found could have been avoided. *Id.* at *5. The plaintiff also pointed to evidence to "highlight major investigatory failures at the [police department]," including evidence that investigations occurred in-house and thus were potentially biased; that the police department failed to thoroughly question essential eyewitnesses, that the police department failed to properly handle weapons, crime scenes, and files; that the police department failed to maintain a list of untruthful officers for *Brady* purposes; that the police department failed to conduct needed follow-up interviews, and that police department officers frequently failed to follow internal policies. *Id.* The court acknowledged that the prior shooting incident was an instance of use of excessive force but found that one instance does not constitute a pattern. *Id.* Relying on *Perkins*, the court granted the city's motion for summary judgment, finding that the plaintiff "has not shown

31

a pattern of [department] officers using excessive force to which [the department's] officials were deliberately indifferent." *Id.* at \*6. *See also Davis v. City of St. Louis*, No. 4:22-CV-00902-SEP, 2023 WL 4684510, at \*7 (E.D. Mo. July 21, 2023) (denying as futile a motion for leave to amend a complaint to add allegations of inadequate investigations of police shootings by the Force Investigation Unit; reasoning that "without well-pled facts showing the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees, Plaintiff cannot state an unconstitutional custom claim under *Monell*, regardless of any allegations about investigative or disciplinary practices").

In contrast, a municipal liability claim based on a custom of tolerating the use of excessive force may survive summary judgment where there is evidence of defective investigations, combined with specific evidence that meritorious complaints of similar misconduct were ignored. In *Shannon v. Koehler*, the plaintiff argued that a city ignored its officers' use of excessive force to such an extent that it amounted to a continuing, widespread, persistent pattern of unconstitutional misconduct. 673 F. Supp. 2d 758, 792 (N.D. Iowa 2009). The plaintiff identified 42 prior complaints of excessive force, none of which had been sustained. *Id.* at 791-92. The plaintiff argued that more than 15 of those complaints had merit and had been wrongly decided, setting forth a detailed analysis of the complaints at issue. *Id.* at 791-801. The plaintiff also had an expert who identified flaws in the methodologies used to investigate complaints, and another expert who found that having zero complaints sustained was inconsistent with the expected percentage. *Id.* at 788, 790, 791-92. After a lengthy discussion of the facts of each of the complaints the plaintiff asserted had been wrongly decided, the court concluded that the plaintiff had created a genuine issue of material fact as to the existing of a continuing, widespread, persistent pattern of unconstitutional misconduct. *Id.* at 802. It noted that the plaintiff had identified evidence that the

police had ignored complaints of excessive force and that "many of the complaints had merit." *Id.* Finding the other elements of the claim were also satisfied, the court denied the motion for summary judgment. *Id.* at 803.

The Court finds the facts of the present case closer to *Perkins* and *Cole* than to *Shannon*. The Court acknowledges that Plaintiff has produced a good deal of evidence to suggest that from 2014 to 2018, the SLMPD's investigations of officers' shootings had serious deficiencies. However, as in *Perkins* and *Cole*, Plaintiff's evidence of a pattern of incidents of police misconduct like the one at issue in this case is lacking in both number and specificity. Plaintiff states that the FIU investigated "dozens" of shootings from 2014 to 2018, and that none led to indictments. However, Plaintiff does not offer evidence of how many of those shootings involved citizen complaints of excessive force, nor does Plaintiff offer any facts from which a jury could determine whether any of those shootings involved facts that bear any similarity to the facts of the Ball-Bey shooting. Plaintiff also fails to point to evidence from which the jury could find that complaints arising from any of these dozens of shootings had merit and should have led to indictments or other action.

Plaintiff does point to three specific shooting incidents, two of which occurred before Ball-Bey was shot (one in 2011 and one in 2014), and one of which occurred after (in 2017). Again, however, Plaintiff offers only an extremely brief description of each of these shootings. He does not discuss the specific facts involved in the incident, how the investigation was conducted, or what the outcome was. There is nothing from which the jury could determine how factually similar these shootings are to the Ball-Bey shooting or whether they involved unconstitutional misconduct. Thus, the Court finds that these shootings also do not establish a pattern of prior similar incidents of misconduct. *See Perkins*, 915 F.3d at 520-23. *See also Morgan-Tyra v. City of St. Louis*, No.

4:18-CV-01799-MTS, 2022 WL 4378858, at *12 (E.D. Mo. September 22, 2022) (granting summary judgment in favor of defendant on a custom claim in a police shooting case; noting that the plaintiff asserting such a claim "must show sufficient factual similarity between the prior complaints and her experience to potentially show a pattern of excessive force" and finding that Plaintiff failed to do so where only one prior case identified by the plaintiff involved a shooting that "could possibly be considered factually similar" to the case at bar, and even as to that incident, the plaintiff failed to provide details of the incident or the investigation relating thereto); *Liggins v. Cohen*, No. 4:16-CV-00413-AGF, 2019 WL 2075902, at *9 (E.D. Mo. May 10, 2019), *rev'd on other grounds,* 971 F.3d 798 (8th Cir. 2020) (granting summary judgment in favor of the defendant on a claim that a city had a custom of allowing officers to use excessive force without consequence based a lack of disciplinary action following investigation of five prior officer-involved shootings over a five-year period; stating, "the Court simply cannot find a pattern of unconstitutional excessive force based on Plaintiff's evidence of other police shootings and related investigations without delving into the details of each to determine whether the use of force was unreasonable and the investigation inadequate" and finding that "Plaintiff has not offered sufficient evidence of the facts").

Additionally, the Court notes that unlike the plaintiff in *Shannon*, Plaintiff has not produced any statistical or expert evidence to support either his contention that the City's investigations were defective or his suggestion that at least some of the "dozens" of shootings investigated by the FIU should have led to charges or other action.

Plaintiff also points to the existence of a City policy under which if an arrestee was charged with resisting arrest or interfering with a police officer, those charges would not be amended unless the arrestee signed a waiver releasing the City from civil liability. Plaintiff suggests that this

contributed to the culture of insulating officers and the City from liability for uses of excessive force. However, Plaintiff has not produced any evidence to show that this policy actually contributed to a pattern of unconstitutional misconduct similar to the misconduct at issue here. There is no evidence of how often these releases were actually used or whether they were used at all in cases involving shootings or deadly force. The evidence related to this policy does not suggest the existence of a persistent pattern of unconstitutional misconduct similar to the misconduct here.

Plaintiff relies on *Qandah v. St. Charles County*, No. 4:20-CV-53 JCH, 2021 WL 808857, at *7 (E.D. Mo. Mar. 3, 2021), for the proposition that a municipal liability custom claim may survive summary judgment where there is a repeated failure to review complaints against officers.[11] In *Qandah*, a pretrial detainee brought claims against jail officers who, among other

---

[11] Plaintiff also cites two other cases in support of this proposition, but the Court finds them readily distinguishable. In *Dreith v. City of St. Louis*, No. 4:18-CV-1565-JCH, 2021 WL 4148324, at *7 (E.D. Mo. Sept. 13, 2021), *aff'd in part, vacated in part, and remanded*, 55 F.4th 1145 (8th Cir. 2022), a protester who was pepper sprayed brought a municipal liability claim against the City for failure to train and supervise its officers. *Id.* at *7. In denying the City's motion for summary judgment, the court considered "evidence that even if official policy mandates that all claims against officers be thoroughly documented and reviewed, in reality such review did not always happen" but also noted that the plaintiff had evidence of prior similar incidents, including evidence of five incidents of excessive force against protesters within a four-year period and a settlement agreement the City had entered into regarding its use of chemical agents. *Id.* at *6-*7. The evidence of prior, factually similar incidents distinguishes *Dreith* from the instant case.

In *Rohrbough v. Hall*, No. 4:07-CV-00996-ERW, 2008 WL 4722742, at *13 (E.D. Mo. Oct. 23, 2008), the Court denied summary judgment on supervisory liability claim against members of the Board of Police Commissioners brought by a plaintiff who had been abused by a police officer. *Id.* at *12. The court noted that there was evidence of 322 complaints of physical abuse in a five-year period, plus evidence of a system in which complaints of physical abuse usually never even reached the members of the Board of Commissioners. *Id.* at *13. The Court found that "the Board of Police Commissioners for the City of St. Louis has either intentionally or unwittingly created an insulating barrier which prevents notice of complaints from reaching the Commissioner Defendants. This is tantamount to turning 'a blind eye' which can be the basis for supervisory liability reasoning in party that *Id.* at *12-13. Here, Plaintiff has not presented evidence either of a voluminous number of prior complaints or of a system preventing supervisors

things, allowed an attack on him by another inmate. *Id.* at *1-*2. The plaintiff also asserted a municipal liability claim against the County for failure to train and supervise its officers. *Id.* at *7. The court denied the County's motion for summary judgment on the municipal liability claim, reasoning that "the Court has deemed admitted the fact that from 2010 through 2017, St. Charles County did not have policies, protocols, and practices in place to retain, record or track fully inmate complaints made against correctional staff"; that there was "evidence that although St. Charles County policy mandates that all incidents where officers use force on inmates, or where inmates are hurt by other inmates, be thoroughly documented and reviewed, in reality such review did not always happen"; that "even when investigations did take place (and the use of unreasonable force or other unacceptable action was found), the officers often were not disciplined and the transgression was not referenced in their performance reviews"; and that the director of the jail had testified, "The use of force happened pretty regularly. Investigations, not so much." *Id.*

The Court acknowledges that *Qandah* provides some support for Plaintiff's argument here. However, the Courts finds *Qandah* distinguishable on several fronts. First, in *Qandah*, it appears that the evidence suggested a complete absence of tracking or investigations of incidents of officer misconduct, rather than the flawed investigations that are present here. Second, it appears that, unlike the facts here, there was evidence in *Qandah* that even where investigations took place and misconduct was found, "officers were not disciplined," and the transgressions were not referenced in their performance reviews." *Id.* at *7. Finally, *Qandah* involved an admission by the jail director that "[t]he use of force happened pretty regularly. Investigations, not so much." *Id.*

from finding out about such complaints.

In stark contrast to the evidence of record before this Court, the plaintiff in *Qandah* developed evidence that, in addition to failing to track or investigate officer misconduct, jail officials also apparently failed to act on known officer misconduct. For this reason, as well as the reasons set out above, the Court finds that *Perkins* and *Cole* are more directly on point regarding the facts of the instant case and thus are more persuasive.

In sum, the Court finds that Plaintiff does not have sufficient evidence from which a jury could find a continuing, widespread, persistent pattern of unconstitutional misconduct by City employees. Accordingly, the Court finds that the City is entitled to summary judgment on this claim.

### 3. Municipal liability based on failure to train

To the extent that Plaintiff is asserting a claim based on the City's failure to train its officers, the Court agrees with Defendants that they are entitled to summary judgment on that claim. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *S.M. v. Lincoln Cty.*, 874 F.3d 581, 585 (8th Cir. 2017). As discussed above, Plaintiff does not have evidence from which a reasonable jury could find such a pattern. Moreover, Plaintiff identifies no deficiencies in training either in his statement of facts or in his brief, and he admits that both Chandler and Vaughan had been trained by the St. Louis Metropolitan Police Department on use of force. Thus, the City is entitled to summary judgment on a failure to train claim.

## V.    CONCLUSION

For    the above reasons, the Court finds that Plaintiff has established that there are genuine issues of material fact that prevent summary judgment on Plaintiff's excessive force claim against Chandler in Count I and Plaintiff's wrongful death claim against Chandler in Count II. However,

Defendants have established that the City is entitle to summary judgment on the municipal liability claims in Counts III and V. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 230) is **GRANTED IN PART and DENIED IN PART**. With respect to Counts I and II, the motion is **DENIED**. With respect to Counts III and V, the motion is **GRANTED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of September, 2023.