UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS BALL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:18-CV-1364-SPM |
| | ) | |
| | ) | |
| KYLE CHANDLER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Kyle Chandler's Motion for New Trial, Motion for Remittitur, and Renewed Motion for Judgment as a Matter of Law. ECF No. 549. The motions have been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). ECF No. 12. For the following reasons, the motion for new trial will be denied, the motion for remittitur will be granted in part and denied in part, and the renewed motion for judgment as a matter of law will be denied.

### I.    BACKGROUND

This case arises out of the August 19, 2015, shooting death of Plaintiff Dennis Ball-Bey's 18-year-old son, Mansur Ball-Bey ("Mansur"). Plaintiff alleged that two former St. Louis Metropolitan Police Department officers (Kyle Chandler and Ronald Vaughan) shot Mansur in the back while he was unarmed and fleeing, killing him. Plaintiff filed various claims under 42 U.S.C. § 1983 and Missouri state law against both officers, the chief of police, and the City of St. Louis. Following motion practice, all but two claims were dismissed: the § 1983 excessive force claim against Chandler and the state law wrongful death claim against Chandler. After a five-day trial,

1

the jury awarded Plaintiff $3.75 million in compensatory damages on the § 1983 excessive force claim, $2.5 million in compensatory damages on the wrongful death claim, $5 million in punitive damages on the excessive force claim, and $7.5 million in punitive damages on the wrongful death claim, for a total verdict of $18.75 million. Chandler now moves for judgment as a matter of law, for a new trial, and for remittitur of the compensatory and punitive damages awards.

## II.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of Plaintiff's evidence and at the close of all the evidence, Chandler moved for judgment as a matter of law on the excessive force claim based on qualified immunity and on the state law wrongful death claim based on official immunity. Tr. Vol. 4, at 100-07, 182-89. The Court denied the motion, and Chandler now renews it pursuant to Rule 50(b) of the Federal Rules of Civil Procedure.

"The law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." *Washington v. Denney*, 900 F.3d 549, 559 (8th Cir. 2018) (quoting *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017)). "Judgment as a matter of law is only appropriate when no reasonable jury could have found for the nonmoving party." *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780 (8th Cir. 2021) (quoting *Southern Wine & Spirits of Nev. v. Mountain Valley Spring Co.*, 646 F.3d 526, 533 (8th Cir. 2011)). It "is appropriate 'when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party.'" *Hortica–Florists' Mut. Ins. Co. v. Pittman Nursery Corp.,* 729 F.3d 846, 854 (8th Cir. 2013) (quoting *Ehrhardt v. Penn Mut. Life Ins. Co.*, 21 F.3d 266, 269 (8th Cir. 1994)). In determining whether judgment as a matter of law is appropriate, the Court must "resolve all factual conflicts in favor of the nonmoving party, give the nonmoving party the benefit of all reasonable inferences,

and assume in the nonmoving party's favor all facts supported by the evidence." *Murphy v. FedEx Nat. LTL, Inc.*, 618 F.3d 893, 902 (8th Cir. 2010). The Court "may not make credibility determinations or weigh the evidence." *Hortica-Florists' Mut. Ins. Co.*, 729 F.3d at 854 (internal quotation marks omitted). In his renewed motion for judgment as a matter of law, Chandler argues he is entitled to qualified immunity on the excessive force claim and official immunity on the wrongful death claim.

### A.  Qualified Immunity

"'Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known.'" *De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009)). It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). A government official is "entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff[ ], demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Aldridge v. City of St. Louis*, 75 F.4th 895, 898 (8th Cir. 2023) (quoting *Bell v. Neukirch*, 979 F.3d 594, 602 (8th Cir. 2020)). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Winslow v. Smith*, 696 F.3d 716, 738 (8th Cir. 2012) (internal quotation marks omitted). For a right to be clearly established, there need not be "a case directly on point"; however, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

3

Where, as here, a case involves the use of deadly force, the inquiry focuses on whether the use of deadly force was reasonable under the circumstances. "Whether the use of deadly force is reasonable turns on 'the totality of the circumstances, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether the suspect is actively fleeing or resisting arrest.'" *Wallace v. City of Alexander*, 843 F.3d 763, 768 (8th Cir. 2016) (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012), & citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)). "While the situation at the precise time of the shooting will often matter most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Barnes v. Felix*, 605 U.S. 73, 73 (2025). "Both the Supreme Court and [the Eighth Circuit] have repeatedly stated that 'an officer may not use deadly force against a fleeing suspect *unless* the suspect poses an *immediate and significant threat* of serious injury or death to the officer or to bystanders.'" *Wallace*, 843 F.3d at 769 (8th Cir. 2016) (quoting *Thompson v. Murray*, 800 F.3d 979, 983 (8th Cir. 2015), & citing *Garner*, 471 U.S. at 11-12).

Chandler argues that his use of force was objectively reasonable based on the facts and circumstances he faced because he saw Mansur point his gun in Vaughan's direction. However, the jury expressly rejected this version of the facts. It found instead that, based on the evidence, Mansur was likely *not* pointing a gun in Vaughan's direction when Chandler shot him. *See* Special Interrogatory, ECF No. 532, at 3. Indeed, at trial, the jury was confronted with starkly different versions of the circumstances leading up to the shooting. Plaintiff's position was that when Chandler shot Mansur, Mansur had discarded the gun he had been holding and was running through a gangway leading from the backyard to the front of the house. Chandler's position (and testimony) was that when he initially started to chase Mansur, he saw that Mansur had a gun (a

fact not disputed by Plaintiff) but he did not shoot at Mansur until he saw Mansur raise the arm holding the gun and "cant" in the direction of Vaughan (or where he believed Vaughan to be). Chandler's testimony was, in effect, that he disarmed Mansur by shooting him:

> Q.    So as Mansur is running in the alley, you're giving commands, and he comes up to 1233 Walton; right?
>
> A.    Yes.
>
> Q.    Did he have his gun in his hand at that point?
>
> A.    Yes.
>
> Q.    And when you come to the backyard of 1233 Walton, you said that you kind of round, you pie out a little bit; correct?
>
> A.    Yes.
>
> Q.    From—I guess this would be the east side of the alley;
>
>        is that right?
>
> A.    Yes.
>
> Q.    When you round that corner, what do you see?
>
> A.    Mansur is ahead of me, and he is going through the yard. However, he's looking back to his right, and his arm's coming up, and it's—the gun is in his arm—or in his hand. And as his arm comes up, he's canted towards where Detective Vaughan I believe to be.
>
> Q.    What did you think when you saw that?
>
> A.    That he was going to engage Detective Vaughan.
>
> Q.    What do you mean by "engage"?
>
> A.    He was going to shoot.
>
> Q.    Okay. Then what happened?
>
> A.    I raised my weapon and fired a shot . . .
>
> Q.    After you shot at Mansur, did you know you had struck him?
>
> A.    I was pretty sure that I did just from the body language because he kind of stumbled and the twitch. So I was sure that I did; however, he kept running, which confused me.
>
> Q.    Say that again.
>
> A.    Which kind of confused me, because he just kept running from that.
>
> Q.    Okay. Where were you looking when you shot at Mansur?
>
> A.    I was looking at him, his back, and the gun. . . .

Q.    What happened after you fired your shot?

A.    Like I said, he kind of twitched, and the gun came back with his—when his arm came, like, like, flung back, he continued to run, and I just continued to run after him . . .

Q.     . . . again, after you shot Mansur, he dropped the gun?

A.    Yes.

Q.    After he dropped the gun, you no longer felt he was a threat?

A.    Yes.

Tr. Vol. 2, at 148-49 & 160.

Relying on a combination of witness testimony, forensic evidence collected by the police department, and expert testimony, Plaintiff's position at trial was that, based on the physical evidence, Chandler's version of events could not be true. Specifically, Plaintiff posited that the locations of shell casings, Mansur's body, and the gun (which were all carefully documented by police immediately after the shooting), along with medical evidence regarding the likely impact the shot would have had on Mansur's ability to keep running, all supported Plaintiff's version of events leading up to the shooting. Left with starkly different versions of the events leading to the shooting, the jury found the evidence better supported Plaintiff's version of events.[1]

Giving Plaintiff the benefit of all reasonable inferences, as this Court must, the evidence presented at trial supports that determination by the jury.

Applying to these facts the same legal principles discussed in detail in the Court's order denying summary judgment, *Ball-Bey v. Chandler*, No. 4:18-CV-1364-SPM, 2024 WL 5379123, at *3-*14 (E.D. Mo. Aug. 23, 2024), Chandler is not entitled to qualified immunity because the facts presented at trial demonstrate the deprivation of a constitutional right and because that right

---

[1] Chandler did not suggest at trial that there was any chance he might have been mistaken in believing that Mansur was still armed at the time Chandler shot him, nor does any of the evidence presented appear to be consistent with such a version of events.

was clearly established at the time of the deprivation. *See, e.g.*, *Capps v. Olson*, 780 F.3d 879, 885-86 (8th Cir. 2015); *Nance v. Sammis*, 586 F.3d 604, 607-11 (8th Cir. 2009).

### B. Official Immunity

Under Missouri law, the doctrine of official immunity "protects public officials sued in their individual capacities 'from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'" *State ex rel. Alsup v. Kanatzar*, 588 S.W.3d 187, 190 (Mo. 2019) (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. 2008)). "The purpose of this doctrine is to allow public officials to make judgments affecting the public safety and welfare without the fear of personal liability." *Id.* (internal quotation marks omitted).

Official immunity does not apply "when a public official acts in bad faith or with malice." *State ex rel. Love v. Cunningham*, 689 S.W.3d 489, 495 (Mo. 2024). "A finding of bad faith 'embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, [or] breach of a known duty through some ulterior motive.'" *Green v. City of St. Louis*, 134 F.4th 516, 527 (8th Cir. 2025) (quoting *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. 1986)). "The relevant definition of bad faith or malice in this context ordinarily contains a requirement of actual intent to cause injury." *Cunningham*, 689 S.W.3d at 496 (quoting *Twiehaus*, 706 S.W.2d at 447). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Id.* at 496-97 (quoting *Kanatzar*, 588 S.W.3d at 190 n.7). "Malice, or the actual intent to cause injury, is the only mental state to which official immunity does not apply under Missouri law." *Id.* at 498. *See also Carlton v. Means*, 688 S.W.3d 625, 631 (Mo. Ct. App. 2024) ("[R]eckless conduct alone does not amount to malice; there must

also be evidence that the official had the intent to injure or prejudice the plaintiff.").

Chandler contends that there is no evidence that he performed any act with bad faith or malice, noting that the trial record shows that he did not know Mansur, had no history with Mansur, had no ill will towards Mansur, and did not want Mansur to die. The fact that Chandler did not know Mansur or have prior dealings with him does not preclude a finding that Chandler acted with malice. As discussed above, "[a] defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." *Cunningham*, 689 S.W.3d at 496-9. The evidence at trial supported a finding that Chandler was aware of his duty to refrain from using lethal force on an unarmed suspect who was fleeing. Specifically, Chandler testified that he was trained in the use of force, that the City police department had a policy on the use of force, and that at the time of this incident he understood that deadly force could be used "to protect [him]self, protect other police officers, and to protect the public." Tr. Vol. 2, at 140-41. Chandler testified that he believed that when he shot Mansur "at that point deadly force was authorized" because "Mr. Ball-Bey had the gun in his right hand and began to raise it in Detective Vaughan's direction," *id.* at 141. However, the jury rejected Chandler's assertions that he was responding to the real and present threat posed by Mansur raising his gun and pointing it at Chandler's fellow officer. Instead, in the Special Interrogatory, the jury found that based on the evidence Mansur was likely not pointing his gun at the time Chandler shot him.

Giving Plaintiff the benefit of all reasonable inferences, the evidence presented at trial supported a finding that, contrary to his duty to use deadly force only to protect himself, protect other officers, and the public, Chandler shot Mansur, not because he was a threat, but because he was running and not complying with commands by police to stop. In sum, Chandler's argument

that he is entitled to official immunity fails because the evidence at trial supports a finding that Chandler acted with malice when he shot Mansur, contrary to his duty to refrain from using deadly force under the circumstances and with intent to injure Mansur. *See Cunningham*, 689 S.W.3d at 496-97 ("A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.").

*Estate of Snyder v. Julian*, 789 F.3d 883 (8th Cir. 2015), relied on by the Court in denying Chandler's motion for summary judgment, is instructive. In *Julian*, a parole officer (Julian) was assigned to apprehend a parolee (Snyder) for violating the terms of his parole. *Id.* at 885. Julian informed Snyder that he was a parole officer with a warrant for Snyder's arrest, and Snyder placed his hands on the back of Julian's car. *Id.* Julian approached Snyder, stood to Snyder's left, and placed his left hand on Snyder's left shoulder. *Id.* At that point, Snyder turned to his right and began to run. *Id.* After Snyder took two steps, Julian fired one shot at Snyder, killing him. *Id.* The jury entered a verdict against Julian on the wrongful death claim. *Id.* On appeal, Julian argued that the district court should have granted judgment as a matter of law in his favor based on official immunity. *Id.* at 886-87. Specifically, he argued that the shooting was not done in bad faith or with malice because he made a "split second decision to discharge his service weapon as an immediate reaction" based on his belief that Snyder would attack him. *Id.* at 887. Julian testified at trial that he was unsure of Snyder's state of mind, that he acted only when Snyder suddenly jumped up from Julian's car and turned right toward him, that he thought Snyder would attack him, that he fired his gun as Snyder was turning, and that Snyder began running after the gunshot. *Id.* The Eighth Circuit rejected Julian's argument. *Id.* It found that there was evidence that Julian acted with reckless indifference to Snyder's rights, including "evidence that Snyder, unarmed, was running

9

away from Julian and posed no threat when Julian fired the gun." *Id.* It noted that there was a witness who testified that Snyder had turned right and taken two steps when Julian fired, and that there was evidence that Julian had given two or three different versions of Snyder's movements prior to the gunshot and could never describe how Snyder was attacking him. *Id.* The court stated:

> We conclude that a reasonable juror could have found that Julian shot Snyder when Snyder was running away from Julian, not after Snyder turned toward Julian in a threatening manner. The evidence thus supported a reasonable inference that Julian intentionally fired his gun at Snyder "needlessly," while "manifesting a reckless indifference to the rights of others." *Twiehaus,* 706 S.W.2d at 447 (internal quotation omitted). Julian is not entitled to official immunity, because the evidence supported a finding of malice.

*Id.*

Here, as in *Julian*, the evidence supported a finding that Chandler shot Mansur while Mansur was running away from him, without any action from Mansur that threatened Chandler or anyone else. As in *Julian*, this evidence supports a finding that Chandler intentionally shot his gun at Mansur, and that he did so needlessly and while manifesting a reckless disregard for the rights of others. Thus, as in *Julian*, the Court finds the evidence sufficient to show malice.

Chandler does not attempt to distinguish *Julian,* despite the fact that the Court and Plaintiff have repeatedly relied on it, nor does Chandler argue that *Julian* does not reflect Missouri law. Most of the cases cited by Chandler in his motion and reply provide little guidance because they involved very different factual scenarios.[2] The cases cited in Defendant's brief that involved

---

[2] *See Cunningham*, 689 S.W.3d at 498 (finding supervisory employees who failed to take certain safety measures to protect highway workers were entitled to official immunity on claims based on a highway worker's death after being struck by a third-party motorist; noting that "[t]here is nothing in the pleadings from which a jury reasonably could infer the employees collectively or any employee individually intended to cause the injury or death of [the decedent and her unborn son] through a vehicle operated by [a] third-party [motorist] entering the work space and striking [the decedent]"); *Laughlin v. Perry*, 604 S.W.3d 621, 627-34 (Mo. 2020) (public defenders acting pursuant to their constitutional and statutorily mandated duties by representing the plaintiff were entitled to official immunity where the plaintiff did not allege or prove they acted with malice

police shootings are distinguishable. In one case, the officers reasonably (even if mistakenly) believed the person they shot was armed and posed a risk of serious harm to the officers or others. *See Green*, 134 F.4th at 520. In the other, it was undisputed that the suspect went into the driver's side of a car before turning toward officers, then raised his hands in the direction of the officers, giving the officers at least some basis for shooting at the suspect other than intent to cause injury. *See N.S. by & through Lee v. Kansas City Bd. of Police Commissioners*, 35 F.4th 1111 (8th Cir. 2022).

In sum, here, the jury clearly believed a version of events in which Mansur had done nothing other than throw his gun away and run from officers at the time Chandler intentionally shot him in the back. This case thus closely resembles *Julian*, in which the officer shot an unarmed, fleeing arrestee. The facts presented are sufficient to demonstrate that Chandler "wantonly" (i.e., "needlessly, manifesting a reckless indifference to the rights of others," *Twiehaus* 706 S.W.2 at 447") did "that which a man of reasonable intelligence would know to be contrary to his duty and which he intend[ed] to be prejudicial or injurious to another," *Cunningham*, 689 S.W.3d at 496-97 (quotation marks omitted). Thus, there is sufficient evidence to show malice, and Chandler is not entitled to judgment as a matter of law.

### III. MOTION FOR NEW TRIAL

"The district court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal

---

toward him); *Carlton*, 688 S.W.3d at 631-32 (holding that in the context of responding to an emergency, an officer's act of driving over the speed limit and past a stop sign, even if reckless, did not show an intent to injure anyone, so there was no malice and the officer was entitled to official immunity); *Twiehaus*, 706 S.W.2d at 444-49 (superintendent of mental health facility was entitled to official immunity based on claim that patient was killed when he jumped or fell from the window of his room; finding no facts alleged to show bad faith or improper motive).

errors at trial." *K7 Design Grp., Inc. v. Walmart, Inc.*, 143 F.4th 931, 939 (8th Cir. 2025) (quoting *Trickey Kaman Indus. Techs. Corp.*, 705 F.3d 788, 807 (8th Cir. 2013)). *See also* Fed. R. Civ. P. 59(a)(1)(A) (permitting the court, on motion, to grant a new trial on all or some issues). "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). However, "motions for new trials are generally disfavored." *Williams v. Baum*, 48 F.4th 571, 573 (8th Cir. 2022) (quotation marks omitted).

Chandler argues that he is entitled to a new trial because of several erroneous evidentiary rulings, because the verdict was against the weight of the evidence, and because the Court permitted improper closing argument related to punitive damages.

## A. Evidentiary rulings

The Court first considers Chandler's argument that a new trial is warranted because of several erroneous evidentiary rulings. "A new trial will be awarded only if an evidentiary ruling constituted a clear and prejudicial abuse of discretion affecting a substantial right of the objecting party." *Walmart Inc. v. Cuker Interactive, LLC*, 949 F.3d 1101, 1113 (8th Cir. 2020) (quotation marks omitted). "An allegedly erroneous evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result." *Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 880 (8th Cir. 2015) (quoting *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 833 (8th Cir. 2005) (internal quotation omitted). The Court will address each allegedly erroneous evidentiary ruling below.

### 1. Evidence of post-shooting investigation

Chandler first argues that the Court erred in admitting evidence of the post-shooting investigation because it confused the issues, wasted time, was extremely prejudicial to Chandler,

and had little probative value as to the question of excessive force. Specifically, Chandler challenges the Court's admission of the testimony of Roger Engelhardt, supervisor of the unit that investigated police shootings. Engelhardt testified as follows. After interviewing Chandler and Vaughan, Engelhardt informed the medical examiner, Dr. Graham, that Dr. Graham's initial statement made to the press (that Mansur's spine was severed and Mansur would have gone to the ground immediately upon being shot) was inconsistent with the officers' statements (that Mansur ran after being shot). Tr. Vol. 3, at 272-77, Dr. Graham ordered and conducted a second autopsy, showed Engelhardt the severed spinal cord to confirm his initial statement to the press, and said, "Well, what now?" *Id.* at 283-89. Engelhardt told Dr. Graham, "You need to get fire insurance," by which he meant that there would be civil unrest. *Id.* at 287, 292. Engelhardt told Dr. Graham the chief of police would have questions for him and went to the phone to dial the chief. *Id.* at 292. Before Engelhardt talked to the chief, Dr. Graham approached Engelhardt with an alternative theory: that the spinal cord had been nicked by the bullet and only later broke as Mansur ran. *Id.* at 292-96. Engelhardt came up with his own alternative theory: that the bullet broke the bones in Mansur's spinal column, he continued to run, he collapsed, and in the "polyester dog pile of handcuffing him, those broken bones severed his spine." *Id.* at 297-98. In the next few days, Engelhardt's team interviewed the other officers on the scene. *Id.* at 298. During those interviews, at least one officer indicated to Engelhardt that Mansur had been thrashing and kicking as officers handcuffed him, even though Chandler and Vaughan had indicated in their initial interviews that Mansur had been compliant. *Id.* at 302-05.

Chandler argues that this evidence had little or no probative value because it concerned the City and its investigation (and possible cover-up) of police shootings, not Chandler's use of excessive force. Chandler repeatedly argued this point at trial, contending that the post-shooting

13

evidence was "*Monell* evidence" that should not be admitted because the *Monell* claim against the City had been previously dismissed.[3] The Court remains convinced, as it was at trial, that this argument is without merit. The evidence at issue was not offered to show a pattern or practice by the City that caused the alleged violation of civil rights here (the subject of the dismissed *Monell* claim), nor was it offered for the purpose of showing wrongdoing by the City or any other nonparty. Instead, the evidence was offered to challenge the credibility of the defense witnesses regarding what they saw in this case. Chandler's only asserted reason for shooting Mansur was that Chandler saw Mansur pointing his gun at Vaughan. A key question at trial was whether Mansur could possibly have been pointing the gun at Vaughan when Chandler shot him, given that Mansur's body was found with a severed spine 164 feet away from the gun. Chandler's version of events—that Mansur was holding the gun when he was shot but then threw it and ran in the opposite direction before falling—was supported by the testimony of officers that they saw Mansur run after he was shot; by the testimony of Dr. Graham that it was possible that the bullet only bruised Mansur's spinal cord (such that Mansur might have been able to run after being shot) and that the spinal cord was severed only later when some force was put on it; and by the testimony of Officer Klipsch that (after the shooting) Mansur was resisting arrest and moving his legs to try to get up and that Klipsch put a great deal of force on him and "drove into [Mansur's] back to keep him pinned down" in the process of handcuffing him, Tr. Vol., 4, at 114-15, 141.

---

[3] The Court does not agree with Plaintiff that Defendant waived this argument by stating at one point that "if [Engelhardt's] going to be testifying today, I think his testimony should be limited to his investigation of this incident." Tr. Vol. 3, at 8. Although this statement, in isolation, could be interpreted as a waiver of this argument, a review of the transcript as a whole indicates that defense counsel repeatedly objected to the admission of Engelhardt's testimony, even as it related to the incident here. *Id.* at 6-14.

The evidence of Engelhardt's post-shooting interactions with Dr. Graham undermined the credibility of Dr. Graham's testimony by suggesting that Dr. Graham's opinion at trial might not have been reached based on his unbiased medical judgment, but under pressure to avoid creating a discrepancy between the medical evidence and the officers' stories that might have led to civil unrest. The evidence that Engelhardt conducted the interviews of several of the other officer-witnesses, including Klipsch, only *after* Engelhardt had learned about the possible discrepancy with the medical evidence and come up with his own "polyester dogpile" theory, and the evidence that Klipsch's statements included new statements consistent with the "polyester dogpile" theory that were not included in Chandler's and Vaughan's earlier interviews, also undermined the officers' testimony by suggesting that the officers might have changed their stories to support the "polyester dogpile" theory. In sum, the post shooting evidence from Englehardt was relevant because it had a tendency to make the testimony of defense witnesses such as Graham, Klipsch, and other officers less credible, and thus to make it less likely that Mansur was holding a gun when Chandler shot him. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

The Court acknowledges that, under Rule 403, it "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Chandler has not shown that this standard was satisfied here. The evidence at issue was highly probative of the credibility of key defense witnesses on a key issue in the case, and the possible prejudice to Chandler and risk of jury confusion were minimal and did not outweigh the probative value of this evidence. Significantly,

15

the questioning of Engelhardt was limited to matters specifically related to the credibility of the witnesses' testimony about what they saw in this case. It did not involve a general exploration of the shortcomings in the City's investigation of this shooting, nor did it involve testimony about the City's investigations of other shootings or the City's investigation process in general. Additionally, Engelhardt did not use the language other courts have found potentially prejudicial, such as "conspiracy" or "cover up." Moreover, Plaintiff's counsel made no suggestion, in closing argument or anywhere in the trial transcript, that Chandler should be held liable for the misconduct of the City or any nonparty. Instead, Plaintiff's arguments were fully consistent with the jury's viewing this evidence for the purpose of evaluating the credibility of the witnesses regarding what occurred when Chandler shot Mansur on the day in question. This was an appropriate use of post-shooting evidence. *See Betts v. City of Chicago*, 784 F. Supp. 2d 1020, 1028 (N.D. Ill. 2011) (declining to exclude evidence that defendant officers attempted to cover up the wrongful nature of an arrest; noting that "proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony") (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)); *Sanchez v. Jiles*, No. CV1009384MMMOPX, 2012 WL 13005996, at *15-*16 (C.D. Cal. June 14, 2012) (precluding "generalized references to the existence of a conspiracy or cover-up" but permitting evidence and argument related to the plaintiffs' theory that the defendant or someone else moved the decedent's hand after the shooting; noting that "Plaintiffs' 'theory' provides some basis for reconciling the [conflicting] evidence and is thus proper argument"); *Gomez v. City of Chicago*, No. 13 C 05303, 2015 WL 13651138, at *10 (N.D. Ill. June 29, 2015) ("Like evidence of alleged misconduct of non-defendant officers, criticism of the police investigation may not be introduced to suggest that Burton should be held liable for the Chicago

16

Police Department's improper investigation. . . . But that does not mean that Gomez is barred from eliciting facts about any flaws in the investigation that would tend to show bias or to explain the presence or absence of certain evidence."); *Townsend v. Benya*, 287 F. Supp. 2d 868, 877 (N.D. Ill. 2003) (prohibiting the plaintiffs "from using the unduly prejudicial terms 'cover-up' and 'conspiracy'" but allowing the plaintiffs "to introduce evidence of false statements and reports made by Defendants or other police officers because such statements and reports would be admissible for impeachment").

Defendant's argument that the post-shooting evidence was inadmissible under Rule 404(b) is also without merit. Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). Rule 404(b) is not relevant here. Chandler does not explain, and the Court does not see, how the post-shooting evidence was offered to prove any person's character in order to show that on a particular occasion the person acted in accordance with the character. The post-shooting evidence was not evidence of Chandler's other crimes, wrongs, or acts, so it could not have been offered to prove that Chandler acted in accordance with any character suggested by such acts. To the extent that the post-shooting evidence showed something about the character of Engelhardt, Dr. Graham, or any nonparty officer, there was no argument or suggestion that any of those people acted in accordance with that character on any particular occasion.

To the extent that Chandler is arguing that admission of this evidence violated Rule 608(b), *see* ECF No. 552, at 9, that argument is also without merit. Rule 608(b) provides, "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support he witness's character for truthfulness." The

evidence at issue was not offered to attack any witness's "character for truthfulness," but rather to show the witnesses' bias or motivation to lie in this particular instance. These are distinct purposes. *See United States v. Allen*, 540 F.3d 821, 824 (8th Cir. 2008) (rejecting the argument that admission of a witness's conviction violated Rule 609(a)'s limitation on the types of convictions that can be admitted for the purpose of attacking a witness's character for truthfulness; stating that the conviction "was not used to cast doubt on [the witness's] character for truthfulness," but instead "set the basis for a specific motive to lie about [the defendant's] possession of the gun"); *United States v. Ngombwa*, No. 14-CR-123-LRR, 2016 WL 111434, at *4 (N.D. Iowa Jan. 10, 2016) (rejecting the defendant's argument that the admission of evidence was precluded by Rule 608(b); stating, "the government does not propose to pursue its line of questioning as a means of establishing Defendant's *character* for untruthfulness, but instead to establish that Defendant has a motive to lie, or bias").

The cases relied on by Chandler do not change the Court's conclusion because they did not involve post-incident evidence that was relevant to the credibility of the witnesses to the incident. *See Davis v. White*, 858 F.3d 1155, 1160 (8th Cir. 2017) (affirming the exclusion of evidence that a nonparty officer who failed to preserve video of footage of a jail altercation might have been biased because, in the court's view, "excessive force, not the retention of potential evidence, was the central trial issue"); *Sherrod v. Berry*, 856 F.2d 802, 806 (7th Cir. 1988) (holding that in a case where an officer testified that he shot a robbery suspect because the suspect was not following commands and made a quick movement with his hand into his coat as if he was going to reach for a weapon, but where the officer never testified that he actually saw a weapon, post-shooting evidence showing the suspect was unarmed was inadmissible because it was information "beyond that which [the defendant] had and reasonably believed at the time he fired his revolver"); *Fuery*

*v. City of Chicago*, No. 07 C 5428, 2015 WL 13682033, at *5 (N.D. Ill. Nov. 30, 2015) (holding that the plaintiffs could not "insinuate that any non-Defendant officers committed misconduct, since there are no claims against any such officers in this case"); *Sonnier v. Field*, No. 2:05-CV-14, 2007 WL 576655, at *4 (W.D. Pa. Feb. 21, 2007) (excluding expert testimony about "errors or omissions by the State Police in their post-incident investigation" because they "could not be attributed to the Defendants"); *White v. Gerardot*, No. 1:05-CV-382, 2008 WL 4238959, at *7 (N.D. Ind. Sept. 10, 2008) (excluding expert testimony critical of a post-shooting investigation because it was not relevant to the circumstances and information available to the officer at the time of the shooting).

The Court is also unpersuaded by Chandler's argument in his reply brief that the admission of this evidence was improper because it played into Plaintiff's improper "theme" that the City was a bad actor. Chandler relies on *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 959 (8th Cir. 2021). In *Krekelberg*, the plaintiff went to trial on claims that her driver's license data had been accessed 74 times, in violation of the Driver's Protection Privacy Act, by 58 Minneapolis police officers. *Id.* at 952. The defendants were two officers and the City, with the plaintiff alleging the City was vicariously liable for the actions of its officers. *Id.* At trial, the plaintiff presented evidence that her data had been accessed more than 850 times by persons and entities whose conduct was no longer at issue in the lawsuit, evidence that the City failed to investigate her claims, evidence that she experienced harassment and discrimination as a consequence of filing the lawsuit, and evidence that the City failed to hold the offending officers accountable. *Id.* at 953. The Eighth Circuit held that the evidence should have been excluded under Rule 403. *Id.* at 956-58. As to the 850 accesses by non-parties, it reasoned that the evidence was minimally probative and that it "was extraordinarily prejudicial and risked confusing the jury because it took the focus

19

off the 74 accesses from December 2009 to 2012 at issue in the suit and onto the 850 time-barred accesses from 2003 to December 2009, which could not be considered as damages" *Id.* at 956-57. It also found that "[a]dmitting into evidence such a large number of accesses by persons whose conduct was not at issue in the suit, many of whom worked for the City, is inflammatory." *Id.* at 957 (quotation marks omitted). The court also found that a limiting instruction did not overcome the unfair prejudice because the plaintiff "made the evidence a theme of her case by introducing it multiple times in different ways and by repeatedly referencing the one thousand improper accesses during opening and closing argument." *Id.* at 957. As to the retaliation, harassment, and failure-to-investigate evidence, the court found it had no probative value and was prejudicial because it "translated into a major and irrelevant trial theme: the City is a bad actor"—a theme to which "[a]pproximately a third of [the plaintiff's] opening and closing statements were devoted." *Id.* at 958.

The evidence at issue here was much more limited than was the evidence in *Krekelberg* and was much more probative of the issues before the jury. Here, unlike the plaintiff in *Krekelberg*, Plaintiff did not introduce evidence of numerous wrongs committed against Mansur by City personnel that were similar to the illegal conduct at issue, nor did Plaintiff introduce evidence that the City or City personnel failed to investigate the incident. Instead, Plaintiff introduced evidence related to the actions of specific witnesses in this case that bore on those witnesses' credibility as it related to the key question the jury had to decide in this case—whether Ball-Bey could have been holding a gun and pointing it at Vaughan before Chandler shot him. Additionally, the Court disagrees that the theme of Plaintiff's case was that the City was a bad actor. Plaintiff's counsel's opening statement did not mention any misconduct by the City and did not mention any post-shooting misconduct by any City employee; indeed, Plaintiff's counsel discussed the City only

when referencing and relying on diagrams and photographs created by City investigators. In closing argument, Plaintiff's counsel discussed the post-shooting evidence *only* in the context of how it affected the credibility of the witnesses in this case. Plaintiff's counsel did not suggest or imply that any of this evidence showed independent wrongdoing by the City or other non-parties for which the jury should compensate Plaintiff.

In sum, the Court finds no error in its decision to admit the limited post-shooting evidence at issue here. In the alternative, assuming, *arguendo*, that the admission of some or all of the post-shooting evidence was improper, the Court finds that its admission does not warrant a new trial because it was not "so prejudicial that a new trial would likely produce a different result." *See Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 833 (8th Cir. 2005). It appears to the Court that the jury found highly credible the testimony of Plaintiff's medical expert, Plaintiff's crime scene reconstruction expert, and the physical evidence. Although the jury may well have found that the post-shooting evidence bolstered the testimony of Plaintiff's witnesses, considering the other evidence of record, the Court cannot say the jury would likely have reached a different result if the post-shooting evidence had not been introduced.

### 2. *Evidence that union attorneys were present with officers during post-shooting investigation interviews*

Chandler next argues that the Court violated Rule 403 by admitting testimony that Chandler and other officer witnesses had attorneys present with them during their post-shooting interviews, and that those attorneys were the same. Chandler argues that this risked confusing the jury because it implied that the officers required the presence of attorneys to shield them from criminal liability. Chandler argues that this was particularly prejudicial because the Court excluded evidence that no officer was criminally charged for the shooting. Chandler argues that this evidence supported Plaintiff's irrelevant trial theme that the City was a bad actor and that the department was engaged

21

in a coverup of the shooting at issue. Chandler argues that because there was no *Monell* claim for the jury to decide, the Court abused its discretion in not focusing the scope of the trial on the use of force at issue.

The Court finds no error in the admission of this evidence. As with Chandler's first argument, Chandler appears to misunderstand the purpose for which this evidence was introduced. The purpose of this evidence was not to show that because the officers had counsel, they were guilty of something, nor was it to show that they or the City engaged in a coverup for which Chandler should be held liable. Instead, its purpose was to show how it was possible that the officer witnesses could have coordinated their stories about what they saw at the time of the shooting, thereby making their testimony about what they saw less credible. The Court acknowledges that the probative value of this specific evidence was not particularly high. However, the Court also finds that both the potential prejudice to Chandler and the risk of jury confusion were minimal. Plaintiff's questioning about the presence of the attorneys was very limited, as was Plaintiff's discussion of this issue during closing arguments. The Court also finds no suggestion by Plaintiff's counsel, anywhere in the trial transcript, that Chandler should be held liable for the conduct of any other officer.

In the alternative, to the extent that it was error to admit some or all of this evidence, the Court finds that Defendant has failed to show the requisite prejudice. For the reasons stated above with respect to the post-shooting evidence in general, and because the evidence related to the attorneys' presence was limited and not emphasized in closing argument, the Court finds it extremely unlikely that a new trial without this evidence would produce a different result.

   3.   *Evidence related to Mansur's character and family relationships*

Chandler next argues that the Court erred by admitting evidence that presented "a rosy picture" of Mansur (including photographs of him as a child and at his high school graduation and testimony that he was religious, educated, hard-working, and a family member) while excluding evidence that would have refuted that picture (including photographs of him with a gun, photographs of him smoking marijuana, a social media post including photographs of him and the label "Trakcistan Mafia,"[4] and evidence that the gun he was holding was linked to a stolen automobile). Chandler argues that the jury "only saw one side of Mansur—the side his family sees in him" and that the Court "did not permit the jury to see any evidence of who Chandler encountered on August 19, 2015—a young man affiliated with a gang fleeing from a drug house with a gun pointed at an officer." ECF No. 552, at 14.

As a preliminary matter, the Court rejects any suggestion by Chandler that this evidence should have been admitted for purposes of determining whether Chandler used excessive force because it would have shown "evidence of who Chandler encountered on August 19, 2015." *See id.* As discussed at the pretrial conference, there was no evidence that Chandler had any knowledge, prior to the shooting, of any of this evidence or of any of the information reflected in it. Defendant also has made no convincing argument that any of this evidence was probative of the question of whether Mansur pointed a gun at anyone, particularly in light of the fact that there was no dispute that Mansur was in possession of a gun when he ran out of the house shortly before the shooting. Introducing this evidence for the purpose of showing Chandler's or Mansur's state of mind or actions at the time of the shooting would have been irrelevant, confusing, and highly

---

[4] There was testimony provided at trial that "Trakcstan Mafia" was the name of a violent street gang. Tr. Vol. 2, at 144. Defense counsel also told the court of counsel's belief that Mansur was part of a rap group called the "Trakcstan Mafia," though no evidence of that was presented at trial. Tr. Vol. 4, at 10.

prejudicial. If this evidence was relevant at all, it was relevant to the question of the Plaintiff's

damages.

For his argument, Chandler relies on *Cobige v. City of Chicago*, 651 F.3d 780 (7th Cir.

2011). In *Cobige*, the plaintiff's mother died shortly after being arrested, and the plaintiff filed

constitutional and state law claims based on the failure to provide her with medical care. *Id.* at 782.

To show his damages for loss of companionship and damages for the decedent's loss of enjoyment

of life, the plaintiff testified that his mother had been "a friend as well as a parent, a bulwark of

support and a role model throughout his life." *Id.* at 784. To counter that evidence, the defendant

sought to introduce evidence that the decedent was a drug addict who had been in trouble with the

law for much of her adult life and had spent multi-year stretches in prison. *Id.* The district court

excluded the evidence. *Id.* The jury awarded $5 million in compensatory damages. *Id.* at 782. On

appeal, the Seventh Circuit reversed, stating:

> [T]he jury did not learn that in 1998 [the decedent] was sentenced to four years'
> imprisonment for two drug offenses and had scarcely been released when she was
> arrested again and convicted in 2001 for another drug crime, for which the sentence
> was three years. When she died in 2006, she was in the lockup following arrest on
> yet another drug charge. The excluded evidence would have undermined the
> favorable picture that [the plaintiff] painted of his mother's character and would
> have allowed defense counsel to ask just what kind of "role model" she could have
> been. Moreover, evidence that she was in prison for extended periods, and in thrall
> to heroin when not imprisoned, would have undermined testimony that she
> provided wise advice and support to her son: prisoners can't spend nearly as much
> time with their relatives as free persons do. Although a parent's advice (and object
> example) not to repeat the parent's mistakes may be valuable, this is not the kind
> of value that leads to an award of damages in a wrongful-death action. . . .
>
> [The decedent's] character and life prospects were put in question by her son's
> testimony. Just as [the plaintiff] was entitled to paint a favorable view of his
> mother's ability to give sage advice and emotional support—he testified that "she
> taught me mostly everything I know. Everything she knew she tried to instill in
> me."—[the defendant] was entitled to introduce evidence suggesting that [the
> decedent] was not likely to assist others or to have enjoyed life to the extent that
> her son narrated.

*Id.* at 784-85.

As this Court's comments at trial made clear, it was a close question whether to admit at least some of the evidence Chandler wanted to introduce.[5] *See* Tr. Vol. 4, at 70-75, 84-90. However, after careful consideration of each piece of proposed evidence in light of the other testimony presented and the relevant case law, the Court ultimately determined that each of these pieces of evidence was more prejudicial than probative and should be excluded under Rule 403. After review of the parties' briefs and the case law cited in the instant motion, the Court remains convinced that its rulings at trial were not erroneous and do not warrant a new trial.

The Court finds *Cobige* distinguishable for several reasons. First, Plaintiff in this case did not offer the broad, "role model" type claims about Mansur's character that were offered by the plaintiff in *Cobige*. Instead, the vast majority of Mansur's parents' testimony related specifically to the relationship Mansur had with his family members and did not indicate that he was a role model or perfectly wholesome individual. Indeed, Plaintiff's counsel refrained from eliciting certain testimony, including testimony that Mansur was in the top third of his high school class,

---

[5] One piece of evidence did not present a close question: the evidence linking Mansur's gun to a stolen automobile a month prior. At the pretrial conference, counsel for Chandler indicated that she had a firearms expert who would testify that a shell casing fired from Mansur's gun matched shell casings that were found in a stolen automobile a month prior to the shooting. Defense counsel indicated that the implication was that Mansur was involved in a stolen auto incident a month before the shooting. However, as discussed at the conference, there was no evidence to suggest that Mansur was involved in the stolen automobile incident, that Mansur had the gun at the time of the stolen automobile incident, or that Mansur had the gun at any time prior to the date he was shot. The Court indicated that Defendant's theory seemed "really speculative" and took the issue under submission, ruling on the motion in limine that "[a]lthough prior crimes or bad acts might be relevant to Plaintiff's damages or for impeachment purposes . . . [Chandler] will not be permitted to introduce evidence that connects Mansur Ball-Bey to past crimes or other bad acts only through speculation." ECF No. 497, at 3. Chandler never offered any additional evidence to support the implication that Mansur was involved in the stolen automobile incident.

explicitly because Plaintiff's counsel wanted to avoid making claims that would have opened the door to rebuttal testimony under *Cobige*. See Tr. Vol. 4, at 8-9.

Second, unlike the evidence at issue in *Cobige*, which was highly probative of the plaintiff's damages, the evidence Chandler sought to offer in this case had minimal probative value as to the question of Plaintiff's damages. The Seventh Circuit emphasized that the excluded evidence in *Cobige* showed that the decedent "was in prison for extended periods, and in thrall to heroin when not imprisoned," which "would have undermined testimony that she provided wise advice and support to her son" because "prisoners can't spend nearly as much time with their relatives as free persons do." 651 F.3d at 784. It found that the defendant "was entitled to introduce evidence suggesting that [the decedent] was not likely to assist others or to have enjoyed life to the extent that her son narrated"—matters that went directly to the question of the decedent's loss of companionship damages and the damages from the decedent's loss of enjoyment of life. *Id.* at 784-85. Here, in contrast, none of the evidence Defendant wanted to offer (that Mansur sometimes had a gun, sometimes smoked marijuana, and made a social media post with himself containing the words "Trakcistan Mafia") suggested that Mansur would have been unable to interact with his family to the extent described by his parents, to provide companionship to his family to the extent described by his parents, or to enjoy life himself.

Third, unlike the situation in *Cobige*, the jury in this case *did* hear quite a bit of evidence that undermined Plaintiff's "rosy" picture of the decedent. The undisputed evidence presented at trial showed that Mansur was present at a house where a search warrant for guns and drugs was being executed, that Mansur ran out of that house holding a gun with an extended magazine, and that Mansur fled from police officers who were chasing him. It included a photograph of the gun Mansur was holding. It also showed that Mansur was close with the cousin who lived at the house

26

that was the target of the search warrant, that the cousin has since been killed, and that another young man who was with Mansur and running out of the house has also since been killed. The presence of this evidence permitted Defendant to make the following argument during closing:

> By all accounts, Mansur was a young man who was headed down a bad path. He was in a house that was being searched for guns and drugs. He came out of that house with a gun. He was running away from police officers. Every person he was around that day, whether it was his cousin in the house or whether it was the young man that he went out with, he ran out of the house with, both of them are dead.

Tr. Vol. 5, at 64. In light of all of this evidence, the additional probative value of the excluded evidence would have been minimal.

Fourth, the Court finds that the evidence at issue here posed a risk of jury confusion and unfair prejudice that was not present in *Cobige*. For example, as the Court noted at the pretrial conference, because there was no evidence that Chandler ever saw a photograph of Mansur with the name "Trakcistan Mafia" on it, the admission of such a photograph could lead to jury confusion and prejudice because the jury might think that Chandler had some reason to believe that Mansur had a gang affiliation when Chandler shot Mansur—despite the fact that there was no evidence whatsoever that, at the time of the shooting, Chandler had any knowledge that Mansur had any affiliation with any gang or other group.

In sum, although it was a close call, the Court remains convinced that it was not erroneous for the Court to exclude the evidence offered by Chandler even while admitting the evidence offered by Plaintiff. In the alternative, the Court finds that these evidentiary rulings do not warrant a new trial because they were not so prejudicial that a new trial would likely produce a different result. As discussed above, there was already substantial evidence in the record to support Chandler's argument that Mansur was "headed down a bad path." The evidence at issue here would have added little to that argument.

### 4.  *Evidence of drug use by Chandler and Vaughan but not Mansur*

Chandler next argues that the Court erred by admitting damaging evidence against Chandler and Vaughan but excluding damaging evidence against Mansur. Specifically, he argues that the Court erred by admitting evidence of Chandler's misuse of prescription drugs years after this event and evidence that Vaughan was terminated from the police department years after this event, yet excluding evidence that Mansur smoked a joint and evidence of cocaine found at the scene after the shooting.

The Court finds no error in its evidentiary rulings with respect to these matters. The factual and legal issues presented with respect to these various pieces of evidence were entirely distinct. The questioning about Chandler's use of prescription medication was permitted only to the extent that it related to departmental findings that Chandler had made false reports regarding those matters to police personnel. Similarly, the questioning about Vaughan's termination was permitted only to explore Vaughan's termination pursuant to a finding that Vaughan had violated the City of St. Louis Code of Conduct's honesty requirement. These prior findings of dishonesty were highly probative of Chandler's and Vaughan's character for truthfulness, and questioning them about these incidents was permissible under Rule 608(b)(1). Additionally, in light of the importance of the credibility of Chandler's and Vaughan's testimony to the central issues in this case, any possible prejudice was easily outweighed by the probative value of this evidence. In contrast, Chandler does not explain how evidence that Mansur smoked a joint or how evidence that cocaine was found at the house would have been relevant to the credibility of any witness or to any other issue in the case. The Court finds no error in these evidentiary rulings. In the alternative, the Court finds no prejudice resulting from these rulings.

### 5.  *Plaintiff's past criminal history*

Chandler next argues that the Court erred in excluding evidence of Plaintiff's prior convictions: a conviction for robbery about 40 years before his 2021 deposition and a 1989 conviction in which he pled guilty to raping a 14-year-old (for which his prison term ended in 1993). Chandler notes that Plaintiff testified about his own background and his relationship with Mansur. He argues that "Plaintiff's prior convictions would have been used to challenge Plaintiff's background, and the inconsistencies revealed therein would have called into question the entirety of Plaintiff's testimony." ECF No. 552, at 19. Chandler also argues that "prior convictions are highly probative of credibility because of the common-sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath." *Id.* at 18 (quoting *United States v. Hall*, No. 15-CR-55-LRR, 2016 WL 3198289, at *4 (N.D. Iowa June 8, 2016)). He argues that because Plaintiff held himself out as a harmless, hard-working individual, his prior convictions were highly probative of his credibility.

The Court finds no error in the exclusion of this evidence. Under Rule 609(b), where "more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later," impeachment by evidence of a criminal conviction is permissible "only if . . . its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b). "Rule 609(b) effectively establishes a rebuttable presumption against the admissibility of prior convictions more than ten years old." *United States v. Stoltz*, 683 F.3d 934, 939-40 (8th Cir. 2012) (quotation marks omitted). "Such stale convictions should be admitted very rarely and only in exceptional circumstances." *Id.* (quotation marks omitted). *See also Reach Companies, LLC v. Newsert, LLC*, 94 F.4th 712, 720 (8th Cir. 2024) ("[C]onvictions will be admitted under Rule 609(b) 'very rarely and only in exceptional circumstances.'") (quoting *United States v. Jasso*, 701 F.3d 314, 317 (8th Cir. 2012)). Factors that

29

tend to support admissibility include a high number of convictions, the fact that the convictions involved fraud or deceit, and evidence that the witness's dishonest conduct continued after the convictions. *See id.* A factor that tends to weigh against admissibility is the potentially prejudicial nature of the conviction. *See, e.g., United States v. Parker*, 634 F. Supp. 3d 583, 592 (W.D. Ark. 2022) (finding evidence of a conviction for child pornography was inadmissible under Rule 609(b); reasoning in part that evidence of a crime against children "could invoke strong feelings among jurors").

Chandler has not shown that there are any "exceptional circumstances" that would have justified the admission of the convictions at issue here. Plaintiff had two convictions, both of which were well over 30 years old. Nothing suggests that either conviction involved fraud or deceit, nor is there any indication that any dishonest conduct continued after the convictions. The Court finds these convictions would have had little or no probative value as to Plaintiff's character for truthfulness or any other issue relevant to the case. Moreover, the admission of the rape conviction would have been highly prejudicial. The Court finds no error. In the alternative, the Court finds that this ruling does not warrant a new trial because it was not so prejudicial that a new trial would likely produce a different result.

### 6. *Evidence related to Plaintiff's and Mansur's religion*

Defendant next argues that the Court violated Federal Rule of Evidence 610 when it permitted testimony about Plaintiff's and Mansur's religious beliefs. Rule 610 provides, "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."

To the extent that Chandler argues that the Court violated Rule 610 by allowing evidence of Mansur's religion, that argument is without merit because Mansur was not a "witness" in this

case whose credibility could have been supported by evidence of religious beliefs. To the extent that Chandler argues that the Court violated Rule 610 by allowing evidence of Plaintiff's religion, that argument is without merit because Plaintiff's counsel did not elicit testimony about Plaintiff's "religious beliefs or opinions" to support Plaintiff's credibility. Plaintiff testified that he joined the Moorish Science Temple of America when he was 22, that he was still involved in the temple, that his children went to the temple, that the family attended the temple three times a week, and that the family attended a festival at the temple annually, and that Mansur was an usher at the temple. Plaintiff's counsel did not elicit any testimony about Plaintiff's religious beliefs or opinions or the beliefs or opinions of the Moorish Science Temple of America, nor did Plaintiff's counsel suggest in questioning or in closing that Plaintiff's religious beliefs made him more credible as a witness. Instead, Plaintiff's testimony about his and the family's involvement with the temple was appropriately introduced to demonstrate the ways in which the family spent much of their time together, which was relevant to loss of consortium damages. The Court finds no error.

In the alternative, the Court finds that any error in the admission of this evidence did not prejudice Chandler. The Court finds it highly unlikely that evidence that Plaintiff was affiliated with and attended the Moorish Science Temple of America, a religious group likely unfamiliar to many of the jurors and whose religious beliefs were not described to the jurors, significantly bolstered Plaintiff's credibility. There is no reasonable likelihood that this evidence was so prejudicial that a new trial would likely produce a different result.

## B.  Weight of the Evidence

Defendant next argues that the verdict was against the weight of the evidence for several reasons. "A district court should grant a motion for new trial based on the sufficiency of the evidence when 'the verdict is against the weight of the evidence and allowing it to stand would

31

result in a miscarriage of justice.'" *Reach Companies,* 94 F.4th at 718 (quoting *Lonesome Dove Petrol., Inc. v. Holt*, 889 F.3d 510, 516 (8th Cir. 2018)). "A new trial should be granted only if the evidence weighs heavily against the verdict." *White Commc'ns, LLC v. Synergies3 Tec Servs., LLC*, 4 F.4th 606, 613-14 (8th Cir. 2021) (quotation marks omitted). "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Wilson v. Lamp*, 995 F.3d 628, 631 (8th Cir. 2021) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)). However, the trial court is not "free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *White*, 961 F.2d at 780-81 (quotation marks omitted). "[G]reat deference is to be accorded the trial judge's decision in such rulings." *Wilson*, 995 F.3d at 631 (quoting *White*, 961 F.2d at 780).

### 1. *Verdict against the weight of the evidence because every eyewitness account contradicted Plaintiff's theory*

Chandler first argues that the verdict was against the weight of the evidence because every eyewitness account contradicted Plaintiff's theory. He also argues that "[t]here was no evidence adduced at trial that Mansur did not point a gun at Officer Vaughan." ECF No. 552, at 23.

The Court acknowledges that the eyewitness testimony presented, even if not perfectly consistent, strongly supported Chandler's version of events rather than Plaintiff's. However, the Court does not agree with Chandler that there was no evidence adduced at trial that Mansur did not point a gun at Vaughan. Plaintiff did present such evidence, including the uncontroverted physical evidence that the gun was found 164 feet away from Mansur's body and the expert testimony from Dr. Carlock that Mansur could neither have run after having been shot nor have thrown the gun to its resting place after having been shot. The physical evidence, combined with

Dr. Carlock's testimony, strongly suggested that Mansur could not possibly have been holding or pointing a gun when Chandler shot him. Plaintiff also presented other evidence, including ShotSpotter audio and the expert testimony of crime scene reconstructionist Matthew Noedel, that tended to undermine the credibility of the officers' version of events. It is apparent that the jury gave more weight to the physical evidence and expert evidence than it did to the eyewitness testimony of the officers. Chandler offers no authority to suggest that a jury's decision to weigh a combination of physical and expert evidence more heavily than eyewitness testimony indicates a verdict against the weight of the evidence, nor is the Court aware of any such authority. The Eighth Circuit has noted that "a lack of eyewitness testimony is not a lack of evidence." *See Partridge v. City of Benton, Arkansas*, 70 F.4th 489, 491 (8th Cir. 2023) (rejecting the defendants' argument that they were entitled to summary judgment because there was no eyewitness testimony that the decedent did not point his gun at the officers; noting that the expert's testimony, "if believed, supports a reasonable inference that [the decedent] did not point his gun at the officers"). *See also* Model Civ. Jury Instr. 8th Cir. § 1.04 (2023) ("[T]he law makes no distinction between the weight to be given to direct and circumstantial evidence.").[6]

The jury certainly could reasonably have weighed the evidence differently and reached a different conclusion. However, based on the Court's own evaluation of the evidence presented at trial, including the uncontroverted evidence of the relative locations of the gun and Mansur's body and the persuasive testimony of Dr. Carlock,[7] the Court does not find the verdict was against the

---

[6] Defendant's reliance on *King v. Davis*, 1991 WL 441734 (S.D. Iowa Nov. 19, 1991), *aff'd*, 980 F.2d 1236 (8th Cir. 1992), is unpersuasive. *King* did not involve physical and medical evidence inconsistent with the eyewitness testimony presented and does not stand for the broad proposition that testimony that a verdict unsupported by the eyewitness testimony presented is against the weight of the evidence.

[7] Defendant suggests that Dr. Carlock's testimony was of little value because Dr. Carlock admitted

weight of the evidence. Allowing it to stand would not result in a miscarriage of justice. Thus, Chandler is not entitled to a new trial based on this argument.

### 2. *Verdict against the weight of the evidence because of a lack of evidence to refute that Mansur pointed a gun at Vaughan*

Defendant next argues that there was no evidence to refute that Mansur pointed a gun at Vaughan. The Court finds this argument unpersuasive for the reasons articulated above with respect to Defendant's previous argument concerning eyewitness testimony.

Defendant's reliance on *Jordan v. Howard*, 987 F.3d 537, 541 (6th Cir. 2021), is unavailing. In *Jordan*, the officers testified that the decedent initially complied with commands to raise his hands, but then reached for a gun in his lap and moved it in the direction of officers, at which point they began shooting at him and hit him six times in different parts of his body. The only evidence supporting the plaintiff's argument that the decedent was not holding a gun at the time officers shot at him was an expert report stating that the decedent's right hand was raised in front of him, near shoulder level, when he was shot in the base of the right thumb, and that the lack of damage to the gun provided clear evidence that the decedent was not holding the gun when he was shot in the hand. *Id.* at 541-42. The Sixth Circuit noted that the expert could not opine on the sequence of the shots, found that his report did not contradict that the decedent stopped following officer commands and picked up the gun in his lap, and noted that the report "tells us *only* that by the time one of [the officer's] eight shots struck McShann's right hand, there is 'clear evidence'

---

he did not know whether the bullet immediately transected the spine and because Dr. Graham testified that the bullet did not perforate the spinal cord. The Court disagrees. Dr. Carlock's testimony that Plaintiff could not have run after having been shot was not dependent on a finding that the bullet immediately transected or perforated the spinal cord. Dr. Carlock testified that he was 99.5% certain that the bullet severed the spinal cord at the moment of impact, but that even if it did not, the bullet would have caused spinal shock that would have led to immediate paralysis below the level of the injury. Tr. Vol. 3, at 192, 200-04.

that McShann was not holding the pistol." *Id.* at 545. The court found that this "such speculation is not enough to controvert consistent officer testimony to the contrary and create a genuine dispute of material fact for trial." *Id*. Here, in contrast to *Jordan*, Plaintiff's version of events does not rest on a single expert opinion that might not even be relevant to the point in time at which officers began shooting. Instead, it relies on a combination of physical evidence, crime scene reconstruction expert testimony from Mr. Noedel, and medical expert testimony from Dr. Carlock, all of which, taken together and credited by the jury, showed that Plaintiff could not have been holding or pointing a gun when the officers began shooting. Indeed, the instant case is similar to another Sixth Circuit case that was distinguished by the court in *Jordan*: *King v. Taylor*, 694 F.3d 650 (6th Cir. 2012). In *Kin*g, the officers testified that the decedent had pointed a gun at them just before he was shot. *Id.* at 662-63. Despite the consistent officer testimony, the court found a genuine issue of material fact regarding whether the decedent was pointing a gun at the officers based on bullet trajectory evidence that was more consistent with the plaintiffs' theory of events and medical expert evidence indicating that the decedent's arm would not have come to rest where it did if he had been shot with his arm extended toward the officers. *Id.* It stated, "a jury could find, based upon the forensic evidence, expert testimony, and common sense, that [the decedent] did not threaten the officers by pointing a gun at them just before he was shot." *Id.* at 662. Here, as in *King*, it was not unreasonable for the jury to find, based on the forensic evidence, medical expert testimony, and common sense, but contrary to officer testimony, that Mansur was not pointing a gun when Chandler decided to shoot him. Chandler is not entitled to a new trial based on this argument.

### 3. *Punitive damages verdict against the weight of the evidence*

Chandler next argues that he is entitled to a new trial because the punitive damages verdict

was against the weight of the evidence.[8] He offers two arguments: (1) that Plaintiff failed to adduce evidence that Chandler's shooting of Mansur was done with an evil motive or intent or involved reckless or callous indifference to Mansur's federally protected rights;[9] and (2) that the Court erroneously admitted prior acts that were not of the sort that harmed Mansur.

"Unlike compensatory damages, which are mandatory and are awarded as a matter of right once liability is established, punitive damages are awarded or rejected in a particular case at the discretion of the fact finder once sufficiently serious misconduct by the defendant is shown." *Naucke v. City of Park Hills*, 284 F.3d 923, 929 (8th Cir. 2002) (citing *Smith v. Wade*, 461 U.S. 30, 52 (1983)). "The focus is on the intent of the defendant and whether the offensive conduct calls for deterrence and punishment over and above that provided by compensatory awards." *Id.* (citing *Smith*, 461 U.S. at 54). "Punitive damages are appropriate in a § 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Id.* (quoting *Walters v. Grossheim*, 990 F.2d 381, 385 (8th Cir. 1993)). "It is a question of fact whether a defendant's conduct was

---

[8] In his motion for remittitur, Chandler separately argues that the punitive damages award is grossly excessive under the Due Process clause of the Fourteenth Amendment and should be reduced. The Court will address that argument in Section III, *infra*. In this section of the opinion, the Court addresses only whether the Chandler is entitled to a new trial because the threshold showing for punitive damages was not made and/or because the Court improperly admitted evidence of prior acts.

The Court also notes that Chandler has not moved for judgment as a matter of law on the question of punitive damages, nor did he do so at trial. He moves only for a new trial and for remittitur.

[9] When Chandler refers to "punitive damages" in this section of his briefing, it is unclear whether he is referring only to the punitive damages awarded on the § 1983 excessive force claim or to those damages *and* the aggravating circumstances damages awarded on the state law claim, which are punitive in nature. Chandler makes no arguments based on the standard for an award of aggravating circumstances damages under Missouri law, and he relies entirely on federal cases.

36

motivated by an evil motive or involves reckless indifference to the federally protected rights of others." *Schaub v. VonWald*, 638 F.3d 905, 923 (8th Cir. 2011).

Here, the issue of punitive damages was submitted to the jury using the Eighth Circuit's model instruction for punitive damages in a civil rights case, Model Civ. Jury Instr. 8th Cir. 4.72 (2003), as modified by agreement of the parties,[10] and Missouri's model instructions for damages for aggravating circumstances, Missouri Approved Jury Instructions Instruction (Civil) 3.01, 6.02 & 10.01.[11] *See also* Instruction Nos. 15-19, ECF No. 530, at pp. 19-24. The jury awarded punitive damages for excessive force after being instructed that it could do so if it was proven that Chandler's conduct "was motivated by evil motive or intent, or reckless or callous indifference to the constitutionally protected rights of Mansur Ball-Bey." *Id.* at p. 20. It awarded aggravating circumstances damages for wrongful death after being instructed that it could do so if there was clear and convincing evidence that Chandler's conduct "was outrageous because of the Defendant's evil motive or reckless indifference to the rights of Mansur Ball-Bey." *Id.* at pp. 23-24.

The jury's findings on these issues were not so against the weight of the evidence that allowing them to stand would result in a miscarriage of justice. Although the jury could certainly have found these standards not satisfied, the Court is not "free to reweigh the evidence and set

---

[10] By agreement of the parties, the language of the model instruction on punitive damages for excessive force was modified to replace the words "malicious or recklessly indifferent" to "motivated by evil motive or intent or reckless or callous indifference to the constitutionally protected rights of Mansur Ball-Bey. Tr. Vol. 4, 193-97.

[11] "[A]ggravating circumstances damages in wrongful death cases are the equivalent of punitive damages," whose purpose is "to inflict punishment and to serve as an example and a deterrent to similar conduct." *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 810 (Mo. Ct. App. 2008).

aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *White*, 961 F.2d at 780-81 (quotation marks omitted). The jury clearly believed Plaintiff's version of events: that Chandler shot an unarmed man in the back, killing him, while the man was fleeing from him and who posed no serious risk of harm to Chandler or others. It clearly disbelieved Chandler's and Vaughan's testimony that Mansur turned and pointed a gun at Vaughan, then threw the gun some distance behind him and continued running forward. Under these circumstances, the jury could reasonably have inferred that Chandler acted with callous indifference to Mansur's federally protected rights. There was also evidence presented during the punitive damages phase of the trial that Chandler had a history of using force against citizens, sometimes under questionable circumstances, including a 2012 incident in which he shot at someone whom he claimed had pointed a gun at him and then thrown the gun away but in which no gun was ever found, a 2009 incident in which Chandler shot someone in the back and killed him, and a 2013 incident in which he was accused of punching a suspect in the side of the face while he was handcuffed. The Court notes that Chandler, in his motion, does not direct the Court to any cases finding punitive damages inappropriate in a case similar to this one, or even any cases involving use of excessive force.

The Court is also unpersuaded that a new trial is warranted because the Court erred in admitting the evidence of prior uses of force by Chandler at the punitive damages phase. Chandler cites no authority in support of this argument. The jury instructions, which were based on the Eighth Circuit's model instructions, permitted the jury to consider "whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the decedent." Instruction No. 16, ECF No. 530, at p. 20. At trial, Plaintiff listed several past incidents involving Chandler that he wanted to address through cross-examination of Chandler at the punitive damages

phase. Tr. Vol. 5, at 87-89. The Court excluded evidence of several of the incidents, finding them insufficiently similar to the conduct in the instant case to be relevant. *Id.* at 89-96. The Court permitted cross-examination about the 2012 shooting over Chandler's objection, finding Chandler's description of what occurred in that case to be very similar to the instant case. *Id.* at 91. Chandler did not object to the introduction of evidence about either the 2009 shooting or the 2013 punching accusation. *Id.* at 87-96. The three incidents about which Plaintiff was permitted to question Chandler—one involving shooting a gun, one involving shooting a man in the back, and one involving an allegation of excessive force against a handcuffed suspect—were sufficiently similar to the instant case to be relevant to the jury's consideration of punitive damages. *See Wilson v. City of Hazelwood*, 628 F. Supp. 2d 1063, 1066, 1070 (E.D. Mo. 2008) (rejecting the defendant's argument that a new trial was warranted because the trial court erred in admitting evidence of prior "unrelated citizen complaints" and that the defendant had been referred to counseling; reasoning that the jury had been instructed that it should consider matters including "whether others were harmed by the same conduct of the defendant that harmed the plaintiff" and "whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed plaintiff" and finding that the evidence of prior complaints "was relevant to the jury's consideration of the amount of punitive damages").

In sum, the jury's finding that punitive damages were warranted was not against the weight of the evidence, and allowing it to stand would not result in a miscarriage of justice. Chandler is not entitled to a new trial based on this argument.

## C.  Impermissible Closing Argument

Finally, Defendant argues that a new trial is warranted because the Court erroneously permitted argument that the jury should enter punitive damages against the City of St. Louis, which

was no longer a party to this action and against which punitive damages could not have been awarded even if it had been a party.[12] Chandler argues that Plaintiff's counsel made several statements during oral argument that, in effect, asked the jury to award punitive damages against the City: (1) counsel's statement, "I'm about to ask for a large amount of money for punishment," followed by a discussion of the City Budget Director's testimony about the City's budget to settle police matters and the City's general budget; (2) counsel's statement that if the punitive damages award "doesn't hurt the budget, it's going to keep happening . . . It has to hurt the budget. Because when it hurts the budget, you change policies"; (3) counsel's request for $50 million and statement that "the City's budget is a billion dollars a year. We're only asking for 5 percent of one budget for one year"; and (4) counsel's statement that "the context here is not Kyle Chandler." Tr. Vol. 5, at 139-41. To support his argument that these statements were improper, Chandler relies principally on *Betts v. City of Chicago.*, in which the court granted the defendant's motion in limine to bar argument that the plaintiff intended to "send a message" to the City of Chicago. 784 F. Supp. 2d 1020, 1033 (N.D. Ill. 2011). The court in *Betts* noted that such argument "implies that the city has a policy or practice of condoning such misconduct, which is precisely the question at issue in Betts' *Monell* claim that is not being addressed in this trial." *Id.* Defendant also relies on *Burke v. Regaldo*, in which the court noted that the plaintiff's counsel's comment that "[a] jury award of five or ten million dollars will not have an impact on the Tulsa County Sheriff's Department" "may have crossed the line" by "urg[ing] deterrence against" a municipal entity that was immune from

---

[12] It is well established that punitive damages are not available against a municipality in a § 1983 action. *See City of Newport v. Fact Concerts,* Inc., 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."). *See also* Mo. Rev. Stat. § 537.610.3 ("No award for damages on any claim against a public entity within the scope of sections 537.600 to 537.650, shall include punitive or exemplary damages.").

punitive damages. 935 F.3d 960, 1029 (10th Cir. 2019). In his reply, Chandler also cites cases cautioning against informing jurors that a defendant would be indemnified. *See, e.g., Griffin v. Hilke*, 804 F.2d 1052, 1057 (8th Cir. 1986).

Plaintiff, on the other hand, argues that Chandler—unlike the plaintiffs in the cases cited by Chandler—opened the door to arguments about the City's budget. As Plaintiff points out, *Chandler* called the City's budget director as a surprise witness, then elicited testimony from him about the City's budget for the purpose of showing how an award of punitive damages would affect the City's budget.

"[W]hen a new trial motion is based on improper closing arguments, a new trial should be granted only if the statements are plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict." *Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 984-85 (8th Cir. 2019) (quoting *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002)). Here, although the Court does not condone every remark made by Plaintiff's counsel, the Court finds that Chandler has not satisfied this standard. First, the Court agrees with Plaintiff that it is significant that *Chandler*, not Plaintiff, chose to introduce evidence that the City would be paying the punitive damages award and thus invited the jury to consider the effect of the punitive damages award on the City's budget. Once Chandler introduced the evidence from the City budget director, it was not "plainly unwarranted" for Plaintiff to make his own arguments about the effect of punitive damages on the City's budget. It appears that Chandler's counsel made a tactical decision to emphasize the impact of punitive damages on the City's budget in hopes of a smaller award, and the Court is not inclined to award Chandler a new trial to relieve him of the consequences of that tactical decision. *See Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) (noting that defense counsel's stipulation that punitive damages award against an officer

41

would be paid by the City "presumably reflects a calculation by the defense that the jurors would be tight-fisted with the taxpayers' money" and stating, "[w]e are disinclined to relieve the defense from the consequences of that choice, or to facilitate a new trial in which the defense can repair a tactical error").[13]

Second, even assuming, *arguendo*, that some of Plaintiff's counsel's statements were improper, the Court does not find that they were not clearly injurious or prejudicial. The presence of some improper remarks during closing argument about a City's budget does not necessarily mean that a new trial is warranted. *See Burke,* 935 F.3d at 1029, 1034 (assuming, without deciding, that counsel's comment that "[a] jury award of five or ten million dollars will not have an impact on the Tulsa County Sheriff's Department" and other counsel comments were improper, but ultimately denying the motion for new trial because the defendants had not shown that the comments had improperly influenced the verdict). Here, after consideration of the trial as a whole, the Court does not believe that the comments at issue were prejudicial to Defendant or influenced the verdict. The Court also notes that Chandler's counsel had the opportunity to respond in her own closing arguments, which were after the objected-to comments. *See Keller Farms, Inc.*, 944 F.3d at 985 (noting that whether counsel had an opportunity to respond to improper closing argument may be considered in determining whether an argument was sufficiently prejudicial to warrant a new trial).

---

[13] In his reply, Chandler argues that although he called the City budget director as a witness, he was "forced . . . into a corner" because of Plaintiff's counsel's statement to the Court that if Chandler did not call the budget director as a witness, Plaintiff would do so. ECF No. 588, at 34. This argument is without merit. Had *Plaintiff*, rather than Chandler, proposed offering the testimony of the City budget director, Chandler could have objected and given the Court the opportunity to exclude the testimony, which the Court may well have done.

IV.    MOTION FOR REMITTITUR

The Court next considers Chandler's Motion for Remittitur, in which Chandler requests remittitur of both the compensatory and punitive damages awards. "If a trial court determines that a jury award is excessive, it may order a new trial or condition a denial of a motion for a new trial on the plaintiff's acceptance of a remittitur." *Miller v. Huron Reg'l Med. Ctr.,* 936 F.3d 841, 846 (8th Cir. 2019) (citing Fed. R. Civ. P. 59). "Remittitur is not appropriate merely because the district court would have awarded a different amount than the jury." *Id.* "Rather, [t]he court orders a remittitur when it believes the jury's award is *unreasonable* on the facts." *Id.* (quotation marks omitted). "A remittitur is reserved for cases where the verdict is so grossly excessive as to shock the judicial conscience." *Id.* (internal quotation marks omitted).

### A.    Compensatory Damages

Chandler first argues that the $6.25 million in compensatory damages—$3.75 million on the § 1983 excessive force claim and $2.5 million on the wrongful death claim—greatly exceeded that which was adequate. Chandler argues that the total compensatory damages award should be reduced to no more than $1 million.

The Eighth Circuit "has consistently held that awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms." *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 974 (8th Cir. 2014) (quoting *Eich v. Bd. of Regents for Cent. Mo. State Univ.*, 350 F.3d 752, 763 (8th Cir. 2003)). "In Missouri, '[t]here is no precise formula for determining whether a verdict is excessive,' but the 'ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained. *Est. of Snyder v. Julian*, 789 F.3d 883, 888 (8th Cir. 2015) (quoting *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. 1978)).

43

For his argument that the compensatory damages award here was unreasonable, Chandler relies solely on *Jones as Tr. for Handy v. City of St. Paul*, 715 F. Supp. 3d 1166, 1171 (D. Minn. 2024). In *Handy*, the jury awarded $10 million in compensatory damages for the death of the plaintiff's son. *Id.* at 1169. The court found the $10 million award shocked the conscience and remitted the award to $2.5 million. *Id.* at 1171-72. The court began by noting that it "suspect[ed]" that the jury's $10 million damages award "was largely guided by the arguments of plaintiff's counsel," who had argued for an award of $12 million *Id.* at 1171. It found that "[o]ther than the urging of plaintiff's counsel, this award bears little relation to the relevant facts." *Id.* It noted that Plaintiff had admitted that the decedent did not financially provide for his parents or siblings; that no evidence was submitted of his past earnings, future earning capacity, living expenses, legal obligations to support others, or probability of paying off existing debts; that there was no testimony about his income (aside from the fact that he worked full time) or that the was sharing his income with his family; that Handy's talents, including dry wall, house painting, and singing, had not been associated with a monetary value and were impossible to quantify; and that his funeral and burial expenses totaled less than $16,000. *Id.* The court found that the question before it was "whether plaintiff should be awarded nearly $10,000,000 for loss of comfort." *Id.* at 1172. It found that although there was evidence that the decedent was a loving and engaged member of the family who took special care of his mother and siblings, the amount awarded was "patently excessive" and "it appear[ed] that the jury was impermissibly swayed by plaintiff's understandable mental anguish and grief." *Id.* The court also found the amount was "highly speculative, which is an improper basis for a damages award." *Id.* The court concluded that "the maximum amount of compensatory damages the jury could have awarded in this case is $2,500,000." *Id.*

Chandler's reliance on *Handy* is misplaced for at least two reasons. First, the instant case involved types of damages that were not at issue in *Handy*. The jury in *Handy* only considered damages to compensate the plaintiff for *injuries to the decedent's family* as a result of the decedent's wrongful death. *See id.* at 1169; Pl's Ex. 7, *Handy* Jury Instructions, Instruction No. 2, ECF No. 575-7, at p. 3 (instructing the jury to "determine an amount of money that will fairly and adequately compensate [the decedent's] next of kin for the losses they suffered as the result of his death"). Here, in contrast, the jury considered damages to compensate Plaintiff both for *injuries to Mansur's family* (as permitted under Missouri's wrongful death statute) and for *injuries to Mansur himself* (as permitted under § 1983). *See* Instruction No. 14, ECF No. 530, at p.17 (instructing the jury to consider, for the Missouri wrongful death claim, "the pecuniary losses suffered by the survivors by reason of the death of Mansur Ball-Bey, funeral expenses, and the reasonable value to the survivors of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and/or support of Mansur Ball-Bey"); Instruction No. 11, ECF No. 530, at p. 13 (instructing the jury to award damages "to compensate "for any damages you find that that Mansur Ball-Bey sustained," including "the physical pain and mental suffering Mansur Ball-Bey experienced," "the nature and extent of the injury to Mansur Ball-Bey," "the lost wages that Mansur Ball-Bey would have earned over the course of his working life," and "Mansur Ball-Bey's loss of consortium with his family members.")[14] Thus, *Handy* is inapplicable with respect to the

---

[14] Defendant consented to the submission of both of these damages instructions to the jury. *See* Tr. Vol. 4, at 193 (indicating no objection to Plaintiff's Proposed Instruction No. P22, which became Instruction No. 11); *id.* at 199-203  (indicating no objection to Plaintiff's Proposed Instruction No. P26, which became Instruction No. 14, except to change "Dennis Ball-Bey" to "survivors"). *See also* Pl.'s Proposed Jury Instructions (version filed Jan. 30, 2025), ECF No. 521. The instructions were supported by citations to an Eighth Circuit model jury instruction, a Missouri model jury instruction, Eighth Circuit case law, and a Missouri statute. *See id.* The instructions were also similar to those given in other cases in this district involving both Missouri wrongful death claims and § 1983 claims. *See Torres et al. v. City of St. Louis et al.*, 4:19-CV-1525-HEA,

45

excessive force damages considered and awarded by the jury. As Plaintiff argues, there was evidence from which the jury could have found that Mansur's injury was the loss of his life, that Mansur was conscious for at least some time after being shot and before dying (such that he would have experienced pain and suffering), and that he was gainfully employed at the time of his death. The appropriate compensation for these additional types of damages were not addressed by the Court in *Handy*.

Second, *Handy* does not support Defendant's argument that the jury was guided more by arguments of Plaintiff's counsel than by the evidence. On the wrongful death claim, although Plaintiff's counsel requested an award of $7.5 million, the jury in this case awarded $2.5 million— exactly the same amount that was ultimately approved by the court in *Handy* for the injuries suffered by the decedent's family. In awarding Plaintiff only one third of the amount requested for compensatory damages on his wrongful death claim, the jury appears to have been guided by its own independent assessment of the evidence and not solely by the arguments of Plaintiff's counsel. With respect to the excessive force claim, the jury again appears to have been guided more by the evidence and the Court's instructions than by arguments of Plaintiff's counsel. The jury awarded only half of the amount requested by Plaintiff's counsel on the excessive force claim ($3.75 million). Indeed, the fact that the jury came to different conclusions about the amount to award on the excessive force and wrongful death claims further supports a finding that the jury carefully and independently considered the different types of damages appropriate for each claim. In sum, in contrast to *Handy*, the Court here has no suspicion that the jury was guided largely by the arguments of Plaintiff's counsel rather than by its own independent assessment of the evidence.

---

ECF No. 352, Instruction Nos. 17 & 27 (E.D. Mo. Nov. 8, 2024); *Moore et al. v. Ferguson Police Dept et al*. 4:14-CV-1443-SNLJ, ECF No. 160, Instruction Nos. 11 & 14 (E.D. Mo. Nov. 4, 2016).

Although the nature of most of the damages at issue in this case makes them necessarily difficult to quantify, the Court finds neither the award of $2.5 million on the wrongful death claim nor the award of $3.75 million on the excessive force claim shocks the conscience of the Court. Based on the evidence, and considering the Eighth Circuit's guidance that awards such as these are committed to the sound discretion of the jury, the Court finds that neither the $3.75 million award for excessive force nor the $6.25 million total award is grossly excessive. The Court will not grant the request for remittitur of compensatory damages.

### B.  Punitive Damages/Aggravating Circumstances Damages

Chandler next argues that the $12.5 million total punitive damages award ($5 million on the excessive force claim and $7.5 million in aggravated damages on the wrongful death claim) is grossly excessive under the guidelines set forth by the United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996), and *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408, 416 (2003).[15] He argues that the punitive damages award should be reduced to no more than $2 million total.

"Punitive damages are imposed to further legitimate interests in 'punishing unlawful conduct and deterring its repetition.'" *Masters v. City of Independence*, 998 F.3d 827, 840 (8th Cir. 2021) (quoting *Gore*, 517 U.S. at 568). "An award of punitive damages that is 'grossly excessive' in relation to those interests, however, 'enter[s] the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.'" *Id.* (quoting *Gore*, 517 U.S. at 568). *See also Campbell,* 538 U.S.at 416-17 ("The Due Process Clause of the Fourteenth Amendment

---

[15] Although Chandler argues that both the punitive damages on the federal claim and the aggravating circumstances damages on the Missouri wrongful death claim were excessive under the Due Process clause, he does not argue that either award was excessive under Missouri law.

prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. The reason is that elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.") (internal citations and quotation marks omitted). "Punitive damages are grossly excessive if they 'shock the conscience' of the court or 'demonstrate passion or prejudice on the part of the trier of fact.'" *Adeli v. Silverstar Auto., Inc.*, 960 F.3d 452, 460 (8th Cir. 2020) (quoting *May v. Nationstar Mortg., LLC*, 852 F.3d 806, 815 (8th Cir. 2017)). Because aggravating circumstances damages are punitive in nature, the constitutional due process protections apply to aggravating circumstances damages as well as punitive damages. *See, e.g.*, *Bennett v. Owens-Corning Fiberglas Corp.*, 896 S.W.2d 464, 466 (Mo. 1995).

A court reviewing a punitive damages award must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Campbell*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 574-75). Chandler, relying on the first and third guideposts, argues the jury award here was too high. Plaintiff, relying on the first and second guideposts, argues that it was appropriate.[16]

The Court first considers the reprehensibility of Chandler's conduct, which is "the most important indicium of the reasonableness of a punitive damages award." *Id.* at 419 (quoting *Gore*,

___

[16] Plaintiff also argues that Defendant, having not suggested any number for punitive damages to the jury, should not be permitted to now second-guess the jury's award. Additionally, Plaintiff argues that the punitive damages amount awarded was appropriate because it related to the amount of money St. Louis City, the indemnifying party, had available to pay. Plaintiff offers no authority to support either of these arguments, and the Court finds them unpersuasive.

48

517 U.S. at 575). Courts determine the reprehensibility of a defendant's conduct "by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* Chandler suggests that his conduct was not reprehensible at all because the evidence showed that Mansur raised his gun toward Vaughan immediately before Chandler shot him. That argument is without merit. As discussed at length above, there was evidence sufficient to support the jury's finding that Mansur did *not* raise a gun toward Vaughan before Chandler shot him. The evidence that Chandler shot a fleeing, unarmed man in the back, absent any significant threat from him, suggests that Chandler acted with reckless disregard of the health or safety of others. Moreover, the harm at issue here was physical—resulting in death—rather than economic. Additionally, as discussed above, there was also evidence that Chandler had a history of using force against citizens, sometimes under questionable circumstances. On the other hand, the Court notes that there is no evidence that the harm *to Mansur* involved repeated actions (Chandler shot Mansur once), nor is there evidence that the harm to Mansur was the result of trickery or deceit. Additionally, there is no evidence that Chandler used force on Mansur after he had already been subdued or was unconscious, *cf., e.g.*, *Fletcher v. Tomlinson*, 895 F.3d 1010, 1013-14 (8th Cir. 2018), *Masters*, 998 F.3d at 841, or that Chandler taunted or threatened Mansur, *Est. of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1396 (8th Cir. 1997). The reprehensibility of the conduct here thus weighs somewhat in favor of a substantial punitive damages award, but not as strongly as it might in some cases. *See Adeli*, 960 F.3d at 461 (finding that although defendant's conduct was reprehensible, "the reprehensibility should not be overstated").

The Court next considers the second guidepost: the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, often expressed as a ratio between punitive and compensatory damages. Although there is no "simple mathematical formula" for assessing whether this guidepost supports a punitive damages award, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* at 461 (internal quotation marks omitted). "A higher ratio may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages," whereas "a lesser ratio may be appropriate when compensatory damages are substantial." *Masters*, 998 F.3d at 841 (internal quotation marks omitted). *See also Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (stating, "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee" and reducing a punitive damages award from $15 million to $5 million to produce a ratio of approximately 1:1 to satisfy due process requirements) (quoting *Campbell*, 538 U.S. at 425).

Plaintiff argues that the 2:1 ratio of punitive damages to compensatory damages here is in line with, or below, ratios approved in other cases. *See Masters*, 998 F.3d at 842 (approving punitive damages of $425,700 that were nine times higher than the award of compensatory damages). Defendant offers no argument with respect to this guidepost. The Court agrees with Plaintiff that the 2:1 ratio here, standing alone, does not suggest an excessive award. However, the Court notes that this case does involve a substantial compensatory damage award, a circumstance that may suggest a lower than typical ratio is required.

Finally, the Court considers the third guidepost: the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

50

This analysis requires the Court to "compare damages awarded in similar civil cases." *Ondrisek v. Hoffman*, 698 F.3d 1020, 1030 (8th Cir. 2012). Chandler argues that he has been unable to find any punitive damages award in an excessive force/wrongful death case in the Eighth Circuit as high as the $12.5 million awarded here. He states that even under circumstances in which plaintiffs have suffered the loss of a child, punitive damages have not exceeded $1 million to $2 million in this circuit. *See Jones as Tr. for Handy v. City of St. Paul*, 715 F. Supp. 3d 1166, 1171 (D. Minn. 2024) (leaving undisturbed a punitive damages award of $1.5 million in an excessive force/wrongful death case); *Tanner v. City of Sullivan*, No. 4:11-CV-1361 NAB, 2013 WL 3287068, at *2 (E.D. Mo. June 28, 2013) (denying motion for remittitur of aggravating circumstances damages awards of $1,000,000, $250,000, $150,000, and $150,000 against four officers in a state law wrongful death case based on a jail suicide).

Plaintiff offers no arguments with respect to this guidepost and directs the Court to no comparable cases involving punitive damages awards. Through its own research, the Court has identified some cases outside of the Eighth Circuit involving punitive damages awards of slightly more than $2 million in excessive force/wrongful death cases. *See Hardin v. City of Birmingham*, No. 2:21-CV-1002-AMM, 2024 WL 3914835, at *11 (N.D. Ala. Aug. 2, 2024) (punitive damages award of $2.75 million in a wrongful death action was not unconstitutionally excessive), *appeal dismissed sub nom. Hardin v. Birmingham, City of*, No. 24-12708-DD, 2025 WL 518229 (11th Cir. Jan. 30, 2025); *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1212 (W.D. Wash. 2018) (punitive damages awards of $3 million, $2 million, and $1.5 million against three officers in a wrongful death case did not violate due process). However, the only case the Court has identified involving awards as high as the one in this case involved substantially more reprehensible conduct than was present here. *See Est. of Moreland v. Dieter*, 395 F.3d 747, 756 (7th Cir. 2005) (finding punitive

51

damages awards of $15 million and $12.5 million against two officers were not unconstitutionally excessive where the officers threw a handcuffed jail detainee's head against concrete, taunted him, threw cold water on him, strapped him to a restraint chair and sprayed him with pepper spray in the face, refused to take him to the hospital because their shift was ending, and left him strapped to chair with his medical needs unattended, after which he was found dead from his injuries). The third guidepost strongly suggests that the award here was excessive.

After consideration of all three guideposts, the Court finds that the award of $12.75 million in punitive damages against Chandler is grossly excessive and inconsistent with the requirements of due process. As to the first guidepost, although Chandler's conduct was sufficiently reprehensible to warrant *some* punitive damages, the reprehensibility should not be overstated. Chandler shot Mansur one time, Chandler did not threaten or taunt Mansur, and Chandler did not continue to use force on Mansur after Mansur had already been subdued. As to the second guidepost, especially in light of the substantial compensatory damages award in this case, the Court finds that a significantly lower ratio of punitive to compensatory damages is warranted than in the typical case. As to the third guidepost, Plaintiff directs the Court to no similar cases permitting a punitive damages award nearly as high as this one, nor has the Court identified any. To the contrary, the punitive damages awards against individual officers for similar cases in this circuit have been below $2 million. Chandler's conduct was not so reprehensible that it warrants a punitive damages award that is more than eight times the amount previously awarded in excessive force/wrongful death cases in this circuit. The Court finds that the maximum amount of punitive damages the jury could have awarded, consistent with due process, was $2 million.

Where, as here, the Court finds that a punitive damages award must be reduced based on constitutional considerations, the Court need not offer the plaintiff the option of accepting the

reduced award or opting for a new trial. *See Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir. 2002) (noting that although "the traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to a jury trial, the court's mandatory review of a punitive damages award does not implicate the Seventh Amendment" and "[t]he plaintiff's consent to a constitutional reduction of a punitive damages award is 'irrelevant' because the court must decide this issue as a matter of law"; affirming the district court's reduction of punitive damages award without giving the plaintiff the option of a new trial). *See also Adeli v. Silverstar Auto., Inc.*, No. 5:17-CV-05224, 2019 WL 481179, at *5 (W.D. Ark. Feb. 7, 2019) ("The Court need not offer [plaintiff] the opportunity to reject the lesser amount [of punitive damages] in favor of a new trial because his consent is irrelevant. The Court's mandatory duty to reduce an unconstitutional verdict renders a remittitur improper.") (internal citation omitted), *aff'd*, 960 F.3d 452 (8th Cir. 2020). Accordingly, the Court will reduce the amount of punitive damages without offering Plaintiff the option of a new trial.

## V.    CONCLUSION

For all of the above reasons,

**IT IS HEREBY ORDERED** that Defendant Kyle Chandler's Motion for New Trial, Motion for Remittitur, and Renewed Motion for Judgment as a Matter of Law [ECF No. 549] is **GRANTED IN PART** and **DENIED IN PART**, as follows:

Defendant's Motion for New Trial is **DENIED**.

Defendant's Renewed Motion for Judgment as a Matter of Law is **DENIED**.

Defendant's Motion for Remittitur is **GRANTED** to the extent that the punitive damages award on the excessive force claim will be reduced from $5 million to $1 million, and the

aggravating circumstances damages award will be reduced from $7.5 million to $1 million. The Motion for Remittitur is **DENIED** in all other respects.

An amended judgment will be entered separately.

_____

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of February, 2026.