IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DENNIS BALL-BEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Cause No. 4:18-CV-01364-SPM |
| v. | ) | |
| | ) | |
| KYLE CHANDLER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S SUPPLEMENT IN OPPOSITION
TO DEFENDANT'S MOTION TO WAIVE BOND**

As the Court correctly noted at the last hearing, the "general rule is for the district court to set a supersedeas bond in the full amount of the judgment plus interests, costs, and damages for delay." *Jo Ann Howard & Assocs., P.C. v. Cassity*, No. 4:09CV01252 ERW, 2015 WL 4478151, at *1 (E.D. Mo. July 21, 2015) quoting *New Access Commc'ns LLC v. Qwest Corp.*, 378 F.Supp.2d 1135, 1138 (D. Minn. 2005). Plaintiff is pleased that the City and Missouri have apparently resolved their differences and that the City has finally unequivocally affirmed it "will pay any judgment in this matter." D.E. 636 at 2. That admission does not alone demonstrate good cause as to why this Court should deviate from the norm by granting an exception and waiving bond.

The motion to waive bond should be denied for the following reasons:

(1)    The MOU is not final because the parties have not agreed to a material term of the agreement.
(2)    The City has not and cannot demonstrate that it will be able to pay the judgment upon conclusion of the appeal.
(3)    The City has not offered any evidence that a mechanism exists to ensure payment will be made.
(4)    The City's backup plan – the Rams money – is illusory.
(5)    The City's finances are precarious at best.

1

The City has, however, provided an alternative the Court should embrace. Assistant Comptroller Donald Knese provided an affidavit stating that the City is willing and able to create a separate account within the "City's Judgment fund for the purpose of setting aside the amended judgment in this case" and that the account would be interest-bearing. If the City can create such an account, then it could also deposit the same amount into the Court's registry, which would solve this problem. The Court should provide the City with this option as an alternative to a traditional appeal bond.

## I.      The MOU is Not Final.

The City is asking the Court to base its ruling on an "agreement" that is not executed by the parties and, more importantly, lacks agreement on a material term. Buried in footnote 2 on page 2, the City admits that "[a]s condition [sic] to the MOU, the City and Missouri Attorney General have agreed to a cap on outside counsel fees incurred from January 1, 2026 to present (relating to Section 3.2 of the 0MOU). *All parties must agree to the cap number for that period for the MOU to be effective*." D.E. 636 at 2, n. 2 (emphasis added). By their own admission, the MOU is *ineffective*. At present, then, the MOU is meaningless and should not be considered by the Court.

## II.     The City Has Not and Cannot Demonstrate that It Will Be Able to Pay the Judgment Upon Conclusion of the Appeal.

Mr. Payne's declaration discusses the *current* state of the City's finances. As he testified in this case, the City is currently in a surplus. *See* D.E. 552:7 at 125:22-126:8. Mr. Payne's declaration does not, however, predict the City's future finances. His sworn testimony does. In court, Mr. Payne testified about revenue shortfalls. *Id.* He specifically testified to a $40 million revenue shortfall due to less than expected payments of the City's earnings tax. *Id.*, at 126:9-14. Mr. Payne anticipated that future budgets will be detrimentally affected by the downturn in the

earnings tax. *Id.* His declaration never considers the many ways in which the City's budget could be devastated – budgetary cuts his own boss, Mayor Spencer, recently identified.

Focusing only on the City's present ability to pay is not enough. "The party seeking the stay must objectively demonstrate that it has the present financial ability to facilely respond to a money judgment and *present to the court a financially secure plan to maintain that ability during the pendency of the appeal. FTC v. Neiswonger*, No. 4:96CV2225SNLJ, 2008 U.S. Dist. LEXIS 138081, at *3-4 (E.D. Mo. Oct. 16, 2008) (quoting *Poplar Grove Planting & Ref. Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979)).

The City has not presented to the Court any financially secure plan to maintain its ability to pay during the pendency of this case's appeal. For that reason alone, the motion must be denied. But even considering the evidence the City has offered of its present ability to pay, the Court should not trust the City will be able to pay the judgment when this litigation is over.

A.   **The City Has Not Identified an Effective Procedure in Place for Paying the Judgment.**

"Courts are generally reluctant to waive the bond requirement for governmental entities unless funds are readily available and *an effective procedure is in place for paying the judgment*." *Brinkman v. Dep't of Corrections*, 815 F. Supp. 407, 409 (D. Kan. 1993) (emphasis added).

The City ostensibly once had a mechanism in place for paying judgments. As Mr. Payne testified at trial, the City once maintained an entity known as the Public Facilities Protection Corporation ("PFPC"). *Id.* at 121:18-122:10. According to Mr. Payne, the PFPC "was a mechanism for basically doing what we're doing today, which is setting aside monies for judgments." *Id.* at 122:1-3. Mr. Payne confirmed, however, that the City dissolved the PFPC. *Id.* at 122:7-10. Mr. Payne's declaration does not identify any new mechanism replacing the PFPC.

3

Instead, Mr. Payne vaguely described how the City might be able to pay the judgment when appeals conclude. That "plan" consists of:

1. Working with the Comptroller's office to see if unspent budget amounts can be re-allocated to the judgment; and

2. If the unspent budget amounts do not cover the judgment, the City "*can allocate funds from the Rams Settlement as well as its reserve funds to cover the judgment.*" D.E. 636-2 ¶ 6 (emphasis added).

Missing from this description is the mechanism to actually reallocate these funds. Previously, City Counselor Michael Garvin testified under oath that if sufficient funds did not exist in the PFPC to cover a judgment, "a supplement[al] [sic] appropriation would need to be recommended by the Board of Estimate and Apportionment and approved by the Board of Aldermen." Exhibit A, Garvin Dep. 48:13-21. Since the City has not addressed this issue, one can only presume that the mechanism would be the same even under Mr. Payne's plan. Mr. Payne does not appear to have unilateral authority to either reallocate unspent money or allocate funds from the Rams Settlement or reserve funds. That can only happen with approval by both the Board of Estimate and Apportionment and the Board of Aldermen.

Bonds should not be waived when the process to obtain payment is dependent on legislative approval. *Lightfoot v. Walker*, 797 F.2d 505, 506 (7th Cir. 1986) (denying waiver of bond because "the procedure for collecting a judgment against the state is not only cumbersome and time-consuming, but uncertain in outcome, since the judgment cannot be paid unless and until the state legislature votes to appropriate the money necessary to pay it"); *Lamon v. Shawnee*, 758 F. Supp. 654, 657 (D. Kan. 1991) (rejecting city's request to waive bond because "defendant's assertion that it could raise the money by collecting taxes or by issuing bonds to be unassuring").

4

The case relied upon by the City does not support waiver under these circumstances. In *Dillon v. Chicago*, 866 F.2d 902, 905 (7th Cir. 1988), affidavits established that money was "guaranteed to be paid from the Corporate Payroll Fund of the City of Chicago," a fund that was specifically designed to, in part, pay civil judgments and which had a budget of $484 million (in 1988 dollar value).

In *Contreras v. City of L.A.*, No. 2:11-cv-1480-SVW-SH, 2013 LX 50497, at *8 (C.D. Cal. May 20, 2013), the court also refused to waive the requirement for a bond finding that *Dillon* was not applicable because first, the City was pointing only to the general reserve fund, not a specific fund for settlements; and second, payment must be approved by the "City's Claim Board, Council and Mayor."

In this case, Mr. Payne testified that the City only budgets $4 million annually for *all* police judgments. *See* D.E. 552:7 at 119:17-21. To garner sympathy from the jury, Mr. Payne stated that any judgments over $4 million would require cuts to the City's "park department, street department, public safety, health department." *Id.* at 119:22-120:15. Mayor Spencer recently testified to the Missouri General Assembly that even after the judgment in this case, the City is only setting aside $4 million annually for all police cases, while also acknowledging that 50 to 70 police cases remain outstanding "that are considerable." *See* https://www.youtube.com/watch?v=pIZosr5tqg4&t=3386s starting at 57:46. Far from the $484 million in *Dillon*, the City has not budgeted enough to cover this judgment, much less the 50 to 70 other considerable police cases. This also does not account for the fact that the City will also ultimately be responsible for all future litigation, since the Board of Police Commissioners' budget is paid for by the City, and the State only contributes a maximum of $1 million to police settlements and judgments.

5

In sum, the affidavits establish that the City does not have a specific reserve fund sufficient to cover this judgment and reallocating the budget to obtain that money will require legislative approval. For these reasons, this case is identical to *Contreras*, *Lightfoot*, and *Lamon.* The result should be the same – the City should not be permitted to stay execution without posting a bond.

**B.      The City's Plan to Obtain Money from the Rams Settlement or Reserves is Illusory.**

As discussed above, the backup plan Payne proposes is to allocate money from the Rams Settlement and/or the City's reserves. Mr. Payne does not break down how much money is in reserve versus the Rams Settlement. The most recent news article cites Alderman Rasheen Aldridge's claim that the remaining Rams Settlement money is approximately $250 million. *See* Exhibit 2 at 3. Accordingly, the reserve amount would only be $50 million.

The backup plan is illusory because the Rams money could be allocated by the Board of Aldermen at any time. As noted in the article, "City leaders have struggled for years to reach consensus on how to spend the Rams settlement." *Id.* at 4. Alderman Aldridge stated that he hopes the Rams money will be spent on tornado relief. *Id.* at 2. Mayor Spencer is quoted saying "[w]e are working on a plan to spend the Rams dollars." *Id.* at 4. In other words, because city politicians are actively attempting to allocate the Rams money, it is highly likely that in the year or two, the Rams Settlement money will be gone.

**C.      The City's Financial Situation is Precarious at Best.**

In *Contreras*, the court also found that the uncertain state of the City's finances weighed in favor of requiring a bond. *Contreras*, No. 2:11-cv-1480-SVW-SH, 2013 LX 50497, at *8-9 (C.D. Cal. May 20, 2013). The court discussed media reports of a budget shortfall for Los Angeles, which in 2013 had a budget of roughly $7.25 billion, substantially higher than the City's budget

today.[1] "Absent a bond, Plaintiff would be without any security whatsoever in the event of the City's bankruptcy." *Contreras v. City of L.A.*, No. 2:11-cv-1480-SVW-SH, 2013 LX 50497, at *11 (C.D. Cal. May 20, 2013).

The City casually dismisses any discussion of bankruptcy, but the evidence shows that the City's financial situation is precarious at best and bankruptcy is certainly possible.

### 1.     The Police Budget.

As the Court is aware, the State of Missouri recently took over the St. Louis Metropolitan Police Board, but the City is still required to pay the police budget. The changeover also purports to require the police budget to be increased to 25% of the City's general revenue by 2028. The City and the Police Board are nowhere close to agreeing on a new police budget. Mayor Spencer posted a statement on her official government page titled "Mayor Spencer Warns of Massive Service Cuts and Layoffs if State-Controlled Board of Police Commissioners' Budget is Finalized." *See* Exhibit 2. The press release says:

> Today, Mayor Cara Spencer warned that St. Louis residents should expect significant service cuts and mass layoffs for City staff if the budget certified by the state-controlled Board of Police Commissioners for the Police Department is finalized at its current amounts…The budget certified by the Police Board today is wildly out of sync with what the City of St. Louis can afford to do without crippling our other departments, cutting services like trash pickup, park maintenance and fixing our roads. If the Board of Police Commissioners does not change the budget they certified today, they will force the City to look at mass layoffs in other departments to compensate for the cost.

During a recorded meeting of the Police Board, which Mayor Spencer is a member of, she stated, "[t]his budget, make no mistake, would cripple the city of St. Louis…This budget is a real slap in the face to the city worker's work in every other department who not only deserve raises as well but deserve to keep their jobs…We are between $50 and $75 million dollars (per year)

---

[1] https://cao.lacity.gov/budget/summary/BudgetSummary2012-13.pdf

apart."[2] ST. LOUIS MAGAZINE quoted Mayor Spencer at meeting as saying that if the board approves the current proposal she is going to have to look at "Streets, Refuse, and every other department" and make "massive layoffs." *See* Exhibit 3.

Indeed, at the time of the hearing on this motion, the budget proposed by the Board of Police Commissioners was approximately $261 million, representing a 20% increase from the last year of local control. *See* Exhibit 4. A week after the hearing, Mayor Spencer reported that the Board's budget request had grown even higher, pointing to a spreadsheet sent by the Board stating that the City may be statutorily required to pay $333 million. *See* Exhibit 5. The Board disputes that they officially made this request, but notably, the Board appears to be claiming that the police are entitled to 25% of the Rams money. *Id.*

The Police Board has also authorized a 7% increase in salary for police officers. This salary increase has a knock-on effect of increasing police pension costs *and* increasing salaries and pension costs of St. Louis firefighters because the City Charter requires any increase to police salaries to be matched with an increase in firefighter salaries. *See* Exhibit 6. The City has already implemented a pay freeze for other city employees because of this increase in police salaries by the board. *Id.*

As demonstrated above, the police budget situation is highly volatile, and even the mayor has warned that the increased police budget, alone, could "cripple the City of St. Louis."

### 2. Litigation Costs are Unbudgeted.

During sworn testimony before the Missouri Senate Transportation, Infrastructure, and Public Safety Committee on March 2, 2026, St. Louis Mayor Cara Spencer testified under oath as follows:

---

[2] https://www.youtube.com/watch?v=L640iQop0I4

When it comes to litigation matters, I will say the city puts aside $6 million a year for lawsuits. Two [million] we earmark for general function of the city and four [million] we earmark for the police department. We had several large settlements, and I believe we have between 50 and 70 cases outstanding that are considerable. You may have seen the recently an $18 million judgment. It was reduced to just over eight, but these are judgments that often carry very, very significant costs and they are a large burden to us.

\*\*\*

Our budgets are very tight. **We don't have a lot of carryover, particularly once we've implemented raises as put forward by the police board. We're operating on very, very thin margins** and we need a level of accountability and reliability and consistency in order to keep the staff for all of our city departments, including those who plow the streets, fill our potholes, and do the things the city needs to do to keep its citizens happy and to paying taxes within the city of St. Louis in the state of Missouri.

*See* https://www.youtube.com/watch?v=pIZosr5tqg4&t=3386s – the above statement starts at 57:46. The Mayor explicitly stated that this case (which she references via the $18 million judgment) and other similar cases pose a major budgetary concern.

### 3.    The Tornado.

Unfortunately, the police budget is only one of many fiscal issues facing the City. Amplifying the City's deficit, ten months ago, the City suffered a devastating tornado. The City recently reported that "the cost of meeting all requests for repair could run the city between $150 million and $400 million," which is "well above the $15 million or so appropriated as of late last month." *See* Exhibit 7. Other documents suggest the administration allocated $428 million to recovery efforts against an estimated $1.6 billion in damages. *See* Exhibit 8. This shows a deficit of $1.2 billion in future needs. Only an additional $86M might be coming from the state. *See* Exhibit 9. Current funds could expire by May. *See* Exhibit 10.

9

As mentioned above, one alderman has indicated a desire to use the Rams money to fund these repairs, but even spending all the Rams money and the City's reserve would not cover the estimated $400 million in repairs. *Id.*

### 4.    The Earnings Tax.

In April, St. Louisans will vote on abolishing the City's Earnings tax. *See* Exhibit 11. The earnings tax represents 36% of the City's general revenue funds. *See* Exhibit 12. Mayor Spencer has said the tax is critical to how the city functions and it would cripple the city not to have that money. *See* Exhibit 13. On her Facebook page, Mayor Spencer wrote "(t)he earnings tax makes up a third of our budget, and without it, every service the city provides, including police and fire services, parks and recreation, maintaining our roads and keeping them free from snow and ice, and so much more, would be severely underfunded and likely impossible to provide in any reasonable way." *See* Exhibit 14.

In sum, the City would like the Court to believe Plaintiff will undoubtedly be paid if he prevails on an appeal. However, the City does not address the budgetary devastation of the Earnings Tax being voted down, the Police Board getting its budget, the cost of tornado relief, and the uncertain litigation costs that may be incurred in the future.

## III.    Requiring Bonds is Standard Practice and The City Has Not Demonstrated Good Cause to Deviate from This.

As the Court noted, bonds are routinely posted by large corporations and governments that have billions of dollars of assets. *See Kennedy Building Associates, Plaintiff-appellee, v. CBS Corporation, Defendant-appellant*, 476 F.3d 530 (8th Cir. 2007) (CBS, one of the largest companies in the world, ordered to post $1,311,000 bond); *Telex Corp. v. International Bus. Machines Corp.*, 464 F.2d 1025 (8th Cir. 1972) (preliminary injunction dissolved because trial court failed to require IBM to post a bond pursuant to Rule 65(c)); *Conagra, Inc. v. Tyson Foods,*

10

*Inc.*, 708 F. Supp. 257, 270 (D. Neb. 1989); *Central Telecommunications v. TCI Cablevision,* 610 F. Supp. 891 (W.D. Mo. 1985) ("Although the Court does not doubt TCI's integrity, it does not believe that plaintiff should be required to bear any risk pending appeal."); Gander v. FMC Corp., 733 F. Supp. 1346, 1347 (E.D. Mo. 1990) (Corporation posts bond of $2,200,000); *Wilmer v. Bd. of County Com'rs, Leavenworth, KS*, 844 F. Supp. 1414 (D. Kan. 1993) (Government entity ordered to post bond of $798,071.62, which is 1/10th the size of the judgment in the instant case).

There is no reason why bond should not also be granted here. A bond in this case will do what a bond is intended to do: protect Plaintiff from unanticipated, unrelated litigation that he is not part of, budgetary debates, and potential loss of substantial revenue due to an April election.

## IV.    The City Has the Option and Apparently the Ability to Pay the Money in the Registry of the Court.

A constant theme in the City's supplemental response is that requiring the City to purchase a bond at taxpayer expense is a waste of money. *See* D.E. 636 at 1, 3, and 4. What the City ignores is that the City is not required to pay a bond. Federal Rule of Civil Procedure 62 allows the City to "obtain a stay by providing a bond *or other security*." The City is entitled, of course, to deposit into the Court's registry the full amount of the judgment, plus a cushion for future interest and attorneys' fees. *See, e.g.*, *Harvey v. Lake Buena Vista Resort, LLC*, No. 6:07-cv-1641-Orl-DAB, 2008 U.S. Dist. LEXIS 127922, at *3 (M.D. Fla. June 18, 2008).

Fortunately for all parties, the City has agreed to segregate the necessary funds. Assistant Comptroller Donald Knese provided an affidavit stating that the City is willing and able to create a separate account within the "City's Judgment fund" for the purpose of setting aside the amended judgment in this case and that the account would be interest-bearing. D.E. 636-3. Nothing in this affidavit, however, suggests that creating this separate account would prevent the Board of

11

Aldermen from reappropriating this money, especially if any or all the budgetary problems described above come to pass.

If the City can segregate these funds, then it can pay that amount into the Court's registry, which would also be in an interesting bearing account. *See* Fed. R. Civ. P. 67. This would prevent the "segregated" funds from being re-appropriated by the Board of Aldermen and would solve the concern of requiring the City and its taxpayers to waste money on a bond.

The only remaining issue, then, is how much should be deposited. The total amount currently outstanding consists of:

A.   $8,638,336.14 –

    a.   Judgment of $8,250,000

    b.   Interest of $388,336.14: $938.01 per diem as post-judgment interest (calculated as $8,250,000.00 x 4.15% divided by 365 days) from January 31, 2025 to today (414 days).

B.   $830,178.06 –

    a.   Attorneys' fees of $825,858.66

    b.   Interest of $4,319.40: - $93.90 per diem as post-judgment interest (calculated as $823,924.46 x 4.15% divided by 365 days) from February 3 to today (46 days).

C.   23,847.59 - Costs

D.   Total Amount Outstanding as of Today: **$9,492,361.79**

The amount deposited should account for the judgment amount, interest for the appellate period, which could be one to two years, and attorneys' fees for the appeal. To account for this, courts have required such payments to include a 25% cushion. *Harvey v. Lake Buena Vista Resort,*

*LLC*, No. 6:07-cv-1641-Orl-DAB, 2008 U.S. Dist. LEXIS 127922, at *3 (M.D. Fla. June 18, 2008) (requiring court registry deposition to include 25% cushion); *Brinkman v. Dep't of Corr.*, 815 F. Supp. 407, 408 (D. Kan. 1993) (noting that the court's local rules required a supersedeas bond in the amount of the judgment plus 25%).

Accordingly, the Court should order Defendants to pay into the court registry $11,865,452.20 ($9,492,361.79 * 1.25).

For the above reasons, the City has not met its burden to justify waiving bond. The City should deny the motion except to allow the City to deposit 11,865,452.20 into the Court's registry.

Dated:  March 20, 2026

**KHAZAELI WYRSCH, LLC**

/s/ James R. Wyrsch
Javad M. Khazaeli, 53735MO
James R. Wyrsch, 53197MO
John M. Waldron, 70401MO
911 Washington Avenue, Suite 211
St. Louis, Missouri 63101
(314) 288-0777
(314) 400-7701 (Fax)
javad.khazaeli@kwlawstl.com
james.wyrsch@kwlawstl.com
jack.waldron@kwlawstl.com

THE LEGAL SOLUTIONS GROUP
Jermaine Wooten, 59338MO
10250 Halls Ferry
St. Louis, Missouri 63136
(314) 736-5770
(314) 736-5772 (Fax)
wootenjlaw1@aol.com

*Attorneys for Plaintiff*

13